1        IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF TEXAS

3               PECOS DIVISION

4
UNITED STATES OF AMERICA,      )      P-05-CR-234
5              Government,      )
                               )
6                              )
VS.                            )      PECOS, TEXAS
7                              )
                               )
8   JOSE AGUIRRE-ESTRADA,       )
               Defendant.      )      March 20, 2006
9

10
            TRANSCRIPT OF JURY TRIAL VOLUME 1
11
          BEFORE THE HONORABLE ROBERT JUNELL
12
             UNITED STATES DISTRICT JUDGE
13

14
   A P P E A R A N C E S:
15

16  FOR THE GOVERNMENT:        MR. JAMES J. MILLER, JR.
                              Assistant United States Attorney
17                            2500 N. Highway 118, Suite A-200
                              Alpine, Texas  79830
18                            (432) 837-7332

19
   FOR THE DEFENDANT:         MS. LIZ ROGERS
20                            Federal Public Defender's Office
                              108 N. 10th Street
21                            Alpine, Texas  79830
                              (432) 837-5598

22

23                            MS. CHARLOTTE ALINE HARRIS
                              Federal Public Defender's Office
24                            108 N. 10th Street
                              Alpine, Texas  79830
25                            (432) 837-5598

1   COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
                                 United States Court Reporter
2                                1100 Commerce St., Rm. 1625
                                 Dallas, Texas  75242
3                                (214) 753-2170

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
            The above-styled and numbered cause was reported by
23   mechanical stenography and produced by computer.

24

25

INDEX

Motion in Limine......................................... 7

Jury sworn.............................................. 10

Preliminary Jury Instructions.......................... 10

Ruled Invoked.......................................... 17

OPENING STATEMENT:  Mr. Miller......................... 19

OPENING STATEMENT:  Ms. Rogers........................ 21

|                                        | Direct  | Cross   | Redirect | Recross | Further Redirect |
|----------------------------------------|---------|---------|----------|---------|------------------|
| WITNESSES FOR THE GOVERNMENT           |         |         |          |         |                  |
| MARK AGURE                             | 24      | 29      | 33       | 36      | 37               |
| MARICELA LUJAN                         | 38      | 77      | 93       | 98      |                  |
| JOHN PREWIT                            | 101,108 | 106,118 | 121      | 122     |                  |
| JOHN PREWIT (Called by Ms. Rogers; Jury out) | 125 | 126 | 127 |         |                  |
| MICHAEL L. STEVENSON                   | 157     | 159     |          |         |                  |
| TERRY LUCK                             | 161     | 165     | 166      |         |                  |

Government rests....................................... 167

MOTION:  Ms. Rogers................................... 167

|                                        | Direct  | Cross   | Redirect | Recross | Further Redirect |
|----------------------------------------|---------|---------|----------|---------|------------------|
| WITNESSES FOR THE DEFENDANT            |         |         |          |         |                  |
| MIGUEL SANCHEZ                         | 172     | 178     | 184,186  |         |                  |

REDI FRANCO              188    196

SALVADOR ESTRADA         202    205
CHAVEZ

SOCORRO AGUIRRE          209    217    235,237
DE ESTRADA

YOLANDA TAPIA-           239    244     251      252
PLIEGO

SOCORRO FIERRO-          256    262
ESTRADA

Defenses rests.......................................... 271

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESS FOR THE GOVERNMENT | | | | | |
| MICHAEL L. STEVENSON | | | 273 | 275 | |

Government closes.................................... 276

Defense closes...................................... 277

MOTION:  Ms. Rogers................................. 278

GOVERNMENT'S EXHIBITS                                    Received

   1   FD 249 Fingerprint Card 10/27/05                    46

   2   Certificate of Custodianship - A-File 41907686      47

   3   Mexican Birth Certificate 05/29/78                  49

   4   Mexican Birth Certificate 08/05/87                  49

   5   Application for Immigrant Visa 09/01/87             51

   6   R-84 Final Disposition Report 02/20/89              52

   7   Photo and Fingerprint Card                          54

| | | | |
|---|---|---|---|
| 1 | 8 | I-213 with record from Huntsville (redacted), | 56 |
| 2 | | two fingerprint cards, FD 249 and R-84, I-200, I-286, I-221, EOIR, I-294, I-205 07/11/89 | |
| 3 | 9 | Two FD 249 fingerprint cards dated 10/07/90 and | 57 |
| 4 | | 10/09/90 respectively; I-200, I-221, I-294, I-205 05/06/9256 | |
| 5 | 10 | I-200, I-286, FD 249 (fingerprint card), I-221, | 59 |
| 6 | | Photo, I-385, EOIR, I-294, I-205 10/13/94 | |
| 7 | 11 | I-871, I-205 09/09/04 | 59 |
| 8 | 12 | Certificate of Nonexistence | 61 |
| 9 | 14 | Socorro Aguirre's A-file | 236 |

DEFENDANT'S EXHIBITS                                    Received

| 10 | | | |
|---|---|---|---|
| 11 | 1 | Birth Certificate | 30 |
| 12 | 5-A | Map | 194 |
| 13 | 5-B | Map | 194 |
| 14 | 5-C | Map | 194 |
| 15 | 5-D | Map | 194 |
| 16 | 6-A | Photograph | 190 |
| 17 | 6-B | Photograph | 190 |
| 18 | 6-C | Photograph | 190 |
| 19 | 6-D | Photograph | 190 |
| 20 | 6-E | Photograph | 190 |
| 21 | 6-F | Photograph | 190 |
| 22 | 6-G | Photograph | 190 |
| 23 | 7 | Baptismal Book | 181 |
| 24 | 8 | Yolanda Tapia-Pliego's documents | 242 |
| 25 | 9 | Affidavit | 258 |

1          (March 20, 2006)

2          (Defendant present)

3          THE COURT:  Would the clerk call the case.

4          THE CLERK:  The Court calls Pecos 05-CR-234, the

5   United States of America versus Jose Aguirre-Estrada.

6          MR. MILLER:  Jay Miller for the United States.  We

7   are present and ready.

8          MS. ROGERS:  Liz Rogers and Charlotte Harris on

9   behalf of Mr. Aguirre-Estrada, and we are ready.

10          THE COURT:  And Mr. Aguirre-Estrada I understand does

11   not need an interpreter; is that correct?

12          THE DEFENDANT:  No, Your Honor.

13          THE COURT:  Okay.  So you can go -- you understand

14   English.  If at any time during this proceeding you do need an

15   interpreter, would you let Ms. Rogers know so she can notify

16   me?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  And we have Ms. Nazaroff available.

19          Mr. Miller, are you ready to go?

20          MR. MILLER:  Just about, Your Honor.  My case agent

21   just walked out, and I have got my witnesses here if you want

22   to swear them in.

23          THE COURT:  What we will do, let me go -- let's get

24   the jury in, get them instructed -- sworn in, instructed.  Then

25   I will bring them up and invoke the rule on the agents.

1          Ms. Rogers, do you have anything we need to take up?

2          MS. ROGERS:  Can we address a motion in limine, Your

3    Honor?

4          THE COURT:  All right.

5          (Pause)

6          MS. ROGERS:  The Government is going to introduce all

7    the things they were showing us.  We are going to object on

8    Crawford grounds, but I will concede to you the Fifth Circuit

9    allows it in.  I need to make an objection every time it comes

10   in.

11         THE COURT:  Let's go ahead and do it right now.

12         MR. MILLER:  Okay.  Your Honor, regarding the

13   Crawford objection, the United States would argue that the

14   A-File is nontestimonial, which Crawford covers.  And we would

15   cite United States versus Rueda, R-U-E-D-A, Rivera.  It's cited

16   at 396 F.3d 678.  That is a Fifth Circuit case, decided

17   January 10th of 2005.  And they basically said not only is the

18   A-File nontestimonial and admissible, but also a certificate of

19   nonexistence as well.

20         THE COURT:  Okay.

21         MS. ROGERS:  I have to agree with Mr. Miller on all

22   those things, except we think it is wrongly decided, and we

23   want to reserve our chance to go to the Supremes on it again,

24   particularly because the Rueda case is out of the Fifth

25   Circuit.

     1          But particularly the Crawford opinion is directly on

     2   point for the certificate of nonexistence, because it is

     3   absolutely a document that is testimonial, that is prepared for

     4   the purpose of prosecution.  And we believe that Crawford is

     5   on -- squarely on point on that, even though Rueda allows it to

     6   come in.

     7          THE COURT:  I'm going to overrule the Defendant's

     8   objection.  The A-File is admissible.

     9          I want you to go through -- there may be some

    10   things -- I don't know.  I haven't seen the A-File, but what I

    11   would ask you to do is go through the A-File.  There may be

    12   some specific references that may not be -- that may have other

    13   objections.

    14          Does that make sense what I'm saying?  In other

    15   words, it may refer to some sort of offense that would not

    16   necessarily be admissible in the case.  So before we introduce

    17   it, what I would like to do is Government and defense go

    18   through the file.

    19          I find that it is not a violation of the Defendant's

    20   Sixth Amendment right to confrontation and is admissible with

    21   the proviso y'all go through the file together and see if there

    22   is anything that needs to be redacted.

    23          MS. ROGERS:  He provided it to us before court, and

    24   we asked to change some where it says crime committed.

    25          THE COURT:  Yeah.

1          MS. ROGERS:  We are asking to get rid of that stuff

2     even though it's on the original.

3          MR. MILLER:  Your Honor, we do have one other issue

4     if we can raise it.

5          THE COURT:  What is the issue?

6          MR. MILLER:  We want to offer the J&C from a

7     conviction of this defendant, a violation of 8 U.S.C. 1326,

8     with a witness Michael Stevenson, a probation officer out of

9     Baton Rouge.

10          And we have three separate cases we would argue and

11     would not -- we're not asking that that be brought in as

12     conclusive evidence that this defendant is an alien, but it

13     would be evidence to establish an element that we must prove

14     that there is evidence there that he is possibly an alien

15     coupled with other evidence that we have.

16          THE COURT:  Well, why don't we -- are you going to

17     bring that up in your opening?

18          MR. MILLER:  No, we will not.

19          THE COURT:  Don't call that witness.  We will take it

20     up at a break.

21          MS. ROGERS:  And I would object vehemently.

22          THE COURT:  Yes.

23          Ms. Rogers, are you ready?

24          MS. ROGERS:  Ready.

25          THE COURT:  You might move that box so you don't trip

1    over it.

2           Let's all rise for the jury, please.

3           (Jury in)

4           THE COURT:  Would you please raise your right hand

5    and let Mrs. LaForge swear you as a juror in this case?

6           (The jury was sworn)

7           THE COURT:  Please be seated.

8           Good morning.  The District Court comes to Pecos, and

9    it rains.  Just remember that.  I hope all of you got some of

10   that wonderful rain the last couple of days.

11          So let's make sure we have the right persons here.

12          We have Ms. Martinez, Mr. Bowden, and Mr. Love,

13   Ms. Guerrero, Mr. Anderson, Ms. Loera, and Ms. Grubb.

14          And then we have Ms. Alligood, and Mr. Garza,

15   Ms. Armendariz, Ms. Cotton, Ms. McKay, Mr. Rodriguez, and

16   Mr. Hernandez.

17          We appreciate y'all being here this morning.

18          You've now been sworn as the jury to try this case,

19   and you and you alone will decide the disputed issues of fact,

20   and I will decide the questions of law that may arise during

21   the trial.  And before you retire to deliberate at the close of

22   the case, I will instruct you on the rules of law that you must

23   follow and apply in deciding upon your verdict.

24          Nothing that I say or do during the course of the

25   trial is intended to indicate nor should be taken by you as

1   indicating what your verdict should be.  Your verdict should be

2   based upon your own independent assessment of the facts in this

3   case as applied to the law in which I will instruct you at the

4   conclusion of the case.

5        The evidence from which you will find the facts will

6   consist of the testimony of witnesses, documents, and other

7   things received into the record as exhibits and any facts the

8   lawyers agree or stipulate to or that I may instruct you to

9   find.

10        Certain things are not evidence and must not be

11   considered by you as evidence, and I will list those for you

12   now.

13        These are really fine lawyers.  Do you remember

14   Mr. Miller -- Mr. Miller, Ms. Harris, who was here the other

15   day, and Ms. Rogers, who is her partner and will be trying this

16   case.  They will be trying it together.

17        But these are really fine lawyers.  But as good as

18   they are, their statements and arguments and questions are not

19   evidence.  Their objections to questions are not evidence.

20        Lawyers have an obligation to their client to make an

21   objection when they believe evidence being offered is improper

22   under the rules of evidence.

23        You should not be influenced by the objection or by

24   my ruling on it.  If I sustain the objection, ignore the

25   question.  If I overrule the objection, treat the answer like

1    any other.

2           If you're instructed that some item of evidence is

3    received for a limited purpose only, you must follow that

4    instruction.  And testimony that I exclude or tell you to

5    disregard is not evidence and must not be considered.  And

6    anything you have seen or heard outside the courtroom is not

7    evidence and must be disregarded.

8           You are to decide this case solely on the evidence

9    presented here in the courtroom.

10          There are two kinds of evidence:  direct and

11   circumstantial.

12          Direct evidence is proof of -- is direct proof of a

13   fact, such as testimony of an eyewitness.  Circumstantial

14   evidence is proof of facts from which you may infer or conclude

15   that other facts exist.

16          Let me give you an example.

17          When I got appointed to be a judge, we moved from

18   San Angelo, which is my home, over to Midland and we bought a

19   little townhouse, I soon met our mailman, Chris.  And some days

20   I get home, and I see Chris actually there, and he or some

21   other postal worker actually put the mail in the mailbox.  I'm

22   an eyewitness.  I could testify that the postal service

23   delivered my mail.

24          Most of the time I'm not there.  But if I leave in

25   the morning and I don't have mail in my mailbox, so I could

1   testify to that fact.  I come home 6:00, 6:30 in the evening

2   and I open my mailbox, I could testify to that fact.  And there

3   is within my mailbox properly addressed, postmarked, stamped

4   catalogs or mail.  If you're like me, you get catalogs and

5   bills more than other kind of mail, but it is in my mailbox.

6   Then I could testify and we conclude from circumstantial

7   evidence that Chris or somebody from the post office delivered

8   the mail even though we never saw him.

9        You can consider both direct evidence and

10  circumstantial evidence.

11       The law makes no distinction as to your weight in

12  deciding those kinds of issues concerning that type of

13  evidence.

14       One of your important jobs is to decide which

15  witnesses to believe, which witnesses not to believe, and how

16  much of any witness's testimony to accept or reject.

17       You should give careful attention to the testimony

18  and evidence presented for your consideration during the trial,

19  but you should not form or express any opinion about the case

20  one way or the other until you have heard all of the evidence

21  and have the benefit of the closing arguments of the lawyers

22  and my instructions on the law.

23       Although exhibits which I admit into evidence during

24  the course of the trial will be available to you for your

25  inspection and review during your deliberations on a verdict,

1    under normal circumstances no written transcript of the

2    testimony of witnesses can be made available to you for your

3    review during your deliberations.  Nor under normal

4    circumstances can all or any significant portion of a witness's

5    testimony be read to you once you commence your deliberations.

6            Sometimes juries go back and one juror may say, "You

7    know, that first witness, Mr. Smith, he said this."

8            And another juror will say, "No, Mr. Smith didn't say

9    that.  He said this."

10            And they will kind of argue back and forth, and

11    somebody will say, "You know, I watched Law & Order on TV last

12    night, and they had a really smart judge in that case, not like

13    our judge, and that judge just brought the jury in and had the

14    court reporter read the -- what the witness said."

15            Well, that happens on Law & Order, but it doesn't

16    happen in real cases, so -- very often.  It is a very, very

17    unusual circumstance.

18            You have been given notepads.  You are free to take

19    notes or not take nodes.  If notes will help you, that is

20    entirely up to you to do.  If notes will help you keep up with

21    the witnesses and what people say, well, that's fine.  Feel

22    free to take notes.  It's not about who the best note-taker is.

23    Some people feel, I can remember all this.  You should let your

24    memory take precedence over your notes if you get into a

25    conflict of what is said.

1          If you decide to doodle or draw and you make a

2     picture -- you draw the Judge, thin with hair would be very

3     much appreciated.

4          During the trial you must not discuss the case in any

5     manner among yourselves or with anyone else, and you must not

6     permit anyone to attempt to discuss it with you or in your

7     presence.

8          Not only are these good lawyers, they are very nice

9     people.

10          You will see people associated with the case, with

11     the parties.  When we leave this -- this is a big courtroom,

12     but when we leave, there is one elevator, and there's a

13     stairwell over here, and so you may run into them.  And this

14     time of year we all want to talk about March Madness or the

15     rain or something like that.  They've been instructed to have

16     no conversation with you whatsoever.  So they're not being rude

17     to you if they don't say anything to you in polite

18     conversation.  They are just following my instructions.

19          Also, don't let anyone else -- we will break this

20     evening and have to come back in the morning to finish up the

21     case.  But don't let anyone have any conversations with you.

22          I don't think there is going to be anything in the

23     newspaper, the radio, or TV.  But if so, don't pay any

24     attention.  Don't listen to it, because we want to decide this

25     case solely on the evidence we hear here in the courtroom.

1          From time to time during the trial, I may be called

2     upon to make rulings of law on motions or objections made by

3     lawyers.  Again, do not infer on conclude from any ruling I may

4     make that I have any opinion on the merits of this case

5     favoring one side or the other.

6          Also during the trial it may be necessary for me to

7     confer with the lawyers out of your hearing concerning

8     questions of law or procedure that require consideration by me

9     alone.  On some of these occasions I may excuse you outside the

10    courtroom so that I can discuss these matters with the lawyers.

11    It will be a convenience to you and to us, and we will do that,

12    and we will try to keep those at a minimum.

13         The trial will now begin.  The lawyers for each side

14    will be given an opportunity to make an opening statement,

15    which may summarize the facts the evidence will show.  Then the

16    Government -- first the Government will make an opening

17    statement, which, again, is simply an outline to help you

18    understand the evidence the Government's attorney expects to

19    introduce.  And then the Defendant's attorneys may elect to

20    make an opening statement.

21         The Government will then present its witnesses, and

22    the attorneys for the Defendant may cross-examine those

23    witnesses.

24         Following the Government's case, the Defendant may,

25    if it elects, present witnesses, and the Government will have

1    the opportunity to cross-examine those witnesses.

2            Subsequently, the Government may decide to present

3    rebuttal witnesses.

4            After all the testimony and evidence is presented,

5    the lawyers will make -- will be given another opportunity to

6    make their summations or final arguments in the case.

7            The statements the lawyers make now, as well as the

8    arguments they present at the end of trial, are not to be

9    considered by you either as evidence in the case, which comes

10   only from the witnesses and exhibits, or as your instructions

11   on the law, which comes only from me.

12           Nevertheless, these statements and arguments are

13   intended to help you understand the issues and the evidence as

14   it comes in, as well as the positions taken by both sides.

15           Ms. Rogers, I assume are you going to invoke the

16   rule?

17           MS. ROGERS:  I am, Your Honor.

18           THE COURT:  All right.  Could I have all the

19   Government's witnesses come up here, please?

20           (Pause)

21           THE COURT:  Stand right there.  And would you raise

22   your right hands, please.

23           (The witnesses were sworn)

24           THE COURT:  All right.  Would you tell me your name,

25   starting on my right, and we will just go across.

1          MR. PRUITT:  John Prewit.

2          THE COURT:  All right, Mr. Prewit.

3          MR. AGURE:  Mark Agure.

4          THE COURT:  Mr. Agure.  I see it now.

5          MR. STEVENSON:  Michael Stevenson.

6          THE COURT:  Mr. Stevenson.

7          MR. LUCK:  Terry Luck.

8          MS. LUJAN:  Maricela Lujan.

9          THE COURT:  And Ms. Lujan is the case agent; is that

10   correct?

11          MS. LUJAN:  Yes, sir.

12          THE COURT:  All right.  So all you gentlemen will

13   need to stay outside the courtroom.  You may not discuss the

14   case or your testimony with anyone but the lawyer.

15          Now, we've been hearing a lot about a case in the

16   paper in Virginia right now.  Y'all don't talk about the case.

17   Don't talk about anybody's testimony.

18          And the case agent, Ms. Lujan, can stay here in the

19   courtroom.

20          All right.  Thank you very much.  Y'all are excused

21   to go outside.

22          (Pause)

23          MR. MILLER:  Your Honor, could I have one moment with

24   Ms. Rogers?

25          THE COURT:  Uh-huh.

1          (Pause)

2          THE COURT:  Are you ready?

3          MR. MILLER:  Yes, we are.

4          THE COURT:  Would you like to move the podium, or do

5   you want it where it is?

6          Cliff, help him move the podium around, if you would

7   like to.  There you go.

8          (Pause)

9          THE COURT:  All right.  Mr. Miller, you are

10  recognized to make an opening statement on behalf of the

11  Government.

12         MR. MILLER:  May it please the Court.

13         THE COURT:  Yes, sir.

14         MR. MILLER:  Ms. Rogers, Ms. Harris.

15         Good morning, ladies and gentlemen.  As you know, my

16  name is Jay Miller.  I represent the Government in this case.

17  The case agent is Maricela Lujan.  She's an enforcement officer

18  for the Customs and Border Protection in Presidio.

19         The evidence we anticipate you will hear today is on

20  October 27, 2005, the Defendant entered the Presidio, Texas

21  port of entry from Mexico.  He was driving a car, and inside

22  the car with him was his mother.  At the time he stated his

23  name was Jose Lopez Aguilar and presented a birth certificate,

24  a delayed birth certificate out of Brewster County.

25         He claimed to be a United States citizen.  We

1    anticipate you will hear the testimony from Officer Mark Agure,

2    and he is going to inform you what he observed and what he

3    heard.

4            The Defendant was nervous.  The Defendant avoided eye

5    contact.

6            When Officer Agure asked him after he presented him

7    this delayed birth certificate, he asked him for a photo

8    identification of the driver's license since he was driving the

9    car.  The Defendant couldn't produce that.

10           Officer Agure also had questions about the delayed

11   birth certificate, when it was issued, when it was filed, the

12   pristine condition it was in, and then referred the Defendant

13   into secondary.

14           Eventually, the Defendant came in contact with

15   Officer Lujan.  Checks were made and red flags went up.

16           The information you will hear from Officer Lujan is

17   that the Defendant had hits showing that he had previously been

18   deported.

19           Agent Lujan didn't take that for what it was, but,

20   instead, she ordered the A-File.  It's an alien file of the

21   Defendant.

22           She also fingerprinted the Defendant.

23           You will hear evidence that this defendant was

24   deported four previous -- on four previous occasions and was

25   warned not to come back unless he had consent of the Attorney

1  General or the Secretary of the Department of Homeland Security
2  to come back into the United States.
3          The Defendant's last deportation occurred in
4  September of 2004, and never received consent to come back in
5  after being deported four times.
6          The evidence is going to show, ladies and gentlemen,
7  that, one, the Defendant is from Mexico, was born in Mexico;
8  two, that he was previously deported or removed on at least
9  four occasions; three, he did not receive consent to come back
10 into the United States.
11         The evidence is also going to show that this
12 defendant, when he came into the United States at the port of
13 entry in Presidio, Texas, presented himself as a United States
14 citizen when, in fact, he knew he was not a United States
15 citizen.
16         Thank you.
17         THE COURT:  Ms. Rogers?
18         MS. ROGERS:  Jose Aguilar is a citizen of the United
19 States and, therefore, cannot be guilty of the two-count
20 indictment, the charges that the Government has alleged.
21         As this case unfolds to you today, it is a story
22 about real people that live on the border, real people that
23 live a traditional way of life that comes into conflict with
24 the regulations and requirements of a massive bureaucracy.
25         We intend to prove that Mr. Aguilar was born in

1   Indian Hot Springs and living most of his life using the name

2   of his stepfather that his mother married shortly after his

3   birth.

4        We will offer proof of a midwife that birthed him at

5   Indian Hot Springs in Hudspeth County.  His mother was living

6   in a little community on the Mexican side of the border when

7   she went into labor.  She was working at Indian Hot Springs

8   when it used to be open and went into labor and had her baby

9   there.

10        Like many poor migrant workers, probably everybody on

11   this jury, everybody in this courtroom has had some contact

12   with because of the area of the country we live in.  They moved

13   about and lived primarily in Mexico while he was young.

14        In fact, his birth father is a man named Lopez, never

15   married to his mother.  He was illegitimate and his Mexican

16   birth certificate was obtained because it was an easier route

17   for them.  And the various family members will testify as to

18   the reasons they got those.

19        This case is a technical, a big paper case because of

20   all the paper involved in the previous deports.  But what he

21   presented was a valid birth certificate, a valid delayed birth

22   certificate that was issued out of Judge Beard's courtroom in

23   Brewster County, and it gives him the right to come into the

24   United States.

25        You have a little interesting story of a conflict

 1   between state and county officials and the Federal Government

 2   in this case, which, of course, is trying to bar his entry.

 3          I appreciate all of your attention.  I know a bunch

 4   of you came from a long way away, as all of us do that get

 5   called to jury duty in Pecos Division.  And I trust you will

 6   take your oath seriously.

 7          When we finish this case, I believe that you will

 8   return a verdict of not guilty on both counts because

 9   Mr. Aguilar is a citizen of this country and, therefore, can

10   enter as he claimed on that day in October.

11          Thank you very much.

12          THE COURT:  Ms. Rogers?

13          MS. ROGERS:  Yes, Your Honor.

14          THE COURT:  Would you please be sure to let me know

15   if you see any of your witnesses come in so we can instruct

16   them?

17          All right.  Mr. Miller, would you call your first

18   witness?

19          MR. MILLER:  Yes.  We call Officer Mark Agure.

20          THE COURT:  Okay.

21          (Pause)

22          THE COURT:  While we are waiting here for just a

23   second, we are going the hear music from one of the -- whatever

24   word processing we have on our computers.  But I get what

25   Mr. Anderson gets on his computer.  So if you hear that come

1   up, it has the -- the agent did not win the lottery.  There it

2   is right there.  We do that for all the witnesses, by the way.

3            Please be seated.

4            State your name, please, sir.

5            THE WITNESS:  Mark Agure.

6            THE COURT:  You were previously sworn as a witness

7   this morning?

8            THE WITNESS:  Yes, sir.

9            THE COURT:  You may proceed, Mr. Miller.

10            MARK AGURE, GOVERNMENT'S WITNESS, SWORN

11                  DIRECT EXAMINATION

12   BY MR. MILLER:

13   Q.   Officer Agure, could you please tell the jury where you

14   work?

15   A.   I work at the U.S. Customs and Border Protection at the

16   Presidio port of entry, Presidio, Texas.

17   Q.   And how long have you worked down there at the port of

18   entry?

19   A.   Approximately nine to ten months.

20   Q.   On October 27th of last year, did you work on that day?

21   A.   Yes, sir, morning hours.

22   Q.   About what time did you come in, do you recall?

23   A.   I worked the morning shift, second shift, but I took the

24   line approximately about 11:00, about 11:30.

25   Q.   When you say you took the line, what do you mean?

1    A.    Took the line is when you assign yourself or take position

2    at the primary contact, in which anybody coming into Presidio,

3    Texas, United States, that's the first contact they have to

4    declare whatever they have to do or declare citizenship or

5    apply for entry.

6    Q.    Okay.  And you said -- this is at the port of entry in

7    Presidio, Texas?

8    A.    Correct.

9    Q.    Which is in the United States?

10   A.    Yes, sir.

11   Q.    And that's in the Western District of Texas?

12   A.    That is correct.

13   Q.    You said you ask them if they had to declare anything.

14   What do you ask folks to declare when they come in -- from

15   Mexico; is that correct?

16   A.    That is correct.  Yes.

17   Q.    Into the port of entry.

18   A.    Some of the basic declaration questions would involve --

19   include fruits, meats, vegetables, their citizenship, any kind

20   of monetary instruments over $10,000.00, pets, liquor, tobacco.

21   Q.    Okay.  Do you recall between 11:30 and noon on the 27th of

22   October of 2005, recall a four-door Honda, 1999 model, enter --

23   gray in color enter the primary lane?

24   A.    Yes, I do remember the dark Honda.

25   Q.    Okay.  Do you recall how many people were in that vehicle?

1    A.    Two.

2    Q.    Do you see the driver in the courtroom today?

3    A.    Yes, I do.

4    Q.    Would you please point that person out and tell us where

5    he or she is sitting?

6    A.    To my left.

7    Q.    To your left?

8    A.    Yes, sir.

9    Q.    Okay.  And I have three people -- actually, I have five

10   people back there.  Who is it that you are referring to?

11   A.    The gentleman with the gray suit, darker tie, sideburns,

12   mustache.

13         MR. MILLER:  Let the record reflect this defendant

14   has identified -- this witness has identified the Defendant.

15         THE COURT:  The record will so reflect.

16   BY MR. MILLER:

17   Q.    Officer Agure, when you came in contact with the

18   Defendant, who was driving the vehicle, and you said there was

19   one other person in the vehicle?

20   A.    Yes, sir.

21   Q.    Who was that?

22   A.    A female, older female who later turned out to be, I

23   believe, the mother.

24   Q.    When the Defendant came in the primary with a woman who

25   you believe to be his mother, what did you ask, if anything?

1   A.   I asked the driver at the time a declaration for his

2   citizenship, in which he stated he was a U.S. citizen.

3   Q.   Did he present you anything at that time?

4   A.   He presented a birth certificate, a smaller sized birth

5   certificate, as proof of his citizenship.

6   Q.   When you say -- was it a birth certificate or a delayed

7   birth certificate, if you recall?

8   A.   As I recall, it was a delayed birth certificate.  And the

9   reason I say it's delayed, because in my experience I saw that

10   the date issued was just a couple of years ago, maybe two or

11   three years ago, versus the age of the individual, what

12   appeared to be the age of the individual.

13   Q.   That struck you as odd?

14   A.   Yes.

15   Q.   Why?

16   A.   Normally, your birth certificates are issued within a few

17   years or few months after your birth, your birth certificate,

18   not a few years -- not three decades or four decades later.

19   Q.   What kind of condition was that small paper birth

20   certificate in?

21   A.   When he handed it to me, it was pristine.  It was very

22   clean, very neat, looked very new to me, which was very odd

23   considering he handed it to me unlaminated and looked like he

24   carried it around.  There were no creases, no signs of wear.

25   Q.   What was the demeanor of the Defendant when you were

1    questioning about him about his citizenship?

2    A.    He was answering the questions; however, he failed to

3    maintain eye contact when I did ask him questions.

4    Q.    What do you mean by that?

5    A.    He maintained looking forward in the driving position

6    without looking at me when I was asking him for his citizenship

7    or if he had any proof of identification.

8    Q.    So you did ask him for other proof of identification

9    besides this piece of paper?

10   A.    Yes.

11   Q.    What did you specify?  Did you ask for anything

12   specifically?

13   A.    I asked him for photo ID, driver's license, something to

14   match up with the birth certificate to show that it is his.

15   Q.    And was the Defendant able to provide anything to you?

16   A.    No, sir.

17   Q.    Based on that, what did you do?

18   A.    Based on my experience and based on what I saw, he had no

19   proof of ID, photo ID, gave me this birth certificate that

20   looked fairly new, I referred him to what's called customs

21   secondary for further questioning and inspection.

22          MR. MILLER:  Your Honor, may I have one moment?

23          THE COURT:  Yes.

24          (Pause)

25          MR. MILLER:  Pass the witness.

1          THE COURT:  Ms. Rogers?

2                   CROSS-EXAMINATION

3    BY MS. ROGERS:

4    Q.   Agent Agure?

5    A.   Agure, yes.

6    Q.   How do I say?

7          MR. MILLER:  Agure.

8    BY MS. ROGERS:

9    Q.   Like Aguirre but with a U instead of --

10   A.   Correct.

11   Q.   You did not know Mr. Estrada or Mr. Lopez Aguirre before

12   you intercepted him coming into the port of entry, correct?

13   A.   No, ma'am.

14   Q.   Never seen him before?

15   A.   Never seen him before.

16   Q.   What he did present you, in fact, was a delayed State of

17   Texas-issued birth certificate; is that correct?

18   A.   That is what it appeared to be.

19          MS. ROGERS:  May I approach, Your Honor?

20          THE COURT:  You may.

21   BY MS. ROGERS:

22   Q.   I marked this as Defendant's Exhibit Number 1, I just got

23   from the Government.

24          Can you identify this?

25   A.   This appears to be the document that he did present that

1  day.

2  Q.   And the reason that you can --

3              MS. ROGERS:  I move to admit it, Your Honor.

4              MR. MILLER:  No objection.

5              THE COURT:  Defendant's Exhibit 1 is admitted.

6                  (Defendant's Exhibit No. 1 received)

7  BY MS. ROGERS:

8  Q.   The reason that you believe it was delayed was because you

9  could see the issue date on it from 2003; is that correct?

10  A.   Yes, ma'am.

11  Q.   And the whole purpose of a delayed birth certificate is

12  when you register a birth after the fact, correct?

13  A.   Correct.

14  Q.   So that normally in the middle class world, where we are

15  born in hospitals and our parents know the procedure, our birth

16  certificates are very contemporaneous with our births?

17  A.   Sounds right, yes.

18  Q.   But not illegal or in any way abnormal for people that

19  don't register the birth that if they later prove that they

20  were born in the U.S. there is a procedure where they can offer

21  their proof and get a delayed birth certificate, correct?

22  A.   Yes, ma'am.

23  Q.   So while you are telling the jury you thought it was odd

24  that it was clean and wasn't laminated, in fact, it was a

25  fairly new document from what you could see, from the issue

1   date, correct?

2   A.   It did appear nice and new and clean.  Pristine, yes.

3   Q.   Did you take any steps on that day to call up to Brewster

4   County, say, to the Clerk's Office and get them to verify that

5   it was a validly issued certificate of birth?

6   A.   No, ma'am.  What I did is I referred them to secondary

7   customs.  And normally they would take steps or measures to

8   verify the authenticity or verify proof of whatever the

9   individuals say or state.

10  Q.   Which is probably what Ms. Lujan would do as the case

11  agent in the case; is that correct?

12  A.   She is one of the individuals that would do that.

13  Q.   So your role, your duty was there at primary, and it

14  raised your attention.  You sent him into secondary.  And he

15  eventually was arrested and charged with this case, correct?

16  A.   Yes, ma'am.

17  Q.   All right.  Now, you've told the jury he was avoiding eye

18  contact with you.  And I know you are relatively a young agent

19  on the port, but would you agree with me that it is not

20  required for anybody to look in your eyes if they don't want to

21  look in your eyes when you're asking them questions?

22  A.   No, ma'am, there is nothing wrong with that.

23  Q.   And probably you have had some experience with cultural

24  differences between different kinds of people that come in

25  where some people don't assert authority as much or they bend

1    their head low to show respect or deference.  Have you had that

2    experience?

3    A.   Yes, ma'am.

4    Q.   Did you question his mother on that day?

5    A.   I merely asked her for her citizenship or proof of

6    citizenship or what citizen she is a country of -- what country

7    she is a citizen of.  And that's as far as I went, because my

8    primary concern at this point was the lack of proof that I had

9    for the actual driver.

10   Q.   All right.  And she -- did she say she was a Mexican

11   citizen?

12   A.   I can't recall.

13   Q.   Okay.  But whatever she said satisfied you, and you let

14   her go on without further scrutiny?

15   A.   Yes, ma'am.

16   Q.   Do you know who the vehicle was registered to?

17   A.   No, ma'am, I didn't go as far as check the registration.

18   Q.   So your role is basically what you've testified to.  You

19   just sent them into secondary for further inquiry into

20   Mr. Lopez Aguirre?

21   A.   That is correct.

22   Q.   Or Aguirre-Estrada?

23   A.   Yes, ma'am.

24   Q.   He presented that birth certificate that says

25   Aguirre-Estrada?

1    A.   Yes, ma'am.

2    Q.   And no other documentation that showed any different name?

3    A.   No, ma'am.  He didn't present anything else.

4         MS. ROGERS:  All right.  May I have a moment, Your

5    Honor?

6         THE COURT:  You may.

7         (Pause)

8         MS. ROGERS:  I'll pass the witness.

9         THE COURT:  Mr. Miller?

10        MR. MILLER:  Yes, Your Honor.

11        (Pause)

12                   REDIRECT EXAMINATION

13   BY MR. MILLER:

14   Q.   Officer Agure, someone who would be a mature age, someone

15   who is dependent -- or independent, I should say, would carry

16   documents usually in a billfold or a purse; is that correct?

17   A.   Yes, they would carry it on their person.

18        MS. ROGERS:  Your Honor, excuse me.  I'm going to

19   object to the question about what people took with them.

20        THE COURT:  Overruled.

21   BY MR. MILLER:

22   Q.   From your experience working at the port, how often do you

23   see small -- you know, small birth certificates while working

24   the primary or even secondary?

25        MS. ROGERS:  Your Honor, excuse me.  Again, I'm

1    sorry.  It's outside the scope of my cross, and it is not

2    relevant to what he did on the case or on this.  And I object

3    for those reasons.

4              THE COURT:  Mr. Miller?

5              MR. MILLER:  She offered the birth certificate into

6    evidence and questioned him about the birth certificate and the

7    condition it was in.

8              THE COURT:  Overruled.

9    BY MR. MILLER:

10   Q.   From your experience working primary and/or secondary, how

11   often do you think you come across paper -- paper or small

12   birth certificates?

13   A.   Approximately 50 to 75 percent of the time.

14   Q.   Based on a birth certificate that size that's been in

15   circulation for a couple of years, what is your experience of

16   the condition it would be in, if it was not laminated?

17   A.   In my experience, if anybody had a birth certificate or a

18   document to carry with them that was that important to them, it

19   would show more signs of wear, as do the rest of the 50 percent

20   or 75 percent of the time that I have seen.

21   Q.   I'm showing you Government Exhibit -- I mean Defendant's

22   Exhibit 1.

23             THE COURT:  Do y'all need the -- can -- let me ask

24   this.  Can the jurors all the way at the end that are closest

25   to the TV, closest to the screen, can y'all see the exhibit all

1    right?

2         Ms. Grubb, Mr. Hernandez, can y'all see it okay on

3    the screen?

4         JUROR GRUBB:  Yes, sir.

5         JUROR HERNANDEZ:  Yes, sir.

6         THE COURT:  Do we need the room darkened at all?

7         Go ahead.

8    BY MR. MILLER:

9    Q.   Mr. Agure, you mentioned earlier that you said the date it

10   was issued and/or filed, that was 2002.  It was filed and

11   issued in 2003, which makes it a little bit over two years old

12   when you saw it in October.

13        That struck you as odd because of how old the

14   Defendant was based on what he presented here?

15   A.   Yes, sir.  That is one of the factors that is involved in

16   my decision making.

17   Q.   And on October 27th, the Defendant was 41 years old?

18   A.   Yes.

19   Q.   And this birth certificate that he had was basically

20   only -- a little bit over two years old?

21   A.   Correct.

22   Q.   And that struck you as odd?

23   A.   Yes, it did.

24   Q.   And the Defendant didn't have any other photo ID,

25   particularly driver's license, to verify this birth

1   certificate?

2   A.   No, sir.  That also struck me as odd.  He had no photo ID.

3   Q.   And coupled with that, when you were talking to him

4   directly, he would not look to you while you were asking him

5   questions?

6   A.   Correct.

7   Q.   And the name that the Defendant used here or presented to

8   you as a claim of U.S. citizen was Jose Lopez Aguirre; is that

9   correct?

10  A.   That is correct.

11          MR. MILLER:  Pass the witness.

12          THE COURT:  Ms. Rogers?

13                  RECROSS-EXAMINATION

14  BY MS. ROGERS:

15  Q.   Mr. Agure, the Texas driver's license has nothing

16  whatsoever to do with citizenship; isn't that correct?

17  A.   That is correct.

18  Q.   A person can get a driver's license and be a citizen of

19  any country in the world if they can qualify for the driver's

20  exam, correct?

21  A.   That is correct.

22          MS. ROGERS:  Thank you.

23          MR. MILLER:  Your Honor, can I --

24          THE COURT:  (Indicating in the affirmative)

25

REDIRECT EXAMINATION

BY MR. MILLER:

Q.   After the Defendant presented you this piece of paper, why did you ask for a driver's license or photo ID?

A.   It has been in my experience that it's very easy to pass off a birth certificate to someone else; therefore, if I feel or I see the birth certificate and see some differences in it such as condition or dates of issue versus the age of the individual passing it on or for even remotely seems like it doesn't belong to them, I will ask for photo ID to make sure that is their document.

Q.   Okay.

MR. MILLER:  Thank you.

THE COURT:  Ms. Rogers?

MS. ROGERS:  Nothing further.

THE COURT:  May this witness be excused, Ms. Rogers?

MS. ROGERS:  Yes, Your Honor.

THE COURT:  Mr. Miller, may he be excused?

MR. MILLER:  Temporarily.

THE COURT:  Okay.  Well, you are excused from the courtroom anyway.  I would ask you not to discuss your testimony or the case with anyone but the attorneys, all right?

THE WITNESS:  Yes, sir.

(Witness excused)

THE COURT:  Call your next witness, Mr. Miller.

1          MR. MILLER:  We're calling Enforcement Officer
2     Maricela Lujan.
3          (Pause)
4          THE COURT:  You may be seated.
5          Would you state your name, please?
6          THE WITNESS:  Maricela Lujan.
7          THE COURT:  And, Ms. Lujan, were you previously sworn
8     as a witness?
9          THE WITNESS:  Yes, I was.
10          THE COURT:  And can you kind of bring that microphone
11     up so everybody can hear you real well?  I'm getting old and
12     deaf.
13          THE WITNESS:  I'm sorry.
14          THE COURT:  You may proceed.
15          MR. MILLER:  Thank you, Your Honor.
16          MARICELA LUJAN, GOVERNMENT'S WITNESS, SWORN
17                    DIRECT EXAMINATION
18     BY MR. MILLER:
19     Q.   Officer Lujan, can you tell the jury where you work?
20     A.   I work at the Presidio port of entry in Presidio, Texas.
21     Q.   And who do you work for?
22     A.   Customs and Border Protection.
23     Q.   And what is your basic duties with Customs and Border
24     Protection there in Presidio?
25     A.   I determine admissibility or inadmissibility of applicants

1  for admission.

2  Q.    How long have you been with CBP?

3  A.    Approximately nine years, ten months.

4  Q.    Okay.  Now, CBP is under the Department of Homeland

5  Security; is that correct?

6  A.    That is correct.

7  Q.    And prior to the Department of Homeland Security coming

8  into existence, you worked for INS; is that correct?

9  A.    That is correct.

10  Q.    And then after the transition, you became a CBP officer;

11  is that correct?

12  A.    That is correct.

13  Q.    What kind of -- strike that.

14        What are your basic duties as an officer for CBP?

15  A.    I determine admissibility or inadmissibility of applicants

16  for admission coming into the United States.

17  Q.    And is this something you do on a daily basis?

18  A.    Yes, it is.

19  Q.    How do you determine an individual's admissibility or

20  inadmissibility into the United States, i.e., what tools do you

21  have at your disposal?

22  A.    Basic tools would be IDENT, TXCS, CIS.

23  Q.    How do you spell that acronym?

24  A.    T-X-C-S.

25  Q.    IDENT, what is that?

1  A.    It's an automatic -- automated biometric identification

2  system which allows us to capture images as fingerprints and

3  photographs and submit those against other comparisons that

4  have already been submitted to the database.

5  Q.    So this is some kind of computer program?

6  A.    Yes, it is.

7  Q.    And you have fingerprints?

8  A.    Yes.

9  Q.    Do you stamp fingerprint cards or actually a person's

10 fingerprints?

11 A.    An actual person's fingerprints.

12 Q.    Okay.  And you said TXCS; is that correct?

13 A.    Yes.

14 Q.    What kind of -- what does that do for you?

15 A.    TXCS allows us to view an individual's criminal history.

16 Q.    Okay.  And CIS?

17 A.    That is our Central Index System which allows us to verify

18 the status of an individual.

19 Q.    Does CIS provide you any other information besides the

20 identity?

21 A.    It allows us to view -- to see if an individual has an

22 A-File assigned to him.

23 Q.    What is an A-File?

24 A.    It is a series of records kept on individuals to document

25 the history of their interaction with DHS.

1    Q.   Now, how would someone, you know -- you said interaction

2    with DHS.  Who would -- or how would a person get an A-File?

3    What are some of the examples?

4    A.   Someone with immigrant status, someone who violates

5    immigration laws, or somebody who has derived or acquired

6    citizenship.

7    Q.   Now, an A-File has a number to it; is that correct?

8    A.   Yes, it does.

9    Q.   And does that number correspond to what we hear, living

10   here on the border, what would be a person's A number?

11   A.   Yes.

12   Q.   So A-File would have a number, and it would be identical

13   to the person if they have immigration documents to an A

14   number --

15   A.   Yes.

16   Q.   -- is that correct?

17        What kind of documents would you find in an A-File?

18   A.   Identity documents, fingerprints, photographs, birth

19   certificates, marriage certificates, divorce decrees,

20   deportation documents, order of the immigration judge

21   documents, warrants of deportation.

22   Q.   So you would have basically identification documents,

23   any -- how about -- if someone applied for immigration status

24   or benefits, you would have documentation regarding that as

25   well; is that correct?

1    A.    That is correct.

2    Q.    Now, how often do you deal with A-Files?

3    A.    I deal with A-files on a daily basis.

4    Q.    Okay.  Do you rely upon A-files for your work?

5    A.    Yes, I do.

6    Q.    Where are A-files kept?

7    A.    They're kept in different locations where they are kept

8    and secured.

9    Q.    And only certain -- can anyone go and get them, or do you

10   have to be granted access to them?

11   A.    You have to be granted access, yes.

12   Q.    Now, the documents that you mentioned in these A-files,

13   are these documents that are made contemporaneously or at the

14   time that the event took place or provided by a person who has

15   information regarding an event?

16   A.    They are made at the time that the event took place.

17   Q.    And are A-files kept and the documents kept within an

18   A-File kept within the regular course of business?

19   A.    Yes.

20   Q.    And that is the business of now Department of Homeland

21   Security; is that correct?

22   A.    That's correct.

23   Q.    And are these -- is this a regular practice to provide

24   documentation whenever it occurs into an individual's A-File?

25   A.    Yes.

1   Q.   On October 27th of last year, were you on duty?

2   A.   Yes, I was.

3   Q.   Do you recall coming in contact with the Defendant?

4   A.   Yes, I do.

5   Q.   How did you come in contact with the Defendant?

6   A.   The Defendant was referred into passport control secondary

7   from primary Officer Agure.

8   Q.   Were certain tools like TXCS or IDENT used to determine

9   the identity of this defendant?

10  A.   Yes, they were.  The Defendant was placed on the IDENT

11  system, and it revealed that the Defendant had been previously

12  deported.

13  Q.   Okay.  Did you run a CIS check on him?

14  A.   Yes.  CIS was queried also, and it revealed that the

15  Defendant had an A-File assigned to him and that he had been

16  previously deported also.

17  Q.   Okay.  Do you recall what the A-File number is that was

18  assigned to this defendant?

19  A.   Yes.  41907686.

20  Q.   So after you determined initially that this defendant had

21  prior deportations and he had a file, what was the name that

22  the system had for him?

23  A.   Jose Aguirre-Estrada.

24  Q.   After you made that initial determination, what did you do

25  next?

1   A.   We compared the document that was presented to our results

2   that we had from our queries on our databases, and we noticed

3   that the document that he presented had been issued in 2003 and

4   he had been deported in 2004, so we placed him under

5   prosecution proceedings.

6   Q.   Okay.  Did you have to process him for that, for the

7   prosecution proceedings?

8   A.   Yes.

9   Q.   Okay.  Did that also involve fingerprinting the Defendant?

10  A.   Yes.  We also fingerprinted -- I fingerprinted the

11  Defendant.

12  Q.   You personally fingerprinted the Defendant?

13  A.   Yes.

14  Q.   Okay.  Did you eventually order the -- subsequently order

15  the A-File on the Defendant?

16  A.   Yes, I did.

17  Q.   Okay.  Did you receive the A-File?

18  A.   Yes, I did.

19  Q.   Has it been in your custody since you received it?

20  A.   Yes, it has.

21  Q.   Did you review the A-File in its entirety?

22  A.   Yes, I did.

23  Q.   After reviewing the A-File last night, you and I sat down;

24  is that correct?

25  A.   That is correct.

1   Q.   And we painstakingly went through and actually took out

2   the documents that were specific to this case; is that correct?

3   A.   That is correct.

4   Q.   And you now have them separated from the rest of the

5   A-File; is that correct?

6   A.   That is correct.

7   Q.   I want to draw your attention to Government Exhibit 1 for

8   identification.

9        Do you recognize that document?

10  A.   Yes, I do.  These are the fingerprints -- it is the FD 249

11  form on which I took the fingerprints.

12  Q.   Of the Defendant?

13  A.   Of the Defendant.

14  Q.   On October 27th?

15  A.   October 27th.

16  Q.   2005?

17  A.   2005.

18       MR. MILLER:  Your Honor, at this time I would like to

19  move Government Exhibit 1 into evidence.

20       THE COURT:  Ms. Rogers?

21       MS. ROGERS:  No objection, Your Honor.

22       THE COURT:  Government's Exhibit 1 -- these are the

23  fingerprints that Agent Lujan took on October 27, 2005,

24  correct?

25       MR. MILLER:  That is correct, Your Honor.

1           THE COURT:  All right.  They're admitted.

2               (Government's Exhibit No. 1 received)

3    BY MR. MILLER:

4    Q.   Agent Lujan, I want to draw your attention to Government

5    Exhibit 2 for identification.

6           Do you have that document available?

7    A.   Yes, I do.

8    Q.   And what is that a document of?

9    A.   It is a certificate of custodianship for the A-File.

10   Q.   Is that A-File 41907686?

11   A.   Yes, it is.

12   Q.   And does that make you the custodian of the A-File?

13   A.   Yes, it does.

14           MR. MILLER:  Your Honor, at this time I would like to

15   move Government Exhibit 2 into evidence.

16           MS. ROGERS:  Your Honor, I object for the reasons

17   previously stated to the Court.  There will be some testimonial

18   aspects in there that she personally did not do, and I object.

19           THE COURT:  All right.

20           MS. ROGERS:  For the confrontation clause.

21           THE COURT:  For the same reason I overruled your

22   objection earlier, Government's Exhibit 2 -- is that the right

23   number?  Exhibit 2 is admitted.  And the Court finds it has

24   been proven up as a business record under Federal Rules of

25   Evidence and that it is nontestimonial, therefore, does not

1    violate the Defendant's Sixth Amendment rights to

2    confrontation.

3                (Government's Exhibit No. 2 received)

4            THE COURT:  Would you like a running objection to

5    this, Ms. Rogers?

6            MS. ROGERS:  I would, Your Honor, from Numbers 2 down

7    to 12.

8            THE COURT:  All right.  Government's Exhibits 2

9    through 12, which I haven't admitted those other exhibits yet.

10           MS. ROGERS:  I have the same objection.

11           THE COURT:  I will grant a running objection as to

12   Government's Exhibits 2 and to those other exhibits if they

13   come into evidence.

14           MS. ROGERS:  Thank you.

15           THE COURT:  You may proceed.

16           MR. MILLER:  Thank you, Your Honor.

17   BY MR. MILLER:

18   Q.   Officer Lujan, I want to draw your attention to Government

19   Exhibit 3 for identification.

20   A.   Yes, sir.

21   Q.   Okay.  Was this a document that you found in the

22   Defendant's A-File?

23   A.   Yes, it is.

24   Q.   Do you speak Spanish?

25   A.   Yes, I do.

1    Q.    Do you read Spanish?

2    A.    Yes, I do.

3    Q.    How long have you spoken Spanish?

4    A.    All my life.

5    Q.    What was the first language you learned growing up?

6    A.    Spanish.

7    Q.    When did you begin to learn English?

8    A.    When I started attending school approximately at six years

9    of age.

10   Q.    Okay.  So your formative years, early years, Spanish was

11   the only thing you spoke, was Spanish?

12   A.    That is correct.

13   Q.    Is that the language you spoke at home throughout your

14   life at home?

15   A.    Yes, it is.

16   Q.    How about -- you said you read Spanish; is that correct?

17   A.    That is correct.

18   Q.    Who taught you to read Spanish?

19   A.    My mother.

20   Q.    Okay.  Government Exhibit 3 you said was found in the

21   A-File; is that correct?

22   A.    That is correct.

23   Q.    And Government Exhibit 4, I want to direct your attention

24   to that exhibit as well.  That was also found in the A-File?

25   A.    Yes, it is.

1  Q.   And these purport to be Mexican birth certificates?

2  A.   Yes.

3  Q.   On the back side of both of those documents, is there a

4  testation and certification from the Mexican Government?

5  A.   Yes.

6  Q.   And could you read for the record --

7            THE COURT:  Have we offered Government's Exhibit 3

8  and 4?

9            MR. MILLER:  I will offer Government Exhibit 3 and 4

10  into evidence.

11            MS. ROGERS:  No objection.  3 and 4, no objection.

12            THE COURT:  Well, I thought she was talking about 3

13  as well.

14            MR. MILLER:  3 and 4, Your Honor.

15            THE COURT:  Okay.  Let me see the documents.

16            Government's Exhibit 3, do you want a copy of that,

17  Ms. Rogers?

18            MS. ROGERS:  I have it, Your Honor.

19            THE COURT:  And Government's Exhibit 4.  Do you

20  object to both of those?

21            MS. ROGERS:  I do not object to 3 and 4.

22            THE COURT:  Okay.  Government's Exhibit 3 and 4 are

23  admitted.

24            (Government's Exhibit Nos. 3 and 4 received)

25            MS. ROGERS:  So just, Your Honor, for purposes of the

1     record, I just told you I would object, to make a running

2     objection, and I'm really withdrawing it on 3 and 4.

3             THE COURT:  Okay.

4             MS. ROGERS:  Thank you.

5     BY MR. MILLER:

6     Q.   Officer Lujan, I want to draw your attention to Government

7     Exhibit 5.  Do you have that available?

8     A.   Yes, I do.

9     Q.   Would you count for the record how many pages Government

10    Exhibit 5 is?

11    A.   18 pages.

12    Q.   Okay.  Could you -- do you recognize these 18 pages?

13    A.   Yes, I do.

14    Q.   And were these documents retrieved from the A-File

15    41907686?

16    A.   Yes, they were.

17            MR. MILLER:  Your Honor, at this time I would like to

18    move Government Exhibit 5 into evidence.

19            MS. ROGERS:  I do have an objection, Your Honor, on

20    that.

21            THE COURT:  Let me see that exhibit.

22            (Pause)

23            MS. ROGERS:  That one is hearsay.  It is offered for

24    the truth of the matter asserted.  It should not come in.

25            MR. MILLER:  Your Honor, it is a statement against

1    interest.

2            MS. ROGERS:  And testimonial as well.

3            (Pause)

4            THE COURT:  I'm going to admit the documents

5    contained in Government's Exhibit 5, which I understand came

6    all from the A-File.

7            Is that correct, Ms. Lujan?

8            THE WITNESS:  That is correct.

9            THE COURT:  All right.  And I find that the documents

10   are nontestimonial and are part of the A-File, which has been

11   proven up as a business record in this case, and overrule the

12   Defendant's objection.

13           (Government's Exhibit No. 5 received)

14   BY MR. MILLER:

15   Q.   I will draw your attention to Government Exhibit 6.  Do

16   you have that available?

17   A.   Yes.

18   Q.   Was this document retrieved from the A-File?

19   A.   Yes, it is.

20   Q.   And this is an R-84 final disposition report?

21   A.   Yes, it is.

22   Q.   Does it have fingerprints on it?

23   A.   Yes, it does.

24           MR. MILLER:  Your Honor, I move Government Exhibit 6

25   into evidence.

1          MS. ROGERS:  Your Honor, she did not testify she took

2      the fingerprints as she did in Exhibit 1, and I renew my

3      objection to testimonial.

4          THE COURT:  Overrule the objection as to Defendant's

5      Exhibit -- as to Government's Exhibit 6.  Government's Exhibit

6      6 is admitted.

7              (Government's Exhibit No. 6 received)

8      BY MR. MILLER:

9      Q.   I draw your attention to Government Exhibit 7.

10     A.   Yes.

11     Q.   This is a photo and a fingerprint card; is that correct?

12     A.   That is correct.

13     Q.   And the fingerprint card is redacted; is that correct?

14     A.   That is correct.

15     Q.   Were these two documents obtained from the A-File?

16     A.   Yes, they were.

17          MR. MILLER:  Your Honor, at this time I would like to

18     move Government Exhibit 7 into evidence.

19          THE COURT:  May I see 7, please?

20          MS. ROGERS:  The same objection.

21          (Pause)

22          THE COURT:  Let me see the attorneys for just a

23     second.

24          (Bench Conference on the record)

25          THE COURT:  This is Government's Exhibit 7.  It

1   shows -- the copy -- what you are offering -- you have both of
2   them?
3          MR. MILLER:  I am going to offer this one.  I am
4   going to offer that one in.
5          THE COURT:  Okay.  So it doesn't get mixed in, I'll
6   take this one.
7          MS. ROGERS:  Thank you.
8          THE COURT:  And I will give her this.
9          MR. MILLER:  Thank you.
10         (End of Bench Conference)
11         THE COURT:  Ms. Rogers, the same objection?  I
12  understand you have no objection to the redaction, but you have
13  an objection to the fingerprints and the photograph; is that
14  correct?
15         MS. ROGERS:  Correct, Your Honor.
16         THE COURT:  Let me ask -- I hate to bring y'all back
17  up.  One other question, please.
18         (Bench Conference on the record)
19         THE COURT:  Is the photograph a mugshot?
20         MS. ROGERS:  Yeah.  Let's just take -- we don't need
21  the fingerprints, do we?
22         MR. MILLER:  It is a frontal picture, unless we crop
23  it.
24         THE COURT:  Well, what I would suggest we do is -- I
25  think you can Xerox that, and it will come out so it doesn't --

1   I don't mind the fingerprints coming in.

2           MS. ROGERS:  I appreciate it.

3           MR. MILLER:  This is for my next witness, so I want

4   to -- thanks.

5           MS. ROGERS:  So we will do that.

6           THE COURT:  Before it goes to the jury, you will take

7   the portion of that off.

8           (End of Bench Conference)

9           THE COURT:  Government's Exhibit 7, the redacted copy

10  and the photograph are to be redacted, is also admitted.  I

11  overrule the Defendant's objection.

12              (Government's Exhibit No. 7 received)

13  BY MR. MILLER:

14  Q.   Officer Lujan, I draw your attention to Government Exhibit

15  8 for identification.

16  A.   Yes.

17  Q.   Can you count how many pages that document is?

18  A.   14.

19  Q.   Do you want to count again?  There may be --

20  A.   Including the redacted?

21  Q.   Yes.

22  A.   15.  I'm sorry.

23  Q.   Okay.  Were these documents, except the redacted versions,

24  which are copies of a document in there, were these documents

25  found in the A-File 41907686?

1  A.   Yes, they were.

2  Q.   And these are documents in a sequence, in order form, is

3  that correct, regarding a deportation?

4  A.   Yes.

5       MR. MILLER:  Your Honor, at this time I would like to

6  move Government Exhibit 8 into evidence with the redactions

7  being in place of the certain documents, which would bring us

8  down to 12 pages.

9       THE COURT:  The same objection?

10      MS. ROGERS:  Same objection.

11      THE COURT:  All right.

12      MS. ROGERS:  No objection to the redaction.

13      THE COURT:  I'm sorry?

14      MS. ROGERS:  No objection to the redaction, but

15  objection to the same as others.

16      THE COURT:  Okay.  Let me see the attorneys again.

17      (Bench Conference on the record)

18      THE COURT:  I think all of this -- I think you are

19  going to have to try redacting it again.

20      MR. MILLER:  Your Honor, what's wrong there?

21      THE COURT:  Huntsville, Texas, TDC.

22      MR. MILLER:  Okay.

23      MS. ROGERS:  Thank you, because we barely looked at

24  them before, and I sure missed that.  So I appreciate that.

25      THE COURT:  So we will redact all those before it

 1   goes to the jury.  Don't ask the witness about that.

 2           MR. MILLER:  Okay.

 3           (End of Bench Conference)

 4           THE COURT:  Defendant's Exhibit 8 -- Government's

 5   Exhibit 8, the redacted portions are admitted.  And I overrule

 6   the Defendant's objection.

 7           But before this goes to the jury or is shown to the

 8   jury, I want to make sure that those portions that we've

 9   discussed are redacted, Mr. Miller.

10           MR. MILLER:  Yes, Your Honor.

11           THE COURT:  So Government's Exhibit 8 as redacted is

12   admitted.

13           (Government's Exhibit No. 8 received)

14           THE COURT:  And, again, that is part of -- Ms. Lujan,

15   that was all part of the A-File; is that correct?

16           THE WITNESS:  That is correct.

17           THE COURT:  All right.  You may proceed.

18           MR. MILLER:  And, Your Honor, before we proceed,

19   there's some other redacted versions as well.

20           THE WITNESS:  That is correct.

21           MR. MILLER:  That document will end up being 12

22   pages.

23   BY MR. MILLER:

24   Q.   Officer Lujan, I'm drawing your attention to Government

25   Exhibit 9 for identification.

1    A.    Yes.

2    Q.    Is this also referring to a series of documents that were

3    found in the A-File?

4    A.    Yes.

5    Q.    And this is regarding a subsequent deportation; is that

6    correct?

7    A.    That is correct.

8    Q.    How many pages is Government Exhibit 9 to include copies

9    of the redaction?

10   A.    Nine.

11   Q.    Okay.

12            MR. MILLER:  Your Honor, at this time I would like to

13   move Government Exhibit 9 into evidence.

14            THE COURT:  Let me see it, please.

15            Ms. Rogers?

16            MS. ROGERS:  The same objection, Your Honor.

17            THE COURT:  All right.

18            (Pause)

19            THE COURT:  Government Exhibit 9 as redacted is

20   admitted.  And the Defendant's objection is overruled for the

21   same reason I previously overruled it.

22                (Government's Exhibit No. 9 received)

23   BY MR. MILLER:

24   Q.    Officer Lujan, I draw your attention to Government Exhibit

25   10 for identification.

1    A.   Yes.

2    Q.   How many page document is this, to include the redaction?

3    A.   13.

4    Q.   Would you count -- to include the redaction.

5    A.   To include the photos in the envelope?

6    Q.   Yes.

7    A.   14.

8    Q.   Were these documents found in the A-File 41907686?

9    A.   Yes.

10            MR. MILLER:  Your Honor, at this time I would like to

11   move Government Exhibit 10 into evidence.

12            MS. ROGERS:  The same objection, Your Honor.

13            (Pause)

14            THE COURT:  And, Ms. Rogers, on the same grounds as

15   your previous objection?

16            MS. ROGERS:  That is correct, Your Honor.

17            THE COURT:  All right.  These would also include

18   fingerprint cards that she did not take and testimonial aspects

19   to it.

20            (Pause)

21            THE COURT:  Government's Exhibit 10 is admitted for

22   the same reasons I admitted the prior exhibits.  And I overrule

23   the Defendant's objection for the same reasons I overruled them

24   outside the presence of the jury.

25                 (Government's Exhibit No. 10 received)

1  BY MR. MILLER:

2  Q.   Officer Lujan, I draw your attention to Government Exhibit

3  11.

4  A.   It doesn't have a number.

5            MR. MILLER:  Your Honor, may I approach the witness?

6            THE COURT:  You may.

7  BY MR. MILLER:

8  Q.   Now I'm showing you what has been marked as Government

9  Exhibit 11 for identification.  This is a two-page document; is

10  that correct?

11  A.   That is correct.

12  Q.   And these documents are found in the A-File 41907686?

13  A.   That is correct.

14            MR. MILLER:  Your Honor, at this time I would move

15  Government Exhibit 11 into evidence.

16            THE COURT:  Ms. Rogers?

17            MS. ROGERS:  The same objection.

18            THE COURT:  Okay.  Government Exhibit 11 is admitted.

19  And the Defendant's objection is overruled for the same reason

20  that I overruled it outside the presence of the jury.

21            (Government's Exhibit No. 11 received)

22            THE COURT:  And, again, this document, Officer Lujan,

23  came from the A-File, is that correct?

24            THE WITNESS:  That is correct.

25            THE COURT:  All right.  You may proceed.

1  BY MR. MILLER:

2  Q.   Ms. Lujan, you said you reviewed the whole A-File; is that

3  correct?

4  A.   That is correct.

5  Q.   There are two things I have a question about.  Was there a

6  matter in 1990, a matter in Midland that the Defendant was

7  involved in?

8  A.   Yes, there was.

9  Q.   Do you have a cause number for that matter?

10  A.   Yes, I do.

11  Q.   What number is that?

12  A.   MO-90-CR-044.

13  Q.   Looking through the A-File, completely through the A-File,

14  did you see any documentation for this individual who after

15  seeing all these deportations, seeking consent and receiving

16  consent from the Attorney General or the Secretary of the

17  Department of Homeland Security to reenter the United States

18  lawfully?

19  A.   I found no consent.

20  Q.   Okay.  Did you contact the Department of Homeland Security

21  for them to check all their databases?

22  A.   Yes, I did.

23  Q.   I show you Government Exhibit 12 for identification.

24  A.   Yes.

25  Q.   Okay.  Is that what you received from the Department of

1   Homeland Security?

2   A.   Yes, it is.

3   Q.   And this is a -- regarding A-File 41907686?

4   A.   Yes, it is.

5          MR. MILLER:  Your Honor, at this time I would like to

6   move Government Exhibit 12 into evidence.

7          MS. ROGERS:  The same objection, Your Honor.

8   Testimonial in nature.

9          THE COURT:  Okay.

10         MS. ROGERS:  And should have the right to confront.

11         THE COURT:  Government Exhibit 12 is admitted.  The

12  Defendant's objection is overruled for the same reason I

13  overruled it outside the presence of the jury.

14             (Government's Exhibit No. 12 received)

15  BY MR. MILLER:

16  Q.   Agent Lujan -- pardon me.  Officer Lujan, Government

17  Exhibit 12 states what?

18  A.   That the Defendant did not apply for permission to reenter

19  the country, to enter the United States, from the Attorney

20  General or the Secretary of Department of Homeland Security.

21  Q.   And, therefore, did not have consent to come back into the

22  United States lawfully?

23  A.   Exactly.

24         MR. MILLER:  Your Honor, at this time I would like to

25  offer some of these -- go through some of these exhibits.  I

1  don't know if it's a good time to take a break now so I can

2  make a -- redact that one copy.

3          THE COURT:  Well, let's do everything but that copy.

4  How about if we do that?

5          MR. MILLER:  We can do that, Your Honor.

6          THE COURT:  All right.

7          MR. MILLER:  Your Honor, may I approach the witness

8  with this?

9          THE COURT:  You may.

10          MS. ROGERS:  Your Honor, just for the purposes of the

11  record -- moving more rapidly, I'd like a running objection to

12  her testimony from all these documents that have already been

13  admitted.

14          THE COURT:  You have a running objection as to all

15  those documents.

16          MS. ROGERS:  Thank you.

17          THE COURT:  As to her testimony concerning those.

18          Shannon, could you dim the lights?

19          (Pause)

20          THE COURT:  And I don't know about the jury, but it

21  is out of focus for me.

22  BY MR. MILLER:

23  Q.   Okay.  Officer Lujan, I'm showing you Government Exhibit

24  5, okay?

25  A.   Yes.

1   Q.   Can you see that?

2          THE COURT:   Just a second, Mr. Miller.

3          Ms. Rogers, if you and Ms. Harris want to move around

4   if you can see better, and your client.

5          MS. ROGERS:   Thank you.

6          THE COURT:   We are going to turn the lights

7   completely off.   There you go.

8   BY MR. MILLER:

9   Q.   Okay.   Government Exhibit 5, what is this first page on

10  Government Exhibit 5?

11  A.   Immigrant Visa and Alien Registration.

12  Q.   And it's a recent application for --

13  A.   Immigrant visa status.

14  Q.   And this was issued to?

15  A.   It's up at the top.   Jose Aguirre-Estrada.

16  Q.   And he was admitted as a CR-1 on August 31st of '89?

17  A.   No, I'm sorry.   It is September 1, 1987.

18  Q.   How did you get that?

19  A.   It's the date that's stamped with the admission stamp

20  there.

21  Q.   Right here?

22  A.   The third line, yes.   That's the date that he was

23  admitted.

24  Q.   Okay.   This is the day that he -- what's this date?

25  A.   Expiration date for the conditional status.   Conditional

1   status is two years.

2   Q.   So September 1st, he's granted immigration status.  And it

3   expires -- as a CR-1.  What is a CR-1?

4   A.   Conditional resident.

5   Q.   And that expires on August 31st of '89 unless he renews?

6   A.   Exactly.

7   Q.   Okay.  Now, this is a photo attached; is that correct?

8   A.   That is correct.

9   Q.   Does that appear to be anyone that you see in the

10  courtroom?

11  A.   Yes.

12  Q.   Who?

13  A.   The Defendant at an earlier age.

14  Q.   Now, part of this says -- the city and country of birth --

15  how do you pronounce that?

16  A.   Cerocahui, Chihuahua, Mexico.

17  Q.   Repeat, please?

18  A.   Cerocahui, Chihuahua, Mexico.

19  Q.   Now, page 2 of this document, Government Exhibit 5, this

20  is what?

21  A.   The form I-130 petition for alien relative.

22  Q.   And how does that work?

23  A.   The relative petitions for the -- in this case, it was the

24  spouse who petitioned for the husband.

25  Q.   The spouse who petitioned for the Defendant?

1    A.    Yes.

2    Q.    Okay.  And on this document, we have the person who was

3    trying to get immigration status, he states where his place of

4    birth is; is that correct?

5    A.    That's correct.

6    Q.    That is Cerocahui, Chihuahua, Mexico?

7    A.    Yes.

8    Q.    Now, I'm showing you page 3 of this document.  Let me pan

9    out here, expand.

10              What is this a document of?

11   A.    That is your Form G-325A, biographic information.

12   Q.    Okay.  And this is biographical information on Jose

13   Aguirre-Estrada?

14   A.    That is correct.

15   Q.    And a photo attached; is that correct?

16   A.    That is correct.

17   Q.    Do you recognize that photo as anybody in this courtroom?

18   A.    Yes.

19   Q.    Who?

20   A.    The Defendant, again at an earlier age.

21   Q.    Now, he also signed; is that correct?

22   A.    That is correct.

23   Q.    And he signed claiming that he was born in Cerocahui,

24   Chihuahua, Mexico; is that correct?

25   A.    That is correct.

1  Q.   And that was dated 6-25-86; is that correct?

2  A.   That is correct.

3  Q.   I'm turning to page 5 of Government Exhibit 5.  Let me

4  zoom out here a little bit.

5         This document consists of three pages.  And it is

6  front and back.  What is this a document of?

7  A.   That is your Form 230 Application For Immigrant Visa and

8  Alien Registration.

9  Q.   And this is an application made by the Defendant?

10 A.   That is correct.

11 Q.   And on here he states he was born in Cerocahui, in

12 Chihuahua, Mexico; is that correct?

13 A.   That is correct.

14 Q.   Part of this application he states -- let me zoom this in

15 here.  He provides a birth certificate; is that correct?

16 A.   That is correct.

17 Q.   And on the back side of the third page, or would be page 6

18 of that document, there's a signature; is that correct?

19 A.   That is correct.

20 Q.   And prior to the signature, both in English and Spanish,

21 basically is an affirmation saying my application here is the

22 truth, the whole truth, and nothing but the truth; is that

23 correct?

24 A.   That is correct.

25 Q.   And he swore to this on what day?

1  A.   September 1st, 1987.

2  Q.   So the same day that he was admitted as a CR-1 was the

3  same day he signed this saying all the information is truthful?

4  A.   That is correct.

5  Q.   I'm showing you one of the attachments that the Defendant

6  used -- he used in his application for immigration visa.  Is

7  this a birth certificate?

8  A.   Yes, it is.

9  Q.   Okay.  And this is a birth certificate for who?

10  A.   Jose Aguirre-Estrada.

11  Q.   Okay.  And it was issued on what day?

12  A.   August the 5th, 1987.

13  Q.   Okay.  And it claims this defendant was born where?

14  A.   If you will go down a little bit.  Okay.  In Cerocahui,

15  Chihuahua, right below the highlighted date there.

16  Q.   Okay.  And on what date did it say this defendant was

17  born?

18  A.   September 27, 1964.

19  Q.   At what time?

20  A.   5:00 a.m.

21  Q.   And who were his -- who are his parents?

22  A.   Salvador Estrada and Socorro de Estrada.

23  Q.   And this was witnessed by a couple of individuals; is that

24  correct?

25  A.   That is correct.

1          (Pause)

2    Q.   I'm showing you Government Exhibit 3.  You said this is a

3    certified Mexican birth certificate; is that correct?

4    A.   That is correct.

5    Q.   And that's the attestation on the very back from the

6    Mexican Government?

7    A.   Yes.

8    Q.   Okay.  This also is a birth certificate for this

9    defendant; is that correct?

10   A.   That is correct.

11   Q.   And it claims the Defendant was born on what day?

12   A.   27th of September, 1964.

13   Q.   And where?

14   A.   Cerocahui.

15   Q.   And as we discussed, that's in Chihuahua, Mexico; is that

16   correct?

17   A.   That is correct.

18   Q.   And he was born at what time?

19   A.   5:00 a.m.

20   Q.   Okay.  And who were his parents?

21   A.   Salvador Estrada.  And then if you could move it over a

22   little bit, the mother is kind of crossed.  To the side.

23   Socorro Aguirre.

24   Q.   Okay.  And right here it says Del Senior Estrada.  What

25   does that mean?

1  A.   Natural son of Salvador Estrada.

2  Q.   Does that mean that is his natural father?

3  A.   That's what the document indicates.

4  Q.   It doesn't say adoptive father or stepfather?

5  A.   No, it doesn't.

6  Q.   Showing you Government Exhibit 4.  This is also a birth

7  certificate; is that correct?

8  A.   That is correct.

9  Q.   And it's also been certified; is that correct?

10  A.   That is correct.

11  Q.   When was this -- just a minute.  I want to step back.

12  Government Exhibit 3, when was this birth certificate issued?

13  A.   29th of May, 1978.

14  Q.   Now, I show you Government Exhibit 4.  You said this was

15  also a birth certificate; is that correct?

16  A.   That is correct.

17  Q.   And when was this document issued?

18  A.   August the 5th, 1987.

19  Q.   At what time?

20  A.   11:00 a.m.

21  Q.   This is a birth certificate for the Defendant; is that

22  correct?

23  A.   That is correct.

24  Q.   And it states he was born on September 27th, '64; is that

25  correct?

1  A.   That is correct.

2  Q.   And he was born in Cerocahui, Chihuahua.  Urique,

3  Chihuahua; is that correct?

4  A.   That is correct.

5  Q.   And the people that presented as both his father and

6  mother; is that correct?

7  A.   That is correct.

8  Q.   And they presented -- and the people as presented the

9  father and mother were Salvador Estrada and Socorro Aguirre; is

10  that correct?

11  A.   That is correct.

12  Q.   And they claim the child was born at 5:00 in the morning,

13  as you mentioned earlier, in Cerocahui, Chihuahua?

14  A.   Can you move it over again?  Yes.  That is correct.

15  Q.   Okay.  And then at the bottom, we have mom and dad signing

16  for this; is that correct?

17  A.   That is correct.

18  Q.   That is dad's signature?

19  A.   That is father's signature.

20  Q.   And that is mom's signature?

21  A.   That is correct.

22  Q.   And they signed this on August 5, 1987; is that correct?

23  A.   That is correct.

24  Q.   That was one month before Defendant applied for

25  immigration visa; is that correct?

1   A.   It was one month before he was granted immigrant status.

2   Q.   One month before he was granted immigration visa, his

3   parents went out and got him a birth certificate in Mexico?

4   A.   That is correct.

5           MR. MILLER:  Your Honor, if we could turn back the

6   lights, please.

7           (Pause)

8           MR. MILLER:  Your Honor, may I reapproach the

9   witness?

10          THE COURT:  You may.

11   BY MR. MILLER:

12   Q.   Showing you Government Exhibit 8.  On the left-hand

13   column, this is an I-213; is that correct?

14   A.   That is correct.

15   Q.   This is the first page of Government Exhibit 8.  This is a

16   record of deportable alien; is that correct?

17   A.   That is correct.

18   Q.   And the last page of that document is an I-205; is that

19   correct?

20   A.   That is correct.

21   Q.   And it purports this defendant was deported on July 11th

22   of 1989; is that correct?

23   A.   That is correct.

24   Q.   That was prior to his expiration of his CR-1 status; is

25   that not correct?

```
 1   A.    That is correct.
 2   Q.    Okay.  On the I-213, does the Defendant provide an address
 3   at the time -- at that time this document was made?
 4   A.    Yes, he does.
 5   Q.    What's the address?
 6   A.    4550 Spartan Drive, Odessa 79765.
 7   Q.    Okay.  And the second page of that document, he has next
 8   of kin contact number; is that correct?
 9   A.    That is correct.
10   Q.    And who does he have as next of kin to contact?
11   A.    Salvador Estrada.
12   Q.    And that would be his father?
13   A.    That is correct.
14   Q.    What address does he provide?
15   A.    4550 Spartan Drive, Odessa, Texas.
16   Q.    The same address as the Defendant?
17   A.    That is correct.
18   Q.    And this is back in 1989?
19   A.    That is correct.
20   Q.    Prior to his first deportation?
21   A.    Yes.
22           MR. MILLER:  Your Honor, may I approach the witness?
23           THE COURT:  You may.
24   BY MR. MILLER:
25   Q.    Government Exhibit 9, could you look at the last page?
```

1    A.    Yes.

2    Q.    That's an I-205; is that correct?

3    A.    That is correct.

4    Q.    Does it purport to show this defendant was deported on or

5    about May 6th of 1992?

6    A.    Yes, it does.

7    Q.    I want you to look at the second-to-last document, a 294.

8    A.    Yes.

9    Q.    294 is a warning statement; is that correct?

10   A.    That is correct.

11   Q.    And was it signed by anybody?

12   A.    It was signed by Richard M. Casillas, District Director.

13   And it was also signed by an immigration officer Ramirez on

14   May 6, '92.

15            MR. MILLER:  Your Honor, may I approach the witness?

16            THE COURT:  You may.

17            MR. MILLER:  I may be looking at the wrong document.

18            (Pause)

19   BY MR. MILLER:

20   Q.    Government Exhibit 10 is what I want you to look at.  The

21   last page there is an I-205; is that correct?

22   A.    That is correct.

23   Q.    And it purports that this defendant was deported on or

24   about October 13th of '94?

25   A.    That is correct.

```
1    Q.    Is there a photo amongst that Government Exhibit 10?
2    A.    Yes.
3    Q.    And do you recognize anybody in that photo?
4    A.    Yes.
5    Q.    And who do you recognize?
6    A.    The Defendant at an earlier age.
7    Q.    There's an F -- there is a I-200; is that correct?
8    A.    That is correct.
9    Q.    And what is an I-200?
10   A.    Warrant for arrest of alien.
11   Q.    Okay.  And who did they arrest, according to this
12   document?
13   A.    Jose Aguirre-Estrada.
14   Q.    And is there a 286, I-286 in this exhibit?
15   A.    Yes.
16   Q.    What is an I-286?
17   A.    Detention form.
18   Q.    And who is that -- who is that pertaining to?
19   A.    Jose Aguirre-Estrada.
20   Q.    Okay.  The Defendant; is that correct?
21   A.    That is correct.
22   Q.    And there's a fingerprint card, an FD 249; is that
23   correct?
24   A.    That's correct.
25   Q.    And did the Defendant sign that card?
```

1   A.   Yes, he did.

2   Q.   And what did he sign it as?

3   A.   Jose Aguirre-Estrada.

4   Q.   Government Exhibit 11, the last page, two-page document,

5   is that an I-205?

6   A.   Yes, it is.

7   Q.   Does that purport that the Defendant was deported on or

8   about September 9, 2004?

9   A.   Yes.

10  Q.   Okay.  After you -- after you reviewed the A-File and

11  received the A-File, did you have anyone verify that this

12  A-File was indeed, without a doubt, the Defendant's A-File?

13  A.   Yes.

14  Q.   What did you do?

15  A.   I asked Mr. John Prewit to do a fingerprint comparison.

16  Q.   Who is John Prewit?

17  A.   The port director at the Presidio, Texas port of entry.

18  Q.   He is also your boss; is that correct?

19  A.   He is also my boss.  Yes, he is.

20  Q.   And did he do a fingerprint comparison, to your knowledge?

21  A.   Yes, he did.

22       MR. MILLER:  Your Honor, may I approach the witness?

23       THE COURT:  You may.

24       (Pause)

25       MR. MILLER:  Pass the witness.

 1            THE COURT:  All right.  Ms. Rogers, is this going to

 2   be a lengthy cross?

 3            MS. ROGERS:  I need a little time with her, Your

 4   Honor, and I would love to take a break.

 5            THE COURT:  Why don't we take a break right here.

 6   What I would ask you to do, then, is leave your legal pads or

 7   you've got notes, leave them right here and turn them upside

 8   down so nobody can see your notes or lack of notes, and not to

 9   discuss the case among yourselves.  And let's take about a

10   15-minute recess.

11            Let's all rise for the jury, please.

12            (Jury out)

13            THE COURT:  All right.  We will be in recess for 15

14   minutes.

15            (Recess)

16            THE COURT:  Let's bring the jury in, please.

17            Let's all rise.

18            (Jury in)

19            THE COURT:  All right.  Let's be seated.

20            It is about 10:23.  We're back in the courtroom with

21   the jury.

22            Mr. Miller is here for the Government.  Ms. Rogers

23   and Ms. Harris are present.  Mr. Aguirre is present.

24            And Ms. Lujan, the witness, is on the stand ready for

25   cross-examination.

1          MS. ROGERS:  Thank you, Your Honor.

2          THE COURT:  You can be seated, Mr. Aguirre.

3          You may proceed, Ms. Rogers.

4                    CROSS-EXAMINATION

5     BY MS. ROGERS:

6     Q.   Ms. Lujan, you've been with Immigration or Homeland

7     Security for almost ten years, correct?

8     A.   That is correct.

9     Q.   And I heard you say that Spanish was your first language.

10    Are you from the Presidio area?

11    A.   No.

12    Q.   Where are you from?

13    A.   Fort Stockton.

14    Q.   All of your almost ten years with the agency, has it been

15    in Presidio, or have you been posted at different places?

16    A.   It's been in Presidio.

17    Q.   Have you been in Presidio longer than your boss,

18    Mr. Prewit, or was he there ahead of you?

19    A.   He was there first.

20    Q.   I know that you testified earlier on the preliminary

21    hearing in this case in front of Judge Edwards in Alpine.  Do

22    you recall that on November 2nd of last year?

23    A.   That is correct.

24    Q.   And Ms. Harris was asking you some questions.  Do you

25    recall she asked you if on the date of Mr. Aguirre's arrest did

1    you interview his mom?

2    A.   No, I did not.

3    Q.   Did anybody at the bridge inquire of her about where he

4    was born?

5    A.   No.

6    Q.   I assume she was detained for some period of time while

7    you were dealing with my client.  Did there come a time that

8    you released her?

9    A.   Yes, we did release her.

10   Q.   She was probably never under arrest, but she was probably

11   held up because she was the passenger in the car he was

12   driving; is that correct?

13   A.   That is correct.

14   Q.   Was the vehicle seized?

15   A.   I do not recall.

16   Q.   Do you recall who it was registered to?

17   A.   No, I do not.

18   Q.   And you testified that the birth certificate that he

19   presented was a valid Texas birth certificate, correct?

20   A.   That is correct.

21   Q.   For purposes of members of the jury who may not deal in

22   immigration terms all the time, could I run through quickly the

23   different classifications that people have?

24        Some people come into the country illegally; is that

25   correct?

1  A.   That is correct.

2  Q.   They cross with no documentation at all, correct?

3  A.   That is correct.

4  Q.   There is another big category of people that get laser

5  visas that give them the right to come across the border and

6  shop or visit the border cities; is that correct?

7  A.   That is correct.

8  Q.   We used to call them border crossing cards, but now we

9  call them border visas?

10  A.   That is correct.

11  Q.   I ask that because you can run them through the IDENT

12  system and get their fingerprints and get a whole history on

13  them, or is that not the reason?

14  A.   I don't understand your question in regards to that one.

15  Q.   Is it -- do we call them laser visas, what we used to call

16  border crossing cards?

17  A.   Yes.

18  Q.   And those are just for visitors across the border not to

19  go into the interior?

20  A.   No, they can't go into the interior also.

21  Q.   But they have to get a special permit to show that they

22  are good for going into the interior, correct?

23  A.   That is correct.

24  Q.   All right.  And then we have a class of people that are

25  not citizens that are legal permanent residents.  They have the

1  right to live in the United States legally?

2  A.  That is correct.

3  Q.  Often some of those people -- I don't know frequently --

4  how frequently, but they become naturalized United States

5  citizens after meeting all the requirements to obtain

6  citizenship, correct?

7  A.  That is correct.

8  Q.  And then we have a class of citizens that obtain

9  citizenship derived from their parents because of where their

10  parents were born or because of the laws and procedures of

11  immigration; isn't that true?

12  A.  That is correct.

13  Q.  And those derivative citizens were absolutely born outside

14  the country, but they obtained citizenship through their

15  parents?

16  A.  That is correct.

17  Q.  And then you have people like you and me who are citizens

18  because we are born on this soil, correct?

19  A.  That is correct.

20  Q.  You have had some experience, at least with our office,

21  have you not, on a few cases where immigration had deported

22  them but they proved citizenship?

23  A.  That is correct.

24       MR. MILLER:  Object, Your Honor, as to relevance to

25  this case.

1            THE COURT:  Sustained.

2            MR. MILLER:  And ask --

3            THE COURT:  The jury is instructed to disregard the

4    witness's answer.

5            MS. ROGERS:  Your Honor --

6    BY MS. ROGERS:

7    Q.   Well, now, Mr. Miller questioned you on documents that

8    came out of the A-File.  Aliens can have more than one A-File;

9    isn't that correct?

10   A.   That is correct.

11   Q.   Somebody that's maybe petitioning for residency or maybe

12   that was arrested in another part of the country may have two

13   A-files that are generated by different documents?

14   A.   That is correct.

15   Q.   And if there comes a time you can often consolidate the

16   A-Files where you could link them together if you can locate

17   them, correct?

18   A.   That is correct.

19   Q.   A-Files can be missing documents at times, can they not?

20   A.   I'm sure they could be.

21   Q.   I mean, you are a huge agency and generate lots of paper,

22   and I'm sure you have had experience where there are documents

23   that are not there and somebody has to refile them on different

24   cases?

25   A.   That is correct.

1    Q.   Whenever you reviewed the A-File in this case, that's the

2    only one you found?

3    A.   Yes.

4    Q.   There was not a separate A number, for example, on the

5    petition to obtain legal residency that I think was Exhibit

6    Number 5; is that correct?

7    A.   I don't recall the exhibit number, but that was part of

8    the A-File.

9    Q.   All right.  So, to your knowledge, on the case of my

10   client, this is the only A-File that exists?

11   A.   That is correct.

12   Q.   And at least hypothetically should contain all the

13   documents that Immigration Services came into contact with

14   regarding his case?

15   A.   That is correct.

16   Q.   When you reviewed that document, did you find any document

17   that had supporting affidavits that he was born in the United

18   States?

19   A.   Yes.

20   Q.   Okay.  And do you recall what those documents were?

21   A.   I recall one document from the father, Salvador

22   Estrada-Chavez, I believe.

23          Can I refer to the file?

24   A.   Sure.

25          (Pause)

1          MR. MILLER:  Your Honor, I'm going to object to

2   statements made by other people.  That would be hearsay.

3          THE COURT:  Well, it's part -- you proved the whole

4   file up as a business record.

5          MR. MILLER:  I didn't offer the whole A-File, and I

6   offered specific exhibits into evidence.

7          THE COURT:  I thought Exhibit 2 was the entire file.

8          MR. MILLER:  No.  Made her custodian of the A-File.

9          THE COURT:  What is Exhibit 2?

10         MR. MILLER:  The Defendant being the custodian of the

11  A-File.

12         THE COURT:  But is there a specific document that's

13  Exhibit 2?

14         MR. MILLER:  Yes, this.

15         THE COURT:  Okay.  I'm going to -- but this -- you

16  proved up the file as a business record.

17         MR. MILLER:  Yes, sir.

18         THE COURT:  You asked her questions about the whole

19  file as being a business record and proved it up as a business

20  record.  So if it's contained within the file, it's now

21  before -- she may have to offer it as an exhibit within there,

22  but you proved up the entire file as a business record.

23         MR. MILLER:  Your Honor, yes, but within -- I

24  proved -- that is correct, but there are certain other

25  objections why we didn't bring other evidence in, is because of

1   hearsay.  It's a statement out of court.  That is a testimonial
2   statement, and that is a Crawford.
3           THE COURT:  Overruled.  The objection is overruled.
4           MR. MILLER:  Okay.  Yes, sir.
5           (Pause)
6   A.   I'm sorry, I'm trying to hurry.
7   Q.   No, that's okay.  Tell me if you want me to keep asking
8   you questions while you are looking.
9           THE COURT:  No.  Let's take one thing at a time.
10          First of all, let's see what the document is,
11  Mr. Miller, before we -- and see if she is going to offer it.
12          I don't know if you are going to offer the document
13  or not, so --
14          (Pause)
15  A.   Would you like for me to pull it or --
16  Q.   Yes, so we can look at it.
17          But the answer to my question is, there is
18  information in his A-File that suggests that he is a citizen or
19  that somebody says he is a citizen of the United States because
20  of birth in the United States, correct?
21  A.   It is just a statement that he made to a notary public.
22          MS. ROGERS:  Okay.  May we look at that, Your Honor?
23          (Pause)
24          THE COURT:  Let me see the parties for a second.
25          (Bench Conference on the record)

1          THE COURT:  This isn't part of that affidavit,

2     personal contact.  Also they offer DNA tests.

3          MS. ROGERS:  I marked that out.  Is that all -- that

4     might be the original that you have.  I haven't seen -- can I

5     mark this?

6          THE COURT:  Just a second.

7          MR. MILLER:  Where --

8          MS. ROGERS:  That is somebody's notes.

9          THE COURT:  All right.  Mr. Miller, what is your

10    objection to the affidavit?

11          And you are going to mark this as Defendant's

12    Exhibit --

13          MS. ROGERS:  Defendant's Exhibit 4.  I have already

14    got --

15          THE COURT:  Let's put it up here, because we are

16    going to mark this.

17          MR. MILLER:  It's asserting a fact that's in issue.

18    I think it was made because it was sworn to and it was made for

19    the purposes of this, is prior to -- this issue was contested

20    in 1999 in the Middle District of Louisiana; and, therefore, it

21    was a statement made for the purposes of testimony at trial.

22          MS. ROGERS:  You are talking too loud.

23          MR. MILLER:  At trial; and, therefore, it is

24    testimonial and an even playing field under Crawford.

25          This is a statement made for the purposes of

1    testimony; and, therefore, the Government should be able --

2    should be able to cross-examine this witness.  This statement

3    was made around the same period as the statement made by the

4    mother and the alleged midwife.

5            THE COURT:  Well, let me ask you this way.  Was this

6    case tried?

7            MR. MILLER:  Yes, in Louisiana.

8            THE COURT:  I mean, what was --

9            MR. MILLER:  He was convicted of illegal entry after

10   deportation.

11           THE COURT:  Well, if this comes in, wouldn't it be

12   all right for the Government -- you have to show circumstances

13   of this coming in.  Wouldn't the Government be able to show

14   that -- did this fellow testify?

15           MS. ROGERS:  No, he did not.  He did not.  But, Your

16   Honor, it seems that the question is about the A-File, that

17   there is some notice that somebody is claiming citizenship, is

18   why I am wanting to offer it.

19           MS. HARRIS:  I don't think we need the document,

20   because the document may be testimonial.  We just -- we have

21   the answer to the question.

22           THE COURT:  I'm not going to allow Exhibit 4.  Why

23   don't we mark it for the record.

24           MS. ROGERS:  Exhibit 4?

25           THE COURT:  For the record.

1        MS. ROGERS:  All right.

2        THE COURT:  And so you can take it with the record,

3   but I'm not going to let Exhibit 4 come in.

4        MS. ROGERS:  All right.

5        (End of Bench Conference)

6        THE COURT:  The defense offers Defendant's Exhibit 4,

7   which is an affidavit that Agent Lujan has talked about.  I'm

8   going to sustain the Government's objection as to Defendant's

9   Exhibit 4.

10        And, Mrs. LaForge, would you make a copy of this?  It

11   will be a part of the record in this case.

12        You may proceed, Ms. Rogers.

13        MS. ROGERS:  And, Your Honor, we'll -- for purposes

14   of the record, it will be attached to the record, and we will

15   redact the bottom.

16        THE COURT:  Yes.  Yes, ma'am.

17        MS. ROGERS:  Thank you.

18   BY MS. ROGERS:

19   Q.   Now, Ms. Lujan, without making you go through more of it,

20   do you think that was the only information that gave supporting

21   suggestions that he was U.S. born?

22   A.   Yes.

23   Q.   You didn't see anything else in your review of it?

24   A.   No.

25   Q.   Okay.  Now I want to ask you about Defendant's -- I mean

1   Government Exhibit Number 12, the certificate of nonexistence.

2        Did you talk to the person that certified the

3   nonexistence of the application?

4   A.   No.  That was done through -- that was done electronically

5   through the computer.

6   Q.   All right.  And it is just a regular, routine part if

7   you're preparing for prosecution on one of these cases that

8   you're calling to try to meet that element of the charge,

9   correct?

10  A.   That is correct.

11  Q.   And you don't know or can't tell this jury what searches

12  were made by the person that alleges they searched it all and

13  couldn't find any reapplication?

14  A.   No, I cannot.

15  Q.   And, of course, a U.S. citizen doesn't have to reapply to

16  anybody to come into the country, correct?  They present

17  themselves at the bridge.  And if they are a citizen, assuming

18  they make their customs declaration, they are entitled to come

19  into the country; is that correct?

20  A.   That is correct.

21  Q.   So all your testimony about nonexistence of the record,

22  that would be for an alien?

23  A.   That is correct.

24        MS. ROGERS:  May I approach, Your Honor?

25        THE COURT:  You may.

1           (Pause)

2    BY MS. ROGERS:

3    Q.   I want to show you what I have marked as Defendant's

4    Exhibit 2 as identification.  Can you identify what that

5    document is?

6    A.   Yes.  It's from the civil register, from the State of

7    Chihuahua.  It is a document saying that there was --

8           MR. MILLER:  Objection, Your Honor.

9           THE COURT:  Was this part of the A-File?

10          MS. ROGERS:  I'm getting ready to ask that next

11   question.

12          THE COURT:  Okay.  Let's bring up --

13   BY MS. ROGERS:

14   Q.   Have you seen what I have marked as Defendant's Exhibit 2

15   in the A-File?

16   A.   No.

17   Q.   Does it appear to be an official document regarding the

18   Mexican birth certificate that you have talked about?

19   A.   Yes.

20   Q.   And you are satisfied -- I know the A-File has lots of

21   documents, but you are satisfied that that is new to you and

22   you have never seen it?

23   A.   Yes.

24   Q.   May I show you what I have marked for identification as

25   Defendant's Exhibit 3?

1           Do you know what that is, or can you identify it?

2    A.   It's a document from Jose Estrada written to -- for the

3    Freedom of Information requesting --

4    Q.   The document itself is a copy of a letter from the U.S.

5    Department of Justice, Immigration and Naturalization Service,

6    to Mr. Estrada, correct?

7    A.   That is correct.

8    Q.   And it references both names, Aguirre and Lopez Aguirre.

9    Aguirre-Estrada and Lopez Aguirre; is that correct?

10   A.   That is correct.

11   Q.   And have you ever seen that document in your A-File?

12   A.   I do not recall.

13   Q.   If you have a chance at the break, will you search your

14   A-File to see?

15   A.   I sure will.

16   Q.   To see if you can find that?

17   A.   Yes.

18   Q.   Because, according to what you just said, if Homeland

19   Security is writing to him and using both names, that should

20   find its way to the A-File, should it not?

21   A.   Yes, it should.

22   Q.   Now then --

23           MS. ROGERS:  If I might approach again, Your Honor.

24           THE COURT:  You may.

25           MS. ROGERS:  These are the Government exhibits that

1  have already been introduced.

2  BY MS. ROGERS:

3  Q.   First I'm going to show you Defendant's Exhibit 3.

4         I'm going to put 3, 4 -- and this comes out of

5  Exhibit 5.  It's torn off, so I don't know if it's inserted.

6         But you're familiar with all of those documents and

7  have just testified in response to Mr. Miller's questions,

8  correct?

9  A.   That is correct.

10  Q.   And so Defendant's Exhibit 3 purports to be a Mexican

11  birth certificate issued in '78?

12  A.   That is correct.

13  Q.   And Defendant's Exhibit 4 purports to be a Mexican birth

14  issued in '87?

15  A.   That is correct.

16  Q.   And then part of Government's Exhibit 5 has another,

17  apparently, Mexican birth certificate referencing the '87, this

18  one.  Government's Exhibit 4, correct?

19  A.   That is correct.

20  Q.   But different form where the part of Exhibit 5 has the

21  same form as Exhibit 3.  And I know the jury can't see all this

22  yet.  But am I correct?

23  A.   Okay.  This is the same form as Exhibit 3?  That's what

24  you're saying?

25  Q.   It's the same form, but referencing -- these two are

1  the -- 4 and 5 are the '87.  3 is the '78, correct?

2  A.    That is correct.

3  Q.    But 3 and 5 are transcribed on the same kind of form, with

4  the Number 4 being different, different Mexican form, correct?

5  A.    That is correct.

6  Q.    And when you compare all of them together -- or I'm going

7  to call it the '78 birth certificate and the '87 -- there are

8  some differences, are there not?

9  A.    Yes.

10  Q.    So if you were having to rely on one, which one do you

11  pick?

12  A.    I would have to rely on all three documents.

13  Q.    Okay.  And if there's differences in it, we can't tell by

14  looking at those which one is factually correct or if all of

15  them are not factually correct; isn't that true?

16  A.    That is correct.

17  Q.    And at least on Government's Exhibit 3, do you see here

18  that it appears that Elodia Aguirre is the person that asked

19  for the birth certificate to be issued?

20  A.    That is correct.

21  Q.    And on here, this will be Exhibit -- part of Exhibit

22  Number 5.  Does it appear that -- tell me if I'm wrong, but

23  does it appear that Salvador Estrada is the person that is

24  asking for that to be issued?

25  A.    That is correct.

1    Q.   And neither on 3, 4, or the birth certificate part of

2    Exhibit 5 is there any signature showing my client adopted

3    this?

4    A.   That is correct.

5    Q.   Would you agree with me, Ms. Lujan, that most of us know

6    where we were born because of what our parents tell us?

7    A.   That is correct.

8    Q.   From your years on the border, do you have any personal

9    knowledge that to go to school in Mexico you're required to

10   produce a Mexican birth certificate?

11   A.   Yes.

12   Q.   Have you had any personal knowledge in your years of

13   immigration where a person might take an easier route that

14   might not be so correct to obtain a goal?

15   A.   Yes.

16           MS. ROGERS:  I'll pass the witness.

17           THE COURT:  Mr. Miller?

18           (Pause)

19                    REDIRECT EXAMINATION

20   BY MR. MILLER:

21   Q.   Officer Lujan, I want to draw your attention to Government

22   Exhibit 5.  There is a birth certificate attached to that; is

23   that correct?

24   A.   That's correct.

25   Q.   Now, there is the immigration visa application that the

1  Defendant applied for; is that correct?

2  A.   That is correct.

3  Q.   And part of that immigration visa, he then submits certain

4  documents, and one of those documents to support his

5  immigration visa is a birth certificate; is that correct?

6  A.   That is correct.

7  Q.   And he swore and signed to that on September 1st of 1987;

8  is that correct?

9  A.   That is correct.

10  Q.   And he's basically saying everything here is the truth and

11  everything I submit I adopt to be the truth; is that correct?

12  A.   That is correct.

13  Q.   Therefore, the birth certificate that he submitted he did

14  adopt and submit the truth.  He may not have signed it, but he

15  submitted it to be the truth?

16  A.   That is correct.

17  Q.   Government Exhibit 4, that's also a birth certificate; is

18  that correct?

19  A.   That is correct.

20  Q.   And that was issued one month or registered one month

21  prior to the Defendant applying for and receiving his

22  immigration visa; is that correct?

23  A.   That is correct.

24  Q.   And it's the same date as the birth certificate found in

25  Government Exhibit 5; is that correct?

1  A.    That is correct.

2  Q.    That is August 5th of 1987; is that correct?

3  A.    That is correct.

4  Q.    Both mom and dad applied for this birth certificate; is

5  that correct?

6  A.    That is correct.

7  Q.    And both mom and dad signed the birth certificate; is that

8  correct?

9  A.    That is correct.

10  Q.    Ms. Rogers asked you about A-files and various people

11  could have more than one A-File; is that correct?

12  A.    That is correct.

13  Q.    Is it is possible they could have a different A number?

14  A.    That is correct.

15  Q.    And more than one A number because they may have used an

16  alias or something?

17  A.    That is correct.

18  Q.    But through IDENT you would be able to catch if a person,

19  based on their fingerprint, if they have more than one A-File

20  and they use different names; is that correct?

21  A.    That's correct.

22  Q.    And the agency tries to marry up those files into one; is

23  that correct?

24  A.    That is correct.

25  Q.    You also got an A-File for the Defendant's mother; is that

1   correct?

2   A.   That is correct.

3   Q.   And that was based on a request from the defense; is that

4   correct?

5   A.   That is correct.

6   Q.   Did they ask you for another A-File with a different A

7   number for the Defendant?

8   A.   No, they did not.

9   Q.   Ms. Rogers asked you a question about was there anything

10  in the A-File referencing the claim that the Defendant was born

11  in the United States; is that correct?

12  A.   That is correct.

13  Q.   When was that -- to draw your attention, I have got a copy

14  of Government Exhibit -- Defense Exhibit 4 for identification.

15          What date was that that was referenced, to give us a

16  time period when the claim was made?

17  A.   On the 23rd day of March, 1999, in Presidio, Texas.

18  Q.   Okay.  Now, I'm showing you Government -- Defense Exhibit

19  1.  It's a birth certificate?

20  A.   That is.

21  Q.   And Ms. Rogers asked you, said you stated it was a valid

22  birth certificate; is that correct?  What do you mean by that?

23  A.   Well, it is a valid document issued by legal authority.

24  Q.   Okay.

25  A.   To an individual.

1  Q.   Okay.  Does it mean -- the document is valid.  How about

2  the information on the document?

3  A.   The information --

4            MS. ROGERS:  Your Honor, now, excuse me.  I'm going

5  to object to what she would know to be anything false if she

6  has no personal knowledge.

7            THE COURT:  Well, she's testified to these other

8  documents.  I guess comparing these other documents with this,

9  is the information correct.  I think she can testify as to

10 that.

11           MS. ROGERS:  She might have an opinion that one is

12 wrong, but I don't think she is the ultimate arbiter.

13           THE COURT:  The jury is going to be the ultimate

14 arbiter.  That is correct.  But she can give an opinion as

15 looking at that document as compared to other documents in the

16 A-File is it a valid -- is it -- is the information accurate.

17           MR. MILLER:  Yes.

18           THE COURT:  Restate the question.

19           Let me ask a question.

20           Ms. Lujan, comparing the birth certificate that is on

21 Defendant's Exhibit 1, the little square one that we had that

22 was received at the border, I believe is where it was

23 testified, and the information and the various birth

24 certificates you have seen in the A-File, do you have an

25 opinion as to which of those -- in your opinion, which one has

1    the correct information, or do you have an opinion as to which

2    one has the correct information?

3              THE WITNESS:  Okay.  There's different information on

4    both birth certificates, but I would go with the first one,

5    which was issued in 1978, I believe, as to being accurate.

6    BY MR. MILLER:

7    Q.   Another question the Judge asked was regarding the delayed

8    birth certificate.  You said the document appeared to be valid.

9    How about the information on the document?

10   A.   I would have to say it's false.

11             MR. MILLER:  Pass the witness.

12             THE COURT:  Okay.  Ms. Rogers?

13                       RECROSS-EXAMINATION

14   BY MS. ROGERS:

15   Q.   All right.  So the document he presented that shows Texas

16   delayed birth certificate, that is a procedure to obtain a

17   birth certificate for people that weren't registered at birth

18   by their parents, correct?

19   A.   Correct.

20   Q.   And there has been a time -- this is probably not the

21   first time -- where state officials might believe the proof is

22   there, somebody familiar with the area or the border, and the

23   Federal Government has deported somebody and you have a

24   conflict; isn't that true?

25   A.   That is true.

1    Q.    All right.  And, of course, if you believed that he was a

2    U.S. citizen on the day that he presented himself, you wouldn't

3    have arrested him; isn't that correct?

4    A.    That is correct.

5    Q.    And when Mr. Miller suggests that because I asked you for

6    the A-File of the mother -- A-files are in the Government's

7    custody, aren't they?  They're in your database?

8    A.    Exactly.

9    Q.    I don't ever, ever get to keep an A-File at my office, do

10   I?

11   A.    I don't know.

12   Q.    You-all make copies for me of things, but when I was

13   asking you to review that, that's because you have custody of

14   it, and you tell me what you're finding and rely on your

15   testimony today, correct?

16   A.    That is correct.

17   Q.    And if I order up an A-File from the Government, they

18   don't respond to me to give me an A-File, do they?  Unless you

19   have the U.S. Attorney asking on my behalf or the Judge orders

20   it, correct?

21   A.    Correct.

22   Q.    That's a government resource that is in the Government's

23   custody?

24   A.    Yes.

25   Q.    And just so when the jury has a chance to look at these

1  documents, you rely on the information you found about the

2  previous deportations; but if there was some way to

3  definitively prove to you that he was born in the United

4  States, would you agree with me that he was deported

5  incorrectly?

6  A.   Yes, I would.

7         MS. ROGERS:  No further questions.

8         THE COURT:  Mr. Miller, anything else?

9         MR. MILLER:  No, Your Honor.

10         THE COURT:  All right.  Agent, you can step down.

11         (Pause)

12         THE COURT:  Mr. Miller, call your next witness,

13  please.

14         MR. MILLER:  We call Mr. John Prewit.

15         THE COURT:  Mr. Prewit, please.

16         (Pause)

17         THE COURT:  Mr. Prewit, if you would come over here

18  and have a seat, please.

19         MR. MILLER:  Your Honor, may I have one moment?

20         THE COURT:  You may.

21         (Pause)

22         THE COURT:  Mr. Prewit, would you state your name

23  for, us please?

24         THE WITNESS:  John Prewit.

25         THE COURT:  Mr. Prewit, you were sworn as a witness

1  this morning, correct?

2       THE WITNESS:  Correct.

3       THE COURT:  Mr. Miller, you may proceed.

4       MR. MILLER:  Thank you, Your Honor.

5          JOHN PREWIT, GOVERNMENT'S WITNESS, SWORN

6                  DIRECT EXAMINATION

7  BY MR. MILLER:

8  Q.   Mr. Prewit, where do you work?

9  A.   I'm the port director for U.S. Customs and Border

10 Protection at the Presidio, Texas port of entry.

11 Q.   How long have you been port director?

12 A.   For CBP, since September of 2003.

13 Q.   Is that when they became part of Department of Homeland

14 Security?

15 A.   Right, when we became part of Homeland Security.  I was

16 immigration port director from 1999 till then.

17 Q.   Okay.  Prior to that, what did you do?

18 A.   I became a deputy sheriff in June 1st, 1973, and then

19 transferred to the police department in Pecos in 1981.  And

20 from then until 1993, when I went to work for Immigration at

21 Presidio, I was a police officer.

22 Q.   Okay.  So you have about 30 years, over 30 years --

23 A.   About 30 years, yes, sir, give or take.

24 Q.   During your time as a peace officer in law enforcement, do

25 you have any specialized training?

1  A.   Yes, sir.  I was trained to identify fingerprints and do

2  crime scene work.

3  Q.   What kind of training did you have regarding fingerprint

4  analysis?

5  A.   In 1974, I spent six weeks in the Department of Public

6  Safety academy in Austin, Texas, for fingerprinting.  And four

7  years later I took another two-week course, refresher course,

8  and I've been practicing ever since.

9  Q.   How often do you deal with analyzing fingerprints?

10  A.   Now, since I'm port director, probably not more than two

11  or three times a year, four times.  If they can't find another

12  expert.

13  Q.   What exactly is fingerprint analysis?  What are you

14  looking for?

15  A.   You look for the similarities of comparison, points of

16  comparison from a known print to another known print or to a

17  latent fingerprint.

18        A latent fingerprint is one that you find at the

19  crime scene that you have to dust and lift.  A known print is a

20  print that's been -- the person's finger has been inked and the

21  print is either rolled or pressed by another person.

22  Q.   Do fingerprints have any special characteristics or

23  patterns?

24  A.   Yes, sir.  There's several types of patterns:  loops,

25  whirls, arches, and the various types of those -- various

1  different types of those.

2  Q.   What are some of those various different types?

3  A.   A loop has two different types.  They are ulnar loops or

4  radial loops.  A loop is characterized by ridges that run --

5  enter one side of the pattern, make a loop, and exit that same

6  side of the pattern.

7        Radial or ulnar designates whether it's on the thumb

8  side or the little finger side of the hand as to whether

9  it's that type or not.

10        A whorl is a circular pattern where the ridges come

11  from both sides of the pattern and tend to surround it.  There

12  would be two deltas in each ridge.  I mean each whorl.  A delta

13  is two parallel ridges that convert -- diverge and tend to

14  surround the pattern, and there's one on each side of a whorl.

15        An accidental whorl will have three or more deltas.

16  Q.   Okay.  Do fingerprints change over time?

17  A.   Yes, sir, with wear and scars, but the patterns remain the

18  same.  The ridge counts remain the same.  The points of

19  comparison remain the same.

20  Q.   Okay.  And when you say points of comparison, in order to

21  say there's a match, how many points of comparison have to

22  be --

23  A.   Most people will -- most experts will run with eight.  I

24  like eight or more.

25  Q.   You like how many?

1    A.    Eight or more.

2    Q.    Okay.

3    A.    Preferably more.

4    Q.    Do fingerprints -- will my fingerprints be the same as

5    your fingerprints?

6    A.    No.

7    Q.    Do the same -- two people in this world, would they have

8    the same fingerprints?

9    A.    I have never heard of that, no, sir.

10   Q.    Also, as a port director -- and you've been in immigration

11   work for, what, 13 years now?

12   A.    Almost 13.

13   Q.    Do you deal with documents regarding deportation of

14   individuals?

15   A.    Yes, sir, we do.

16   Q.    What documents would you be looking for in a deportation

17   packet?  Describe what forms you're looking for and what they

18   refer to.

19   A.    An I-205 would be the deportation itself.  It will have a

20   fingerprint on it.  There's an I-221 that is part of the

21   packet.  There's a warrant of arrest that's part of the packet.

22   Fingerprint cards are FD 249s.  294s and 296s as well.

23   Q.    What's a 294?

24   A.    A 294 is part of the removal packet.  296 is warning or

25   designation by the officer telling the person what he's charged

1    with or what is going to transpire.

2    Q.    What's an I-871?

3    A.    I-871?

4    Q.    Uh-huh.

5    A.    I'm not sure, sir.  If I could see the form, I could show

6    you.  I don't have all those numbers memorized.  Those are --

7    basically been forms and we don't use those.  We find them in

8    the packets.

9    Q.    Is there a form such as -- let me get this correct --

10   notice of intent, decision to reinstate prior order?

11   A.    Yes, sir.

12   Q.    Okay.  So you're familiar with a form for that; is that

13   correct?

14   A.    Yes, sir.  A reinstatement order, yes, sir.

15   Q.    So basically it is just saying, hey, from your last order

16   we are reinstating instead of producing more paperwork?

17   A.    That is essentially what it does.  It also has the

18   person's fingerprint or thumbprint on the bottom of it.

19   Q.    Mr. Prewit, have you ever testified regarding fingerprints

20   in State and/or Federal court?

21   A.    Yes, sir.  I've testified in this court and the State

22   court across the street.

23   Q.    Have you ever been recognized as an expert in fingerprint

24   analysis?

25   A.    Yes, sir, I have.

1          MR. MILLER:  Your Honor, at this time I would like to

2    move Mr. Prewit in as an expert in fingerprint comparisons.

3          MS. ROGERS:  May I take him on brief voir dire?

4          THE COURT:  You may, Ms. Rogers.

5                    VOIR DIRE EXAMINATION

6    BY MS. ROGERS:

7    Q.   Mr. Prewit, I was surprised to see you when you are going

8    to be a fingerprint expert today, so I know you do lots of

9    other things.  Some witness was gone.  Is that the reason they

10   got you?

11   A.   I have no idea why I was chosen.  Apparently the

12   fingerprint -- resident fingerprint expert and master has

13   retired.

14   Q.   So you went to your first training in '74, and four years

15   later you did a two-week refresher course.  And is that the

16   last time?

17   A.   Yes.  That's the last training I have had, yes, ma'am.

18   But I have had a lot of practice.

19   Q.   And you continue to review them or look at them when you

20   are called by the Government --

21   A.   Yes, ma'am.

22   Q.   -- correct?

23          And I guess when we were young, fingerprints were to

24   criminal justice what DNA is to it now; is that correct?

25   A.   Approximately, yes, ma'am.

1  Q.  And there's been some new challenges against the wisdom of
2  fingerprints.  Have you been -- have you kept up to date on the
3  new developments in fingerprint studies?
4  A.  All that I have done is what I was trained to do and what
5  I recognize every day.
6  Q.  And some fingerprint experts would require more than eight
7  comparisons, but that's the minimum you would require; is that
8  correct?
9  A.  That is the minimum.  I really prefer more than that.
10  Q.  Okay.  But some people might require more than eight
11  before they would give a definitive opinion?
12  A.  Yes, ma'am.  It depends on the expert.  If they want to be
13  really, really sure, they will require more.
14       MS. ROGERS:  Thank you, Your Honor.
15       THE COURT:  Sure.
16       And, Ms. Rogers, any objection as to Mr. Prewit being
17  qualified as an expert on fingerprint analysis?
18       MS. ROGERS:  No.
19       THE COURT:  Was that no?
20       MS. ROGERS:  That's no.
21       THE COURT:  Ladies and gentlemen, Mr. Prewit has been
22  qualified as an expert in fingerprint analysis.
23       If scientific, technical, or other specialized
24  knowledge might assist the jury in understanding the evidence
25  or in determining a fact in issue, a witness qualified by

1  knowledge, skill, experience, training, or education may

2  testify and state an opinion concerning such matters.

3       Merely because Mr. Prewit may express an opinion does

4  not mean, however, that you must accept that opinion.  You

5  should judge his testimony like any other testimony.  You may

6  accept it or reject it and give it as much weight as you think

7  it deserves considering his education, experience, the

8  soundness of the reasons given for his opinion, and all other

9  evidence in this case.

10       You may proceed, Mr. Miller.

11       MR. MILLER:  Thank you, Your Honor.

12            DIRECT EXAMINATION RESUMED

13  BY MR. MILLER:

14  Q.   Mr. Prewit, were you asked by Officer Lujan to compare

15  some fingerprints of an A-File?

16  A.   Yes, sir, I was.

17  Q.   And that was A-File 41907686; is that correct?

18  A.   41907686?

19  Q.   That's correct.

20  A.   Yes.

21  Q.   Did she provide you what she stated as a known -- a known

22  set of prints of the Defendant?

23  A.   Yes, sir.

24  Q.   And then you compared that known set with prints found

25  throughout the A-File; is that correct?

1  A.   That is correct.  Yes, sir.

2         MR. MILLER:  Your Honor, may I approach the witness?

3         THE COURT:  You may.

4  BY MR. MILLER:

5  Q.   Mr. Prewit, I'm showing you what has been marked as

6  Government Exhibit 1.  Do you recognize that document?

7  A.   Yes.  This is the known set of prints supplied to me by

8  Officer Lujan that I compared all the rest of the prints in the

9  file with.

10  Q.   Okay.  And how do you know that was the document you used?

11  A.   Because I have dated it and initialed in two places on the

12  document.

13  Q.   And where was that that you initialed and dated?

14  A.   Over the right thumb and the right index finger.

15  Q.   And why did you initial those two areas?

16  A.   Because that is where most -- most of the documents have

17  either one or both of those prints.

18  Q.   What kind of pattern does this individual have?

19  A.   On these two particular fingerprints, the right thumb is a

20  plain whorl, and the right index is a central pocket loop

21  whorl.

22  Q.   Now, I want to show you Government Exhibit 6, which was

23  admitted into evidence.  That's an R-84, final disposition

24  report; is that correct?

25  A.   Yes, sir.

1   Q.   And that has a date of 2-20 of '89; is that correct?

2   A.   Yes, sir.  That's correct.

3   Q.   Did you compare -- on that form are there fingerprints?

4   A.   Yes, sir, there are four fingerprints on the lower

5   right-hand corner.

6   Q.   And on that form -- and on that form which fingerprints

7   did you use to verify or discredit whether or not this is the

8   same as Government Exhibit 1?

9   A.   The right index finger of the known form matches the right

10  index finger on this file, on this form.

11  Q.   So it's your expert opinion that whoever -- whoever did

12  Exhibit 1 is the same person who has fingerprints on Government

13  Exhibit Number 6?

14  A.   Both fingerprints were made by the same person.

15  Q.   Okay.  And on Government Exhibit 6, there's a pink tab for

16  Number 14; is that correct?

17  A.   That's correct.

18  Q.   You did a report regarding this; is that correct?

19  A.   Yes, sir.

20  Q.   About your findings; is that correct?

21  A.   That pink tab indicates that's the 14th document that I

22  compared with the known prints.

23  Q.   Okay.  I want to go to Government Exhibit Number 7.

24  A.   Okay.

25  Q.   That is a photo and a fingerprint card; is that correct?

1   A.   That's correct.

2   Q.   And the fingerprint card is actually a redacted version,

3   so it is a photocopy, but were you able to compare that

4   fingerprint which was Number 13 for your records with

5   Government Exhibit 1?

6   A.   Yes, sir.

7   Q.   And what finger or fingers did you use?

8   A.   It matches -- the match is the right thumb for the -- for

9   Exhibit Number 1, for the known card.

10  Q.   Okay.

11          THE COURT:  What's the date of Exhibit 7?

12          THE WITNESS:  The date is --

13          THE COURT:  There's a date on there, or there may be

14  a date on the unredacted --

15          MR. MILLER:  It isn't.  I'm sorry.

16          THE WITNESS:  The only date that is on this copy is

17  3-3 of '06, and that is the date I put on there.

18          MR. MILLER:  Your Honor, can I give him the original?

19          THE COURT:  Yes.

20          MR. MILLER:  May I approach?

21          THE COURT:  Yes.

22  BY MR. MILLER:

23  Q.   Mr. Prewit, I'm showing you the original document.  Does

24  that have a date?

25  A.   Yes, sir.  It has a date of March 14th, 1989.

1          MR. MILLER:  Your Honor, can I ask that Government

2     Exhibit 7 be modified on the redacted version and put the date

3     March 14th of '89?

4          MS. ROGERS:  No objection, Your Honor.

5          THE COURT:  All right.  Yes, we'll amend Government's

6     Exhibit 7 to show that the date on there, that purports to be

7     the date the fingerprints were taken, was March 14th, 1989.

8     BY MR. MILLER:

9     Q.   Government Exhibit Number 8, Mr. Prewit, that has those

10    pink tabs in order 2, 1, and 3; is that correct?

11    A.   That's correct, sir.

12    Q.   Now, did you compare those fingerprints on those

13    documents -- strike that.

14          Fingerprint Number 2 that you looked at --

15    A.   Yes, sir.

16    Q.   -- on Government Exhibit 8 --

17    A.   Yes, sir.

18    Q.   -- what document is that on?

19    A.   This is an I form -- Form I-200.

20    Q.   Which is what?

21    A.   It's a warrant for arrest of alien.

22    Q.   Okay.  And you compared that fingerprint to Government

23    Exhibit 1?

24    A.   Yes, sir.

25    Q.   And what was your conclusion?

1    A.   It also matches the right thumb of that exhibit.

2    Q.   Okay.  Fingerprint -- and it is a pink tab 1.  Is that a

3    fingerprint on that document?

4    A.   Yes.

5    Q.   What document is that on?

6    A.   This is an I-286.

7    Q.   What is an I-286?

8    A.   It is a detention document showing --

9    Q.   Okay.  Did you compare that fingerprint with Government

10   Exhibit 1?

11   A.   Yes.  It is also a match for the right thumb on Exhibit 1.

12   Q.   And Number 3, the pink tab on Government Exhibit 8, what

13   document is that a fingerprint on?

14   A.   This is an I Form 205.

15   Q.   Okay.  205 is what?

16   A.   A warrant of deportation.

17   Q.   Okay.  And it shows what a particular individual is

18   deported on which day?

19   A.   I beg your pardon?

20   Q.   What day was this person deported on?

21   A.   It shows July 11th, 1989.

22   Q.   And did you compare that fingerprint on that order of

23   deportation?

24   A.   Yes, sir, I did.

25   Q.   And what was your conclusion?

1   A.   It matches also the right thumb on Exhibit 1.

2   Q.   Okay.  Now, I want you to go look at about the third and

3   fourth exhibit in that document.  There's an FD 249 and an

4   R-84; is that correct?

5   A.   Yes, sir.

6   Q.   And these are undated -- an undated fingerprint card and

7   an R-84, which is a final disposition report; is that correct?

8   A.   That's true.  Yes, sir.

9   Q.   And you compared those fingerprints to Government Exhibit

10  1; is that correct?

11  A.   Yes, sir.

12  Q.   And what was your conclusion?

13  A.   That the fingerprint card, the FD 249, matches both the

14  right thumb and right index finger on Exhibit 1.  I could have

15  gone further, but I stopped there.

16          Also, the R-84 matches the right index finger of

17  Document Number 1, Exhibit Number 1.

18  Q.   Okay.  Exhibit Number 9, there's pink tabs 11, 10, 6, and

19  4 in that record order?

20  A.   Yes, sir.

21  Q.   Would you draw your attention to tab Number 11?

22  A.   Okay.

23  Q.   What document is tab Number 11 on?

24  A.   It is an FD 249 fingerprint card.

25  Q.   Okay.  Did you compare that fingerprint card to Government

1    Exhibit Number 1?

2    A.   Yes, sir, I did.

3    Q.   And how about the tab Number 10 on Government Exhibit 9?

4    A.   Okay.  It is a fingerprint card also.

5    Q.   Okay.  And the date of the first fingerprint card was done

6    on what day?

7    A.   The date on the first fingerprint card is August 2, 1990.

8    Q.   Okay.  And on the second -- the second fingerprint card?

9    A.   The date on the second fingerprint card is August 9th,

10   1990.

11   Q.   Okay.  Government -- the pink tab at 6 on Government

12   Exhibit 9, what document is that tab on?

13   A.   It's on a Form I-294.

14   Q.   Okay.  And what's an I-294?

15   A.   An I-294 is a warning to an individual.

16   Q.   Okay.  And did you compare that fingerprint to Government

17   Exhibit 1?

18   A.   Excuse me.  I have to take this file apart.  The

19   fingerprints are at the top.

20            (Pause)

21   A.   It's a two-page document.

22   Q.   Is there a fingerprint on that 294?

23   A.   On the 294, it's on the bottom.  It also compares to the

24   right thumb on Exhibit Number 1.

25   Q.   And tab 4 on Government Exhibit Number 9?

1    A.    Tab 4 is on a Form I-205.

2    Q.    That's the order for deportation?

3    A.    It is a warrant for deportation, yes, sir.

4    Q.    And did you compare that fingerprint with the Government

5    Exhibit 1?

6    A.    Yes, I did.  It also compares as a positive match to the

7    right thumb on Exhibit 1.

8    Q.    And that shows the Defendant was deported on May 6th of

9    '92; is that correct?

10   A.    Yes, sir.  May 6, 1992.

11   Q.    Okay.  Do you want to put that exhibit back together?  And

12   we're going to go to the next.

13   A.    Okay.

14           (Pause)

15   A.    It's back together.  Okay.

16   Q.    Exhibit Number 10.  I want to draw your attention to the

17   pink tabs on Government Exhibit Number 10 -- 9, 5, 8, and 12

18   respectively.

19           Could you tell us where tab 9 is?

20   A.    Tab 9 is on a fingerprint card FD 249, dated 10-7-1994.

21   It's October 7, 1994.

22   Q.    Government -- tab Number 5, what document is that on?

23   A.    Number 5 is on I-221.

24   Q.    What is an order 221?

25   A.    It is an order to show cause.

```
 1   Q.   Okay.  And --
 2   A.   Or certificate of service, as such.
 3   Q.   And there's a fingerprint on that document?
 4   A.   Yes.
 5   Q.   Government Exhibit 8 -- I mean tab 8 on Government Exhibit
 6   10?
 7   A.   Okay.  Tab 8 is a Form 385.
 8   Q.   And there's a fingerprint on that document?
 9   A.   Yes, sir, there is.
10   Q.   What is a Form 385?
11   A.   It is a booking card.
12   Q.   Okay.  And tab Number 12 on that document?
13   A.   Tab Number 12 is an I form, Form I-205.
14   Q.   That's the order of deportation?
15   A.   An order of deportation, yes, sir.
16   Q.   And based on those -- where those tabs are, 9, 12, 8, and
17   5 on Government Exhibit 10, did you compare those fingerprints
18   with Government Exhibit 1?
19   A.   Yes, sir, I did.
20   Q.   And what is your opinion as to whether or not there's a
21   match?
22   A.   They are a match.  They were made by the same person.
23   Q.   And, finally, Government Exhibit 11, there's a pink tab,
24   Number 7.  That's on the I-205; is that correct?
25   A.   Yes, sir.  It's also an I-205 dated March 29th, 2001.
```

1   Q.   I want to step back.

2          Government Exhibit 10, the one we just finished, that

3   I-205 shows this same person was deported on October 13th of

4   '94; is that correct.

5   A.   10-13-1994, yes, sir.  October 13th, 1994.

6   Q.   Okay.  Now, going back to Government Exhibit 11, the pink

7   tab, Number 7, that's on the I-205; is that correct?

8   A.   That is also on I-205, yes, sir.

9   Q.   And that shows -- that's an order of deportation; is that

10  correct?

11  A.   It is an order of deportation.  The order was issued

12  March 29, 2001.  And it was -- the deportation took place on

13  September 9, 2004.

14  Q.   Okay.  And you compared that fingerprint with Government

15  Exhibit 1?

16  A.   Yes, sir.

17  Q.   What is your opinion as to the comparison?

18  A.   It's a match with the right index finger shown on

19  Government Exhibit 1.

20          MR. MILLER:  Pass the witness.

21          THE COURT:  All right.  Ms. Rogers?

22                  CROSS-EXAMINATION

23  BY MS. ROGERS:

24  Q.   Mr. Prewit, at least one of those documents that you

25  examined is a reinstatement of deportation; is that correct?

1  A.   Yes, ma'am.

2  Q.   And for the jury's benefit, reinstatements have even less

3  due process considerations than a deportation hearing in front

4  of an immigration judge, correct?

5  A.   Yes, ma'am.

6  Q.   And immigration hearings are civil by nature.  They are

7  not like a criminal court where a client has a right to an

8  attorney or the right to cross-examine witnesses; isn't that

9  correct?

10  A.   It is a civil process, yes, ma'am.

11  Q.   It is an administrative hearing, and it goes -- it flows

12  much faster than probably they would like -- probably they

13  would like this to flow a little bit faster, but is it true on

14  a reinstatement that none of the processes that goes with an

15  immigration hearing is attached?

16  A.   On a reinstatement you're merely using the order from the

17  prior hearing and reinstating that order.

18  Q.   And if you have a prior deportation and a person is

19  arrested again, you can just reinstate it and out the country

20  they go?

21  A.   In some instances, yes, ma'am.

22  Q.   Where they would never have a chance to claim or to rebut

23  it.  You use that order and put them back at the bridge; is

24  that correct?

25  A.   In some instances, yes, ma'am.

1  Q.   Okay.

2           MS. ROGERS:  Your Honor, may we approach?

3           THE COURT:  The witness or me?

4           MS. ROGERS:  You.

5           THE COURT:  Okay.

6           (Bench Conference on the record)

7           MS. ROGERS:  I would like to ask a question that is

8  outside the scope of the direct on that, and I can recall him.

9  But in December of this year, he was involved in a case that we

10  represented, and I would like to ask him specifically, because

11  that client had been repeatedly deported and then was found to

12  be a United States citizen both by derivative and by birth

13  certificate.

14           MR. MILLER:  It's not relevant.

15           THE COURT:  I agree.  I'm going to keep it out.  I

16  think that that -- you can find -- what if he brings in 500

17  people that had been deported and claimed -- I mean, you just

18  open up a whole -- you go try another case within a case.

19           MS. ROGERS:  It's just my theory of the defense, and

20  with him he's port director.  He has personal knowledge of it.

21  And it's so similar to my case because he was repeatedly

22  deported, and so that is why I would like to ask about it.

23           THE COURT:  Okay.  I'm not going to allow you to go

24  into it.  We will make a record on it later on.

25           Thank you.

1          (End of Bench Conference)

2          MS. ROGERS:  Pass the witness, Your Honor.

3          THE COURT:  Mr. Miller, anything else?

4                    REDIRECT EXAMINATION

5    BY MR. MILLER:

6    Q.   Mr. Prewit, Ms. Rogers asked you about, you know, with an

7    expedited removal you basically are just reinstating the past

8    order; is that correct?

9    A.   Not an expedited removal, no, sir.

10   Q.   I'm sorry.  Reinstatement order?

11   A.   Reinstatement order.  A reinstatement order is basically

12   used by the BP.  We very rarely use reinstatement at the

13   bridge.

14   Q.   Okay.  Now, Ms. Rogers asked, well, it's basically a

15   person who has a reinstatement order doesn't have the benefits,

16   because Congress has basically said here's how the rules are

17   going to be now; is that correct?

18   A.   That's correct.

19   Q.   However, based on the warnings that this defendant

20   received, he's told who he needs to go and receive consent

21   from; is that correct?

22   A.   Yes, sir.

23   Q.   And, therefore, there is a process to petition the

24   Department of Homeland Security, the Secretary of Homeland

25   Security, or the Attorney General in order to gain citizenship

1    or access back into the United States lawfully; is that

2    correct?

3    A.   That's correct.

4          MR. MILLER:  Pass the witness.

5          THE COURT:  Ms. Rogers?

6          MS. ROGERS:  I will follow up quickly.

7                    RECROSS-EXAMINATION

8    BY MS. ROGERS:

9    Q.   Mr. Prewit, is it fair to say that in the '90s immigration

10   law -- there were enormous changes in immigration law as we

11   used to practice it?

12   A.   In 1996, '97, there was a drastic change in immigration

13   law.

14   Q.   Is it also fair to say that many, many people don't

15   understand all the new changes or don't often have the

16   resources to pursue things that people with more means might

17   have trying to adjust their status in that regard?

18   A.   The information is available to everyone.  There are some

19   people that may not have access on the Internet like there is

20   now.  But the information is available to everybody.

21   Q.   All right.  I'm not suggesting that it's not.  But don't

22   you or your staff field lots of questions from many, many

23   people that come to the port of entry seeking entry or trying

24   to adjust their status and that they are often misinformed?

25   A.   Yes, ma'am.

1  Q.   And you probably do your best to try to educate them or to

2  apply what the law is today?

3  A.   Yes, ma'am.  We supply them with the proper forms, if

4  they're available to us.

5  Q.   Would it be fair to say that the Immigration, Department

6  of Homeland Security now, but Immigration Service is an

7  enormous bureaucracy of the Federal Government and has lots and

8  lots of regulations attached to it?

9  A.   Yes, ma'am.

10 Q.   When we're talking about deportations as you've been

11 talking about, those apply to people not born in the United

12 States, correct?

13 A.   That's correct.

14         MS. ROGERS:  Thank you.  That's all.

15         THE COURT:  I'm sorry.

16         Mr. Miller?

17         MR. MILLER:  No further questions.

18         THE COURT:  All right.  Agent, you can step down.  We

19 appreciate you being here.

20         May this witness be excused, Ms. Rogers?

21         MS. ROGERS:  Yes, Your Honor.

22         THE COURT:  Mr. Miller?

23         MR. MILLER:  Yes.

24         THE COURT:  All right.  You're excused.  You can go

25 back to Presidio or Pecos.  And I would ask you not to discuss

1  your testimony, though, with anyone except the attorneys, all

2  right?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Until the jury begins its deliberations.

5          THE WITNESS:  Yes, sir.

6          MS. ROGERS:  Your Honor, if we could excuse him

7  subject to making the record I discussed with you.

8          THE COURT:  What I'm going to ask you to do, if you

9  wouldn't mind, hanging around till about 12:00.

10          THE WITNESS:  That would be fine.

11          THE COURT:  Can I have the exhibits?  And I will take

12  them right here.

13          MS. ROGERS:  Here is the original, Judge.

14          THE COURT:  Thanks very much.

15          Mr. Miller, where are we right now?

16          MR. MILLER:  My next two witnesses are going to be

17  short, but the next witness is -- Ms. Rogers and I need to

18  discuss a matter.

19          THE COURT:  Why don't we do this.  Let's go to lunch

20  early and be back here at 1:00, take an hour and a half.

21          Why don't you leave your notepads here, turn them

22  upside down.

23          I would ask the jury not to discuss the case with any

24  person.  Don't discuss it among yourselves.  Don't go do any

25  investigating.  And we will see y'all back here at 1:00, and we

1   will be ready to start back up then.

2              Let's all rise for the jury, please.

3              (Jury out)

4              THE COURT:  Everybody can be seated.  And I was going

5   to let Ms. Rogers make a record.

6              I will give you this back.  This is the original of

7   Exhibit Number 7.

8              Mr. Prewit, come back up here.  Ms. Rogers wants to

9   ask you a few questions.

10             It's 11:28, and we are outside the presence of the

11  jury.  Mr. Prewit is back on the stand, and Ms. Rogers wanted

12  to make a record, and I told her she could.

13             So, Ms. Rogers --

14             These are some questions I told her she could not go

15  into about another case.

16             So, go ahead, Ms. Rogers.

17        JOHN PREWIT, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

18                     DIRECT EXAMINATION

19  BY MS. ROGERS:

20  Q.   Mr. Prewit, as recently as December of last year, do you

21  recall the client that I represented and that you were

22  assisting me on, Pedro Orona-Carbajal that you helped me get

23  permits on?

24  A.   Yes, ma'am.

25  Q.   Do you recall he was put on the bridge despite my best

1  efforts to tell y'all he was a citizen?

2  A.  Yes, ma'am.

3  Q.  And do you recall that you assisted me when we got a

4  hearing outside in El Paso to parole him into the country to go

5  to El Paso to the hearing?

6  A.  Yes, ma'am.

7  Q.  And you know, of course, that he was granted citizenship?

8  A.  Yes, ma'am.

9  Q.  And I don't know if you know, but would it surprise you to

10  know that judge, again in Presidio County, made a finding that

11  he was born in the United States after we had obtained

12  derivative through the Immigration Service?

13  A.  I did not know that.

14  Q.  And do you recall that Mr. Pedro Carbajal had been

15  deported repeatedly, and later you were accepting that he is a

16  citizen, and you let him come into the country to live here?

17  A.  Yes, ma'am.

18       MS. ROGERS:  Those would be the questions I would

19  like to put in front of the jury.

20       THE COURT:  All right.  Mr. Miller?

21       MR. MILLER:  Yes.

22                CROSS-EXAMINATION

23  BY MR. MILLER:

24  Q.  Mr. Prewit, when this occurred, this was based on the

25  cooperation after he came into the system; is that correct?

1    A.   Yes, sir.

2    Q.   And that was cooperation of the U.S. Attorney's Office and

3    the defense and your office to have the Defendant submit what

4    is called an N-600; is that correct?

5    A.   That's correct.

6    Q.   So paperwork was put into play and presented to CIS there

7    in El Paso; is that correct?

8    A.   That is correct.  Yes, sir.

9    Q.   In this case no such thing was asked for by the defense,

10   was it?

11   A.   No, sir, not that I'm aware of.

12   Q.   Okay.  And they haven't submitted an N-600 to your

13   knowledge?

14   A.   Not to my knowledge.

15          MR. MILLER:  No further questions.

16          THE COURT:  Ms. Rogers?

17          MS. ROGERS:  I will follow up quickly.

18                    REDIRECT EXAMINATION

19   BY MS. ROGERS:

20   Q.   An N-600 is if you are trying to get a birth certificate

21   by derivative?

22   A.   That is correct.  Yes, ma'am.

23   Q.   So on the client that I'm questioning you about, we were

24   going derivative because the Immigration Service had said

25   you're lying when you say you were born in Presidio.  I don't

1   know if you remember the details, but --

2   A.   I don't remember the details.  We are talking about

3   Mr. Carbajal?

4   Q.   Yes.

5   A.   No, I don't remember the details.

6   Q.   He had raised U.S. citizen birth, and he was denied and

7   deported.  So we filed an N-600 based on y'all's finding that

8   his mother was still telling a lie when she said he was born in

9   Presidio.

10  A.   I wasn't familiar with that part of it, because it came

11  from another case.

12  Q.   Another case that comes to mind -- and I don't know if you

13  have a specific knowledge -- is a client named Arturo Rios that

14  was repeatedly deported and now living here in Pecos.

15  A.   I don't -- I'm not familiar with that case, ma'am.

16  Q.   And I think we had a third one Mr. Fannin represented, and

17  I can't think of the name.  But I as always appreciate your

18  assistance in helping us down there, so thank you.

19           THE COURT:  All right.  I'm going to not allow this

20  testimony to go to the jury.  I find that it is not relevant.

21  It has a collateral matter.  It is not substantially the same.

22  And we could get issues -- the Government could bring in one,

23  two, five, ten, and a thousand cases in which people were

24  repeatedly deported who were not U.S. citizens.  So I'm going

25  to not allow this testimony to go to the jury.

 1            MS. ROGERS:  Your Honor?

 2            THE COURT:  Yes, ma'am.

 3            MS. ROGERS:  I understand your ruling, and I don't

 4    want to argue, but may I make one argument for purposes of the

 5    record?

 6            THE COURT:  Yes, ma'am.  Sure.  Uh-huh.

 7            MS. ROGERS:  My questions are to say that it is

 8    exactly the same.  And I just -- maybe if I could tell you

 9    quickly.

10            THE COURT:  Surely.

11            MS. ROGERS:  Pedro Carbajal's mother said he was born

12    by midwife in Presidio.  The Immigration Service found that not

13    truthful.  The regulations for derivative we were able to

14    qualify based on Immigration Service saying you were born in

15    Ojinaga, not in Presidio.

16            But, Judge, I again issued a delayed birth

17    certificate accepting our proof, so it was unique in that he

18    was -- he came in under an N-600 derivative as well as a

19    delayed birth certificate, and the two governmental entities

20    were in conflict.

21            Thank you.

22            THE COURT:  Thank you very much.

23            May Mr. Prewit be excused now, Ms. Rogers?

24            MS. ROGERS:  Yes, sir.  Thank you very much.

25            THE COURT:  Mr. Miller, may Mr. Prewit be excused?

1              MR. MILLER:  Yes, Your Honor.

2              THE COURT:  We appreciate you again coming back in

3      here, and you are really excused this time.

4              THE WITNESS:  Thank you, Judge.

5              (Witness excused)

6              THE COURT:  All right.  Mr. Miller, let me hear from

7      you on other matters.

8              MR. MILLER:  Your Honor, my next witness is -- let me

9      get behind the podium.

10             THE COURT:  Can I make a suggestion?  Let's move the

11     podium this direction so you don't have to --

12             MR. MILLER:  Sure.

13             THE COURT:  We will get Mr. Adkins to give you an

14     assist.  There we go.  That's good.  You can be right in

15     Mrs. LaForge's lap.

16             THE CLERK:  Yeah.

17             THE COURT:  Ms. Rogers, if there was a witness

18     sitting in the witness seat, could you see them now?

19             MS. ROGERS:  If he would move just a little to the

20     left.

21             THE COURT:  How about Ms. Harris or --

22             MS. HARRIS:  I can see, Judge.

23             MS. ROGERS:  I can move back over here.

24             THE COURT:  Mr. Adkins, go sit in the witness stand.

25             This is off the record.  Let's go off the record.

1                    (Discussion off the record)

2               THE COURT:  We are back on the record.

3               Mr. Miller, what would you want to tell us?

4               MR. MILLER:  Your Honor, our next witness is Michael

5    L. Stevenson.  He is a probation officer out of the Middle

6    District of Louisiana.  He is the probation officer of the

7    Defendant.

8               There's three things that we want to elicit from his

9    testimony.  One is -- and I cite Bejar,

10   B-E-J-A-R--M-A-T-R-E-C-I-O-S.  It's a Ninth Circuit case cited

11   at 618 F.2d 81.  It's a Ninth Circuit, 1980.

12              I also cite United States versus Gullardo,

13   G-U-L-L-A-R-D-O-Mendez with a Z.  That is a Tenth Circuit case,

14   July 28th of 1998, at 150 F.3d 1240.

15              And United States versus -- pardon me.  Hernandez-

16   U-R-I-B-E versus United States.  That is an Eighth Circuit case

17   at 515 F.3d -- F.2d, pardon me, 20.  That is an Eighth Circuit,

18   as I stated, 1975 case.

19              Your Honor, basically the Fifth Circuit has yet to

20   rule on this particular issue.

21              THE COURT:  And the issue is?

22              MR. MILLER:  The issue is whether or not the

23   Government can introduce the judgment and committal order of a

24   prior charge and conviction of an identical charge of the

25   Defendant on a prior matter.

1          Initially, the Government was going to file -- to

2     give you some background, the Government was going to file a

3     motion of collateral estoppel in this case based on the fact

4     that this defendant has already had his day in court regarding

5     his alienage.  However, there was a recent -- the Solicitor

6     General through the Department of Justice, basically, did an

7     about-face and no longer would go forward with that, believing

8     that a defendant, no matter how many times they come into the

9     country claiming citizenship, they could not be collaterally

10    estopped in the criminal case.  And I will cite that case.

11         THE COURT:  I'm familiar with the case.  I'm familiar

12    with the law.  I mean, I understand what the law -- what I

13    thought it was until this week, but --

14         MR. MILLER:  And because of that, I'm relying on

15    Bejar, Hernandez-Uribe, and United States versus

16    Gullardo-Mendez.  Those cases basically stand for the -- stood

17    for the proposition that, you know, the Defendant is

18    collaterally estopped.

19         But Bejar-Matrecios is probably the closest case on

20    point that the Government is saying here, that we are asking

21    that the J&C be submitted on a limited circumstance, not as to

22    conclusive evidence but as evidence to show that this defendant

23    is an alien and not a U.S. citizen.

24         Under Bejar-Matrecios, the case was remanded and

25    reversed on other grounds, because they specifically stated

1  that when the J&C was allowed in, evidence of a prior

2  conviction, the Court, through the Government not requesting

3  it, did not inform the jury what was the purpose of this

4  document as it being offered.  And because of that, they found

5  that was more prejudicial than probative.

6          In this case, I believe it's more probative than

7  prejudicial, because one is Ms. Rogers has elicited from

8  Ms. Lujan that there was something in the A-File that occurred

9  in 1999 that alluded he was a United States citizen or claimed

10  to be a United States citizen.

11          This conviction of immigration, identical charges, is

12  as charged in this indictment, occurred after the 1999 date;

13  and, therefore, we believe it is more prejudicial -- I mean it

14  is more probative, pardon me, than prejudicial and, therefore,

15  should be allowed in.

16          THE COURT:  I just want to understand.  The case you

17  are relying on is the Ninth Circuit case 618 F.2d 81?

18          MR. MILLER:  That is correct.

19          THE COURT:  Okay.  Go ahead.

20          MR. MILLER:  And, Your Honor, I'm referring basically

21  to -- and it is on page 84, notes -- keynote 9.

22          Because of that, we request that the burden -- it is

23  a heavy burden.  We have to prove beyond a reasonable doubt.

24  And there is an issue now raised that he is claiming he is a

25  United States citizen, and that claim apparently arose since

1  1999, and we need to establish that the issue of his alienage

2  was heard once before.  It is not conclusive evidence, but it's

3  evidence nonetheless that should be considered by this jury.

4          THE COURT:  Okay.  Let me hear from Ms. Rogers.

5          Is that the only thing you have on that point?

6          MR. MILLER:  That's the only thing on that point

7  regarding this witness, yes.

8          THE COURT:  That's the only thing Mr. Stevenson would

9  testify?

10          MR. MILLER:  No, I have two other things.

11          THE COURT:  What else?

12          MR. MILLER:  The other thing Mr. Stevenson would

13  testify to as his probation officer, he was -- one of the

14  conditions of this defendant's release is that should he be

15  deported that he must receive consent from the Attorney General

16  to come back into the United States.

17          THE COURT:  Okay.

18          MR. MILLER:  And the third issue is -- probably an

19  objection.  I don't know if it's an issue, but we can bring it

20  up.  When Mr. Stevenson was doing his report, Pretrial Service

21  [sic] report, the Defendant told him that it was -- he said

22  Mexico and Texas.

23          And then Mr. Stevenson, "Well, who can I corroborate

24  this information from?"

25          And the Defendant stated, "You can speak with my

1    sister."

2            And he then conferred with his sister, and we would

3    say it is a statement by a party opponent through a

4    representative, and she stated the Defendant was born in

5    Mexico.

6            THE COURT:  Okay.  I mean, I can see what he said --

7    I can see what the Defendant said to Mr. Stevenson be

8    admissible, but how -- tell me again how the sister saying

9    that --

10           MR. MILLER:  Okay.  You're familiar with Pretrial

11   Service reports -- I mean presentence reports.  And as

12   Mr. Stevenson was taking down the information, what the

13   Defendant was telling him, Mr. Stevenson then said, "Well, who

14   can I ask the Defendant -- who can I call to corroborate this

15   information?"

16           And the Defendant stated, "You can call my sister."

17   I can't remember the sister's name.

18           And we would say under 801(d)(2)(C) the statement is

19   offered against a party and by a person authorized by the party

20   to make a statement concerning the subject.

21           THE COURT:  Doesn't that kind of go to like

22   corporations when you say a corporation is a person or a party

23   before the Court and you say, okay, the president is authorized

24   to speak for them or the CEO or something like that?

25           MR. MILLER:  Your Honor, that would be part D, a

1    statement by a party's agent or concerning agency or

2    employment.

3            THE COURT:  Do you have any authority for a sister --

4    sister's testimony?

5            I mean, I think if she comes and testifies -- which I

6    don't have any doubt you can probably impeach her with the

7    statement, but I don't think coming in on your case in chief.

8    But I will look if you have any evidence.

9            MR. MILLER:  I do not have any case law handy.

10           THE COURT:  Is that the three points?

11           MR. MILLER:  That is the three points, Your Honor.

12           THE COURT:  Let's hear from Ms. Rogers on the three

13   points.

14           MS. ROGERS:  Well, on the last thing first, I

15   understood you from the break that Mr. Stevenson was going to

16   say that the client said, "I was born in Mexico, but the mother

17   said I was born in the U.S."  Did I misunderstand that?

18           MR. MILLER:  Something of that nature.

19           MS. ROGERS:  But meaning you need to call them to

20   find it out.

21           THE COURT:  Okay.

22           MS. ROGERS:  That was not what I heard you say to the

23   Judge, but --

24           Your Honor, Rule 403 is the reason to keep out the

25   judgment.  But more importantly, Alemdarez-Torres is a Supreme

1   Court 1998 -- and I want to quote on page -- it's at 523 U.S.

2   224 at 233 -- I mean -- yes, at 233.

3           "Finally, the contrary interpretation -- a

4   substantive criminal offense -- risks unfairness.  If

5   Subsection (b)(2)," which is what we are indicted for, "sets

6   forth a separate crime, the Government would be required to

7   prove to the jury that the defendant was previously deported

8   'subsequent to a conviction for commission of an aggravated

9   felony.'  As this Court has long recognized, the introduction

10  of evidence of a defendant's prior crimes risks significant

11  prejudice."

12          THE COURT:  But in Almendarez-Torres they're talking

13  about the aggravated felony element, not the offense of a

14  deportation in and of itself, correct?

15          MS. ROGERS:  But it would be the same.

16          So it seems like in the long-held --

17  Almendarez-Torres is saying it is a sentencing factor about the

18  aggravated felony; but if you really want to get the jury to

19  not consider the case, show them that someone else has already

20  convicted him of it.

21          And when it is an issue of U.S. citizen, U.S. citizen

22  birth, it is true that Louisiana might find against him and a

23  Pecos jury might find for him.  It raises all sorts of other

24  questions about what happens to him afterwards.

25          But, Your Honor, we are satisfied that we've shared

1   the law with Mr. Miller.  Ms. Harris did a lot of work on this.

2   As he said, the Attorney General even backed up on it.  We have

3   a brief on it about being put on the same defense again.  But

4   it would be highly prejudicial for Mr. Stevenson to say he's

5   his probation officer or certainly prove up the conviction that

6   is exactly what we are charged with here.

7           THE COURT:  All right.  Now, what about the

8   comment -- Mr. Miller has talked about what the sister said to

9   him.

10          MS. ROGERS:  Absolutely hearsay.  She has no personal

11  knowledge of where he's born.  All she has is oral tradition

12  perhaps, but it would be -- it would not meet any exceptions

13  that I can see.

14          THE COURT:  Is his sister going to testify?

15          MS. ROGERS:  She might.

16          MS. HARRIS:  Well, a sister.  We don't know what

17  sister he talked to.

18          MR. MILLER:  The youngest sister.

19          MS. ROGERS:  Well, we haven't made that call.  We are

20  going to huddle at noon about it.

21          THE COURT:  Let's just have one at a time argument

22  from the defense.

23          What is your position on -- Ms. Rogers, on the

24  probation officer saying, "I told him he couldn't come back

25  into the country"?  And I don't know if he's handed him

1   something in writing.  Sometimes they hand them something in

2   writing.

3           MS. ROGERS:  I think that's part of the A-File where

4   they get those warnings on it.  But, of course, if he's a

5   citizen, he doesn't have to reapply, and that's our position on

6   the case.

7           MR. MILLER:  Your Honor, actually, it is on the J&C.

8           THE COURT:  Well, but --

9           MS. ROGERS:  It's repetitive.  There are documents --

10  they are all in English, and they tell you not to come back.

11          THE COURT:  I'm going to let the officer say he told

12  him and he also gave him a copy.

13          Did the officer give him -- did the officer give him

14  the J&C?

15          MR. MILLER:  No.

16          THE COURT:  I don't think he does, because usually it

17  doesn't get done until after they've said good-bye from the

18  courtroom.  So if he -- if the Defendant decides to take the

19  stand, you can certainly ask him if he got the J&C and say --

20  I'm not sure that the jury understands what "did you get a

21  piece of paper that says you couldn't come back?"

22          I'm going to let the officer tell that the

23  Defendant -- is that what your testimony is?

24          MR. MILLER:  No.  He is just a probation officer.  He

25  has recently filed a motion to revoke his supervised release

1  out of the Middle District because he violated the conditions

2  of his release.  And one of the conditions was not to come back

3  into the country unless he had consent from the Attorney

4  General to come back in.

5          THE COURT:  I thought you -- I thought what you told

6  me a minute ago that the second thing that he was going to

7  testify to was that he told the Defendant that he couldn't come

8  back into the United States without permission of the Attorney

9  General or the Director of Homeland Security -- Secretary of

10 Homeland Security.

11         MR. MILLER:  I may have misspoke, Your Honor.  What

12 he would testify to is he was present in court when the Judge

13 informed the Defendant that he could not come back in the

14 country unless he had consent of the Attorney General to come

15 back in, as well as was in the J&C, but he personally did not

16 tell the Defendant.

17         THE COURT:  Okay.

18         MR. MILLER:  I mean, that's -- and -- never mind.

19         MS. ROGERS:  Your Honor, that's more repetitive,

20 because he is not an officer of the Immigration Service.  And I

21 don't -- I think it's improper for the jury to hear that he's a

22 probation officer assigned to this case.

23         THE COURT:  Well, we can -- we can work that out.

24         Let me say this.  And I'm going to fuss just a little

25 bit.

1          It would have been helpful to all of us before during

2     the middle of trial -- so I get this stuff now.  Because these

3     are important questions to the Government and Defendant, and I

4     would liked to have had the opportunity to examine it.

5          I was aware that the Government wasn't going to go

6     into collateral estoppel, because this would have made this a

7     pretty short trial if that was the case.  I wish I had had all

8     the briefing and what these issues were going to be.

9          What is Mr. Luck going to testify to, Mr. Miller?

10          MR. MILLER:  Mr. Luck -- I'm going to see if he's

11     reviewed the file, if he remembers anything.  Sixteen years ago

12     he was the probation officer of the Defendant, and the

13     Defendant told him he was born in Mexico.

14          THE COURT:  If he can recall that?

15          MR. MILLER:  Yes.

16          MS. ROGERS:  I'm still raising 403 objections on both

17     of those, because the file is replete with those statements

18     from the Defendant coming in that he's already introduced.  And

19     if he doesn't have any independent knowledge, I'm going to

20     object on that.  But I think it is highly prejudicial.

21          THE COURT:  This is the ultimate issue in the case,

22     and I'm going to -- if Mr. Luck has recollection that that's

23     what was said by the Defendant, I find that it is highly

24     probative.  And certainly it is prejudicial, but it comes from

25     the Defendant.  And it's to -- it's certainly relevant.  It is

1    not to show the bad character.  It doesn't go to a collateral

2    issue.  It goes to the issues in this case whether or not he

3    was a citizen and believe he was a citizen.

4         And so I'm assuming you meet the predicate of what

5    his recollection of that is, or even if he has notes that he

6    has to refresh his memory -- I don't know if he has notes of

7    his file.  Certainly -- if he doesn't have an independent

8    recollection, if you prove up the predicate, he could refresh

9    his recollection of what was said.

10        So Mr. Luck, assuming the predicate is laid, would be

11   able to testify to that.

12        On these three issues of Mr. Stevenson, I'm not going

13   to let him testify to what the sister said.

14        MR. MILLER:  Okay.

15        THE COURT:  I'm not going to let him testify.

16        Now, if the sister comes and testifies, it may be

17   something you use on rebuttal if y'all can say this is the

18   right sister or you know which of the sisters it is, could come

19   back in -- could come in.

20        On the issue -- I think this -- let's handle this,

21   the second issue, this way.  Why don't we say that

22   Mr. Stevenson works for the courts in Louisiana.  You don't

23   have to say what he does.  He works for the courts in

24   Louisiana.  He was present when the Defendant was told -- I

25   assume he was present when he was told --

1          MR. MILLER:  That is correct.

2          THE COURT:  -- that he could not come back into the

3     United States without permission of the Director of Homeland --

4     he was at a proceeding in which he was told that he could not

5     come back into the United States without permission of the

6     Attorney General or whoever it was at the time.

7          I guess -- what year was this that he was told,

8     approximately?

9          MR. MILLER:  2000.

10         THE COURT:  Okay.  So it is prior to the Homeland --

11    prior, before we had the Secretary of Homeland.

12         MR. MILLER:  That is correct.

13         THE COURT:  So it could have just been the Attorney

14    General.

15         And then I'm going to go look at the issue of -- you

16    don't need to say why he was there.  He is just an officer --

17    he was an employee of the United States Government.  He was

18    present at a proceeding when he was told that.

19         And then as to -- and he can identify him, I mean, if

20    he can identify, that that was the same person that was there.

21         And then as to the issue of the Louisiana court

22    hearing, I'm going to go -- do you have copies of the cases?

23         MR. MILLER:  I do.

24         THE COURT:  Give them to Mrs. LaForge, and she will

25    pass them back to me.

1                MR. MILLER:  And I provided a copy to the defense,

2      Your Honor.

3                THE COURT:  And I will read these during the lunch

4      hour.

5                I know -- I understand the point on Almendarez, what

6      you are trying to say.

7                All right.  Let's take just a minute, and I would

8      like to see the counsel back in chambers for half a second,

9      give you a couple of thoughts about the charge.

10               MR. MILLER:  Sure.

11               THE COURT:  And we can -- I need -- Marshal, I need

12     Mr. Aguirre back up here ready to go at 1:00.

13               THE MARSHAL:  Yes, Your Honor.

14               THE COURT:  All right.  With that, we will be in

15     recess till 1:00.

16               (Recess)

17               THE COURT:  Let's be seated.

18               And it's about eight minutes after 1:00.  We are

19     outside the presence of the jury.  Present for the Government

20     is Mr. Miller.  Ms. Rogers and Ms. Harris are here.  And

21     Aguirre is present.

22               Before the noonhour, I heard argument from the

23     counsel -- from counsel on a proffer from the Government on the

24     guilty findings of Mr. Aguirre.

25               Just so that I'll have the facts straight, tell me

1   again, what's the date of that prior conviction?  This is a

2   prior conviction for illegal entry after deportation; is that

3   right, Mr. Miller?

4           MR. MILLER:  That is correct, Your Honor.  The --

5           MS. ROGERS:  February 11, 2000.

6           MR. MILLER:  That is when the sentence was imposed.

7           THE COURT:  February 11, 2000?

8           MR. MILLER:  Yes.

9           THE COURT:  And was it -- did he plead guilty, or was

10  it to a jury?

11          MR. MILLER:  It was to a jury.

12          THE COURT:  Was it a 1326 case?

13          MR. MILLER:  Yes, it was, Your Honor.

14          MS. ROGERS:  It was a two-count.  1326 was one count.

15  And a Title 8, 1546 was Count Two, possession of a forged

16  document.

17          THE COURT:  Okay.  The Government has waived its

18  right or has not -- may not have waived its right, but has not

19  asserted that the prior conviction collaterally estops the

20  Defendant from asserting his citizenship in the present case.

21          Is that correct, Mr. Miller?

22          MR. MILLER:  That is correct, Your Honor.

23          THE COURT:  All right.  So then the question goes --

24  then the question is, next, is it admissible for some other

25  purpose.  And then I think we would just simply go to look at

1   Rule 403 and 404 and Rule 402 as well.

2          The first question is, is it relevant.  It would seem

3   to me that a finding that a defendant, at least as of 2000,

4   that he had been convicted of the offense of illegal reentry,

5   would have relevancy in this case.  It's the same offense.

6   It's not an offense, for instance, a case of a drug offense or

7   something that could be used, because it is a same or similar

8   offense.

9          It's not being offered to show the bad character of

10  the Defendant.

11         The question then goes to weighing under 404, the

12  probative value versus the prejudice.

13         It is probative, but, again, taking away that he has

14  already -- that the Government has not -- is not offering it

15  for a collateral estoppel issue, so it can't go to the ultimate

16  issue in the case.  It can't be evidence of the ultimate issue

17  in the case.

18         It has to be evidence of things such as stated under

19  Rule 404, which include his state of mind, his intent, motive,

20  opportunity, acted according to a plan or in preparation for

21  commission of a crime, committed the acts for which he is on

22  trial by accident or mistake.  These are the limited purposes

23  for which under 404(b) that these -- that a similar act can be

24  charged.

25         So which of these, Mr. Miller, does the Government

1    offer this evidence?  Or does it offer it for any of those
2    particular items?
3            MR. MILLER:  It goes to intent.  It goes to
4    knowledge.  It goes to identity.
5            THE COURT:  Explain to me identity.  How does it go
6    to identity?
7            MR. MILLER:  The identity is we're claiming today
8    that he's an alien and his identity back when he was convicted
9    his identity was that he was an alien.
10           THE COURT:  All right.  Anything else?
11           MR. MILLER:  We show his intent.  He came in back
12   then, or was found in the United States, and the intent in this
13   case is he came back into the United States.  And the intent is
14   to show that he knew he was an illegal alien, but his intent
15   was to come back in any way.
16           The knowledge of the fact as well, Your Honor.  He's
17   charged with -- as an alien coming back into the country,
18   intended to come back into the country, as the element back
19   then was the same thing.
20           But the thing we are focusing on here is not
21   conclusive evidence of alienage but some evidence of his alien
22   status.
23           Also, Your Honor, it -- based on the testimony
24   elicited by Ms. Rogers of Officer Lujan, there was mention of
25   an allegation -- of a mention that he claimed U.S. citizenship

1   in 1999, and this conviction was on or about that date.

2          THE COURT:  Okay.  I don't find Ms. Rogers opened the

3   door to this.  It's coming in on its own legs.

4          All right.  Ms. Rogers, you or Ms. Harris want to be

5   heard?

6          I didn't find any of the cases cited by the

7   Government to the various instructions -- I mean, I appreciate

8   you citing them, but I don't find they are really on point on

9   the issue.  And I think the Government stated that there

10  really -- I mean, it talks about the issue of prior conviction.

11  They all go to the issue of collateral estoppel, so -- which we

12  are not dealing with.

13         Ms. Harris, I would be glad to hear from you.

14         MS. HARRIS:  Yes, Judge.

15         I believe under all three cases the evidence was

16  introduced under that theory.  Although we certainly knew about

17  the conviction, I don't believe we got an official 404(b)

18  notice.

19         It appears to be -- under an extraneous evidence

20  analysis, it appears to be cumulative, that we've heard all

21  morning allegations that at different times he represented

22  himself to be a citizen of Mexico and he has two birth

23  certificates saying he was born in Mexico.

24         In addition, in the Bejar-Matrecios case, the Court

25  goes on, on their 403 analysis to remark even when evidence of

1  specific prior misconduct is not prohibited under 404(b), it

2  remains potentially prejudicial.  This is especially true where

3  the prior act closely resembles the newly charged offense,

4  because the jury is likely to infer that having once committed

5  a crime the Defendant is likely to do it again.

6        And when it is the exact same crime, it seems to me

7  to be very confusing to say, well, it's some evidence of guilt.

8  But we're not saying it is the end-all evidence of guilt as you

9  would have in collateral estoppel.  And I just don't think that

10  outweighs its substantially prejudicial effect.

11        THE COURT:  Yeah, I don't think -- I don't think you

12  can have a little bit of collateral estoppel.  It's like other

13  conditions that people have.  They are either -- they either

14  are or they're not.

15        So I don't think it can be offered, Mr. Miller, for a

16  little bit of evidence of this.  I think it can be offered for

17  those matters that are set forth in Rule 404 that could be --

18  that could be offered for those -- for evidence of those

19  matters, and that would be intent, knowledge, and I'm not sure

20  identity falls into the case.

21        But here's the Court's ruling.  Here's what I'm going

22  to do.  I do find it's relevant.  I do find it is prejudicial;

23  however, I do find that the probative value outweighs the

24  prejudice.

25        I find that the Defendants have not opened the

1    door -- or the Defendant has not opened the door to the

2    admissibility of this evidence.

3         I find that it does not go to the character of the

4    accused but that the Defendant has placed in issue, by pleading

5    not guilty in this case, his intent and then the knowledge he

6    had when he reentered the United States.

7         Now, I'm not going to -- I think the only thing that

8    is going to come in that there was a conviction, not that he

9    had a jury trial, not that he went into details, even more than

10   you would if you had a similar drug case.  You don't get to go

11   into, well, he presented all this evidence and the Government

12   presented this, and after this the jury went back and

13   deliberated.  We are not going to go into that.  He has a

14   conviction for illegal entry.  You can put the date.

15        Now, if for some reason the Government wants to get

16   in -- the Defendant wants to get into, well, he didn't plead

17   guilty to this, I don't -- just say he has a conviction in the

18   Middle District of Louisiana.  And what year was it?  2000?

19        MR. MILLER:  That is correct.

20        THE COURT:  2000.

21        MR. MILLER:  Your Honor, I think the conviction was

22   '99, but was sentenced in 2000.

23        THE COURT:  Okay.  Pick a date.

24        MR. MILLER:  October 9, 1999.  I'll find out exactly

25   from the witness.

1          THE COURT:  Say he was convicted, was convicted for
2    that offense.
3          Now, the conviction for -- I'm only going to allow to
4    come in the conviction for the illegal reentry after
5    deportation, not the second offense for fraudulent documents or
6    forged documents or -- what's the -- what was the second
7    charge, Mr. Miller?
8          MR. MILLER:  Possession of forged and counterfeit
9    alien receipt card.
10         THE COURT:  I don't want you to get into that.
11   Illegal reentry after deportation.
12         MR. MILLER:  Your Honor?
13         THE COURT:  Yeah.
14         MR. MILLER:  I'm sorry.
15         THE COURT:  Go ahead.
16         MR. MILLER:  I had one question.
17         THE COURT:  Yes, sir.
18         MR. MILLER:  Can I submit it but not for the jury,
19   just for the record, what you're basing this decision on, the
20   J&C?
21         THE COURT:  That will be fine.
22         I mean, there is no -- we are not questioning --
23   Ms. Rogers, you and/or Ms. Harris, don't question the
24   authenticity of his -- I don't mean to say -- you're not
25   questioning that he wasn't the same person that was convicted.

1  You agree that he was the person convicted.  You are saying it
2  shouldn't be admissible.
3          MS. ROGERS:  Right.
4          MS. HARRIS:  Exactly.
5          THE COURT:  So we can -- I mean, I think that
6  takes --
7          MS. ROGERS:  I don't -- it's going to come in through
8  the probation officer, who is not going to say he's a probation
9  officer.
10          THE COURT:  He is just going to say he's an officer
11  of the court.
12          MR. MILLER:  Okay.
13          THE COURT:  Just say he's an officer of the court, he
14  was convicted on this date, here was the offense that he was
15  convicted.  And when he says that, I will go -- give the
16  instruction that's in the pattern jury charge 1.30, similar
17  acts, and tell them what it is limited -- what it's limited to,
18  that they can't consider this in deciding if he's guilty in
19  deciding whether or not he committed the acts charged in this
20  indictment.
21          However -- I mean, I take it right from here.  If you
22  want to look it up, it's 1.38.  I will just plug in intent and
23  knowledge.  And the officer can also testify that he was told
24  in court.  I assume he was told in court --
25          MR. MILLER:  Yes.

1          THE COURT:  -- that he cannot come back into the

2    United States.

3          MR. MILLER:  Okay.

4          THE COURT:  Because I think that goes into his

5    knowledge at that time as well.

6          MR. MILLER:  Okay.  Your Honor, can I have one

7    minute?

8          THE COURT:  Surely.  You can go instruct your

9    witness.  We will take a quick break.

10          If you will tell the jury we will be about five

11    minutes, if they will give us about another five minutes.

12          MR. MILLER:  Your Honor, I wasn't clear.  Should I

13    offer this just for the record purposes but not for the jury?

14          THE COURT:  Why do you need it for the record?

15          MR. MILLER:  I guess you agree with this?  I didn't

16    catch that.

17          THE COURT:  I think -- what I understand the

18    Defendants say, they stipulate that he was convicted on that

19    date.  They don't stipulate that it should be admissible into

20    evidence, but that he was the Defendant; he was convicted for

21    8 U.S.C. 1326(b) on that date.

22          MS. HARRIS:  Your ruling does not allow the actual

23    paper --

24          THE COURT:  I'm not allowing the actual document to

25    come in.  He is offering it for the record to prove up, so if

1  there was a question whether or not this was the same gentleman

2  that was convicted at that time for that offense.  And as I

3  understand, the Defendants also stipulate that he was.

4           Is that right, Ms. Harris?

5           MS. HARRIS:  Yes.

6           MR. MILLER:  All right, Your Honor.  Can I go see --

7           THE COURT:  You can go see your witness.

8           MR. MILLER:  Thank you.

9           (Pause)

10          MS. HARRIS:  Your Honor?

11          THE COURT:  Yes.

12          MS. HARRIS:  Liz and I were just chatting, and we

13  were confused as to a statement in court.  If he just says, "I

14  heard it in the courtroom that he is not supposed to return,"

15  how is that not a hearsay statement?

16          THE COURT:  Because it is not offered for the truth

17  of the matter asserted, but it is offered for the fact he was

18  given notice.  It is an exception, that he was given notice.

19          I mean, he is saying -- I think the question is, that

20  he's being told that he can't return to the United States, that

21  he was present and that was stated to your client.

22          MS. HARRIS:  Okay.

23          THE COURT:  It's irrelevant whether or not the

24  statement is true.  The fact is that the statement was told --

25  was made and he heard it.

1         MS. HARRIS:  Okay.

2         THE COURT:  That's -- I mean, that's the reason I

3    think it's non-hearsay.

4         MS. ROGERS:  The only thing that I'm losing sight of

5    as the defense is that he is a citizen, not that he's an alien

6    that didn't apply.  So I think we are going down the wrong

7    trail, letting the Government come in on that.  Because if he

8    is -- if it's what we say, that he's a citizen, then he doesn't

9    have to get notice.  Now they are not conceding that.

10         THE COURT:  But that is your theory.  The

11    Government's theory is that he's not a citizen and he had just

12    been found guilty of not being a citizen and coming back in,

13    so --

14         MS. ROGERS:  Okay.

15         THE COURT:  Are we ready to proceed, Mr. Miller?

16         MR. MILLER:  Yes.

17         THE COURT:  Could we get the witness to come up here,

18    please?

19         MR. MILLER:  Yes, Your Honor.

20         THE COURT:  If we could get the witness to come on

21    up.

22         MR. MILLER:  Oh, Michael.

23         THE COURT:  All right.  Let's all rise, and we'll

24    bring the jury in.

25              (Jury in)

1           THE COURT:  All right.  Please be seated.

2           It's 1:26.  We're back in the courtroom with the

3   jury.

4           Mr. Miller is here for the Government.  Ms. Rogers

5   and Ms. Harris are present.  And Mr. Aguirre is present.

6           I'm sorry that we made y'all wait for a few minutes.

7   I know many of y'all would like to go out and take a walk in

8   this wonderful spring break and do that, but it is March in

9   West Texas.

10          But it is my fault.  I needed to visit with the

11  lawyers for a few minutes.  And it will make things go a little

12  bit faster through the rest of the day.

13          So, Mr. Miller, call your next witness.

14          MR. MILLER:  I call Mr. Michael Stevenson.

15          THE COURT:  Mr. Stevenson, you were sworn as a

16  witness this morning; is that correct?

17          THE WITNESS:  That's correct.

18          THE COURT:  All right.  And I've had some -- Art back

19  there, our Courtroom Security Officer, is really hard of

20  hearing.  And so if you -- and we have the international sign

21  that I can't hear, so y'all put -- if you can't hear, put your

22  hands up here and -- or raise your hand.  But if you could

23  speak up so that we can all hear.

24          THE WITNESS:  Okay.

25          THE COURT:  Because some of them are a little bit

1   away.

2            All right.  Go ahead, Mr. Miller.

3            MR. MILLER:  Thank you.

4        MICHAEL L. STEVENSON, GOVERNMENT'S WITNESS, SWORN

5                    DIRECT EXAMINATION

6   BY MR. MILLER:

7   Q.   Mr. Stevenson, you are an officer of the court in Middle

8   District of Louisiana, Baton Rouge, Louisiana; is that

9   correct?

10  A.   That's correct.

11  Q.   How long have you been an officer of the court?

12  A.   Almost eight years now.

13  Q.   Do you know the Defendant?

14  A.   Yes.

15  Q.   And you met the Defendant back in 1999; is that correct?

16  A.   That's correct.

17  Q.   In the Middle District, was there a conviction of the

18  Defendant, a violation of illegal entry after deportation?

19  A.   That's correct.

20           MS. ROGERS:  Your Honor, may I just insert an

21  objection that we discussed outside the presence of the jury?

22           THE COURT:  I overrule your objection for the same

23  reason that we discussed it outside the presence of the jury.

24           And you do have a running objection, Ms. Rogers, to

25  this testimony.

1          MS. ROGERS:  Thank you.

2          THE COURT:  Ask the question again so he can hear it.

3    BY MR. MILLER:

4    Q.   Mr. Stevenson, was the Defendant convicted of a violation

5    of Title 8, United States Code, Section 1326, illegal entry?

6    Illegal entry by deported alien?

7    A.   That's correct.

8    Q.   And were you present when he was advised by the Judge not

9    to reenter the United States without the consent of the

10   Attorney General?

11   A.   Yes, I was.

12         MR. MILLER:  Pass the witness.

13         THE COURT:  Ladies and gentlemen, as concerns the

14   testimony about the conviction in Louisiana that you just heard

15   evidence of, this is one of those that you are going to have to

16   consider this for a limited purpose only.  And I'm going to

17   give you an instruction.  It will be in the jury charge.

18         You'll have a copy of this instruction or something

19   very close to it at the time, but just to let you know, this

20   evidence, which may be similar to those charged in the

21   indictment here, but which was committed on another occasion,

22   you must not consider this evidence in deciding if the

23   Defendant committed the acts charged in the indictment.

24   However, you may consider this evidence for other, very

25   limited, purposes.

1              If you find beyond a reasonable doubt from other

2    evidence in this case that the Defendant did commit the acts

3    charged in the indictment, then you may consider evidence of

4    this prior conviction allegedly committed on another occasion

5    to determine the following:  one, whether the Defendant had the

6    intent necessary to commit the crime charged in the indictment

7    and whether or not -- and/or whether or not the Defendant had

8    the knowledge to commit the acts charged in the indictment.

9              This is the limited purpose for which this evidence

10   has been admitted for your consideration.  And you'll have that

11   laid out for you in writing later on.

12             All right.  Ms. Rogers or Ms. Harris, either one.

13             MS. ROGERS:  Just briefly.

14                       CROSS-EXAMINATION

15   BY MS. ROGERS:

16   Q.   Mr. Stevenson -- Stevens or Stevenson?

17   A.   Stevenson.

18   Q.   In any of your dealings with Mr. Aguirre-Estrada, do you

19   have information that his mother asserts that he's born in the

20   United States?

21             MR. MILLER:  Objection, Your Honor.  Hearsay.

22             THE COURT:  Overruled.

23   A.   Only what he told me when I interviewed him.

24   Q.   Okay.  Thank you.

25             MS. ROGERS:  No further questions.

1          THE COURT:  All right.  Do you want to let this
2   witness hang around for a while?
3          MR. MILLER:  Yes, I do, Your Honor.
4          THE COURT:  All right.  He's from Louisiana.  He just
5   loves being in West Texas in March.
6          Mr. Stevenson, we appreciate you being here.  We are
7   going to ask you to hang around the courthouse for a while.
8   And, again, I would ask you not to discuss your testimony or
9   this case with any other witness.
10          THE WITNESS:  Okay.
11          THE COURT:  Mr. Miller, call your next witness.
12          MR. MILLER:  Call Mr. Terry Luck.
13          THE COURT:  Terry Luck.
14          (Pause)
15          MR. MILLER:  One moment, Your Honor.
16          THE COURT:  All right.
17          (Pause)
18          THE COURT:  Mr. Luck, would you state your name for
19   us, please, sir?
20          THE WITNESS:  Terry Luck.
21          THE COURT:  And, Mr. Luck, you were sworn as a
22   witness this morning, correct?
23          THE WITNESS:  Yes, sir.
24          THE COURT:  And, again, Art is very hard of hearing
25   back there in the back, so would you project your voice and

1    speak that way so that even he can hear you?

2              THE WITNESS:  All right.

3              THE COURT:  Thank you very much.  And sometimes he

4    nods off, so I want him to be fully awake.

5              THE WITNESS:  No problem.

6              THE COURT:  Go ahead.

7              TERRY LUCK, GOVERNMENT'S WITNESS, SWORN

8                        DIRECT EXAMINATION

9    BY MR. MILLER:

10   Q.   Mr. Luck, you're an officer of the court here in the

11   Western District of Texas; is that correct?

12   A.   Yes, sir.

13   Q.   How long have you been an officer of the court?

14   A.   A little over 16 years.

15   Q.   And you work both in the Midland Division as well as the

16   Pecos Division?

17   A.   I have, yes, sir.

18   Q.   Do you recall back in 1990 dealing in a matter that the

19   Court asked you to look into?

20   A.   Yes, sir.

21   Q.   Do you remember did it have a cause number?

22   A.   Yes, sir.

23   Q.   What cause number was that?

24   A.   MO-90-CR-044.

25   Q.   And did it have a name of the person that you were

1  supposed to look into?

2  A.  Jose Aguirre-Estrada.

3  Q.  Okay.  And before today, did you review a file regarding

4  Mr. Jose Aguirre-Estrada?

5  A.  Yes, sir.

6  Q.  Does it have a photo in that?

7  A.  Yes, sir, it does.

8  Q.  Did you review that photo?

9  A.  Yes, sir.

10 Q.  Do you see anybody who may be 16 years older resemble that

11 photo here in the courtroom today?

12 A.  Yes, sir, similar.

13 Q.  And who -- where do you see that person?

14 A.  To the right of Ms. Rogers.

15 Q.  Wearing a gray suit?

16 A.  Yes, sir.  Gray suit, white shirt.

17        MR. MILLER:  Let the record reflect this witness has

18 identified the Defendant.

19        THE COURT:  The record will so reflect.

20 BY MR. MILLER:

21 Q.  As part of the direction of the Court, did you interview

22 Mr. Jose Aguirre-Estrada?

23 A.  Yes, sir.

24 Q.  On what day was that that you interviewed him?

25 A.  10-9 of '90.

1   Q.   So that would be October the 9th, 1990?

2   A.   Yes, sir.

3   Q.   Did you ask Jose Aguirre-Estrada whether or not -- what

4   his citizenship was?

5   A.   Yes, sir.

6   Q.   And what did he say?

7           MS. ROGERS:  Excuse me, Your Honor.  Objection under

8   Rule 403.  And there is no predicate laid that he has

9   independent recollection of it, and I object to that.

10           THE COURT:  Let's go back and lay the predicate for

11   his testimony as far as what he had to say.

12   BY MR. MILLER:

13   Q.   After -- did you speak with Mr. Jose Aguirre-Estrada?

14   A.   Yes, sir.

15   Q.   And did you take notes of that?

16   A.   Yes, sir.

17   Q.   And did you review those notes before today's trial?

18   A.   Yes, sir.

19   Q.   Do those notes refresh your memory?

20   A.   Yes, sir.

21   Q.   Without looking at your notes, can you testify?

22   A.   To some degree.

23   Q.   Okay.  Can you testify as to whether or not Jose

24   Aguirre-Estrada you spoke with made a statement regarding his

25   citizenship status?

1          MS. ROGERS:  Excuse me.  Objection, Your Honor.  "To

2    some degree" is not accurate in this instance, and I renew my

3    objection.

4          THE COURT:  I'm going to overrule the objection.  I

5    find that the Government has laid the proper predicate for the

6    witness being able to refresh his memory.

7          Mr. Luck, you -- without having looked at your notes,

8    would you have remembered the conversation?

9          THE WITNESS:  From the style of the report and stuff

10    I would have remembered some of the information, but not

11    specifics.

12          THE COURT:  Okay.  And have you refreshed your memory

13    after reviewing the notes?

14          THE WITNESS:  Yes.

15          THE COURT:  All right.  I will overrule the

16    Defendant's objection.

17          You had another objection as to 404?

18          MS. ROGERS:  403, Your Honor.

19          THE COURT:  403.  I overrule that objection.  I find

20    that the information is relevant and it is not hearsay; and,

21    therefore, the Defendant -- I mean the witness may testify as

22    to what Mr. Aguirre-Estrada told him at that time.

23    BY MR. MILLER:

24    Q.   What did Mr. Aguirre-Estrada tell you his citizenship

25    status was?

1    A.    He told me he was a Mexican citizen.

2    Q.    Thank you.

3          MR. MILLER:  Pass the witness.

4          THE COURT:  Ms. Rogers?

5                    CROSS-EXAMINATION

6    BY MS. ROGERS:

7    Q.    Mr. Luck, your work with the court is often to prepare

8    Pretrial Services reports on accused people, correct?

9    A.    Yes, ma'am.

10   Q.    Is it not the pattern and practice, at least in this

11   division, that -- if the allegation is immigration related,

12   that Pretrial Services does an abbreviated report as opposed to

13   maybe an American citizen charged in more serious or drug

14   related offense?

15   A.    It's been different at different times within my 15 years

16   as a pretrial officer.

17   Q.    And certainly in your 15 years as a pretrial officer, you

18   see many, many, many defendants come through this court?

19   A.    That's correct.

20   Q.    And is it possible that you ever -- is it possible that

21   you could have made an assumption and marked down Mexican

22   without really asking the question?

23   A.    I guess it is possible, but I don't believe that happened.

24   Q.    Thank you.

25          MS. ROGERS:  I'll pass the witness.

```
 1              THE COURT:  Mr. Miller, anything else?
 2                      REDIRECT EXAMINATION
 3    BY MR. MILLER:
 4    Q.   You said you were a pretrial officer for 15 years?
 5    A.   Yes, sir.
 6    Q.   So in 16 years you worked in a different capacity for the
 7    first year you were with the court; is that correct?
 8    A.   That's correct.
 9              MR. MILLER:  Pass the witness.
10              THE COURT:  Anything else, Ms. Rogers?
11              MS. ROGERS:  No, Your Honor.
12              THE COURT:  Okay.  May Mr. Luck be excused,
13    Mr. Miller?
14              MR. MILLER:  Yes, he may.
15              THE COURT:  Ms. Rogers?
16              MS. ROGERS:  Yes, Your Honor.
17              THE COURT:  You are excused, Mr. Luck.  We appreciate
18    you being here.
19              THE WITNESS:  Yes, sir.
20              THE COURT:  And I would ask you not to discuss your
21    testimony or this case with any person, all right?
22              THE WITNESS:  Yes, sir.
23              (Witness excused)
24              THE COURT:  Mr. Miller?
25              MR. MILLER:  The United States rests, Your Honor.
```

1              (Government rests)

2         THE COURT:  Let's take a quick break.  We need about

3    five minutes, so we will take a quick break.  Don't discuss the

4    case among yourselves.  Why don't you leave your legal pads

5    here.

6              Let's all rise for the jury, please.

7              (Jury out)

8         THE COURT:  All right.  We are outside the presence

9    of the jury.  And Mr. Miller and Ms. Harris and Ms. Rogers and

10   Mr. Aguirre are present.

11             Y'all may be seated.

12             Ms. Rogers, do you or Ms. Harris have a motion?

13             MS. ROGERS:  Under Rule 29 I move for motion of

14   acquittal.

15             THE COURT:  Do you have a response?

16             MR. MILLER:  I think there is ample evidence for it

17   to be presented to the jury.

18             THE COURT:  The Court, in reviewing the evidence in a

19   light most favorable to the Government, and resolving all

20   issues in favor of the Government, finds that a reasonable

21   juror could find the Defendant guilty beyond a reasonable doubt

22   on all counts of the indictment.  Ms. Rogers -- and I

23   respectfully overrule the Defendant's motion.

24             Are you ready to proceed?

25             MS. ROGERS:  We are, Your Honor.  We need to bring

1  the witnesses in to get them all sworn.

2          THE COURT:  All right.  We will take a minute here

3  while we get organized.

4          MR. MILLER:  Your Honor, can I go get something out

5  of my office?

6          THE COURT:  Yes.  We will be in recess here.

7          (Recess)

8          (Jury out)

9          THE COURT:  If I could have the witnesses come up

10  here.

11          MS. ROGERS:  Your Honor, one witness is outside with

12  a small child.

13          THE COURT:  Have her come in while we swear them in.

14          (Pause)

15          THE COURT:  Everybody raise your right hands.

16          MS. ROGERS:  Judge, we need to do this in front of

17  the jury, don't we?

18          THE COURT:  Don't have to.  I will just say they have

19  been sworn.

20          THE INTERPRETER:  Your Honor, may I have a second to

21  get their names?

22          THE COURT:  I will get that in a second.

23          Let me have everybody raise their right hands that

24  are going to testify.

25          All right.  Mrs. LaForge, would you give the oath.

1              (The witnesses were sworn)

2              THE INTERPRETER:  I swear before God and before men.

3              THE COURT:  Does everybody say I do?

4              THE INTERPRETER:  I do.

5              THE COURT:  All right.  Would you tell me your name,

6    sir?

7              MR. FRANCO:  Redi Franco.

8              THE COURT:  First, Redi.

9              MR. SALVADOR ESTRADA:  Salvador Estrada, at your

10   service.

11             THE COURT:  All right.  Now, would you give me your

12   name, sir?

13             MR. SANCHEZ:  Reverend Sanchez.

14             THE COURT:  Give me your name, ma'am.

15             MS. SOCORRO FIERRO-ESTRADA:  Socorro Fierro-Estrada.

16             THE COURT:  All right.  And the young woman in the

17   pink right there?

18             MS. TAPIA-PLIEGO:  Yolanda Tapia-Pliego, at your

19   service.

20             THE COURT:  And the other young lady right there next

21   to you, in the purple?

22             MS. SOCORRO AGUIRRE:  Socorro Aguirre.

23             THE COURT:  All right.  We will get all these names

24   down here in a minute.

25             I need to instruct you that you may be called as a

1  witness in this case, that you may not discuss your testimony

2  with anyone except the attorneys or discuss this case with

3  anyone but the attorneys until you come in here and testify.

4       And then after you testify, you cannot discuss the

5  case again with anyone except the attorneys until the jury goes

6  and begins its deliberations.

7       Does everyone understand?

8       THE WITNESSES:  Yes.

9       THE COURT:  Okay.  Who is going to be your first

10 witness, Ms. Rogers?

11       MS. ROGERS:  Father Miguel.

12       THE COURT:  You can stay.

13       The rest of you are excused to go outside until you

14 come in here as a witness.

15       (Pause)

16       THE COURT:  Are we ready to go once we get the

17 witnesses in?

18       MS. ROGERS:  We are, Your Honor.

19       THE COURT:  And be sure to tell them if they would

20 like to bring water in, they certainly -- tell them when it

21 gets here, we will have it delivered to them, so --

22       (Pause)

23       THE COURT:  All right.  Ms. Rogers, are you ready to

24 proceed?

25       MS. ROGERS:  Yes, Your Honor.

```
 1              THE COURT:  All right.  Let's all rise for the jury,
 2      please.
 3              (Jury in)
 4              THE COURT:  All right.  Please be seated.
 5              It is ten minutes till 2:00.  The jury is back with
 6      us.
 7              Mr. Miller is present.  Ms. Rogers, Ms. Harris are
 8      present.  Mr. Aguirre is present.
 9              I'm so sorry about the water.  I didn't know you
10      didn't have any.  We ordered it up.  And when it comes in, you
11      can take a quick break, and you can certainly have water while
12      you're in the jury box.  We have sent someone to get it.
13              Outside of your presence, while we were taking a
14      break here for a second, I swore in a number of individuals as
15      witnesses so just to kind of speed things along a little bit.
16      So I always ask them whether or not they were sworn.  They were
17      sworn -- they are all sworn to tell the truth just like the
18      other witnesses, but we just did it outside of your presence
19      for a time-saving deal.
20              State your name for us, please.
21              THE WITNESS:  Reverend Miguel Sanchez.
22              THE COURT:  And, Reverend Sanchez, you were sworn as
23      a witness a minute ago?
24              THE WITNESS:  Yes, I was.
25              THE COURT:  You may proceed.
```

1          MIGUEL SANCHEZ, DEFENDANT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3     BY MS. ROGERS:

4     Q.   Father Miguel, state your full name?

5     A.   Miguel Angel Sanchez.

6     Q.   Father Miguel, tell the jury what you do.

7     A.   I am the pastor at Our Lady of Fatima Church in Van Horn,

8     with missions in Sierra Blanca, Valentine, and Dell City San

9     Isidro Mission.

10    Q.   Did you come in here today in response to a subpoena that

11    my office issued for your testimony?

12    A.   I have.

13    Q.   Did we ask you to review your records to see if you

14    couldn't find the baptismal record for our client?

15    A.   Yes, I reviewed the records.

16    Q.   And did you bring the official documents with you today?

17    A.   I brought the record book from Our Lady of Miracles in

18    Sierra Blanca, yes.

19    Q.   And would you open it and tell the jury what you found?

20    A.   Yes.  I found the record of Jose Lopez Aguirre receiving

21    the sacrament of baptism dated December the 27, 1964.

22    Q.   And does it show the priest that performed or approved the

23    sacrament?

24    A.   Yes.  Father Raymond Clumbis.

25    Q.   Is Father Clumbis still alive?

1  A.   No.  He's deceased.  He's dead.

2  Q.   Did he used to be a priest in the Sierra Blanca parish?

3  A.   He was a previous pastor in that area, yes.

4  Q.   Does it show any other information that is in the entry?

5  A.   Yes.  It has the name of the parents, and it has the date

6  of birth and the name of the godparent or sponsor.

7  Q.   Okay.  And will you read us the date -- the names of the

8  parents?

9  A.   Yes.  Jose Lopez Aguirre, Socorro Aguirre Aguirre.

10  Q.   And the name of the godparents of the Defendant?

11  A.   Orozco.

12  Q.   Is there only one person listed as a witness?

13  A.   Only one, yes.

14  Q.   Do you know any of those parties?

15  A.   I do not.  I just met them outside, yes.

16  Q.   And until today, when you got here, do you know my client,

17  who I assume you have not met him yet?

18  A.   I have not met him.

19  Q.   Have you had any dealings with any of his family members

20  prior to your arrival today?

21  A.   Only in extending the certificate of baptism.

22        MS. ROGERS:  Your Honor, may I approach and -- I'm

23  going to move to offer this under 801(11).  I think it is the

24  baptismal record.  I hate to write in the book.

25        THE COURT:  Why don't we do this.  Why don't we make

1  a copy of this book.

2          MS. ROGERS:  Without my stamp.

3          MR. MILLER:  Your Honor, I have never seen this book

4  before.

5          THE COURT:  Why don't you show it to Mr. Miller.

6          MS. ROGERS:  I will.

7          MR. MILLER:  Your Honor?

8          THE COURT:  Yes, sir.

9          MR. MILLER:  I would request that the page before and

10  the page after --

11          Sorry about that, Father.

12          -- the page after also be made a part of the record.

13          THE COURT:  Any objection, Ms. Rogers?

14          MS. ROGERS:  No, Your Honor.

15          THE COURT:  All right.

16          THE WITNESS:  Do we have any say-so in that?

17          THE COURT:  Well, let's see.

18          THE WITNESS:  Because they are private records.

19          THE COURT:  Let me see the attorneys for just a

20  second.

21          MR. MILLER:  Sure.

22          (Bench Conference on the record)

23          THE COURT:  What's the reason for the extra pages?

24          MR. MILLER:  I don't want to say in --

25          MS. ROGERS:  You can cross-examine him.

 1              THE COURT:  Yeah, you can cross-examine him about it.
 2    But why don't we --
 3              MS. ROGERS:  Let's don't make him -- just
 4    cross-examine him.  Were are you headed?
 5              THE COURT:  And what I suggest we do is make a copy
 6    of that page that he recognizes.
 7              MS. ROGERS:  And maybe redact it all except for our
 8    client.
 9              MR. MILLER:  How about this.  We can redact the
10    names, but can we keep this column in?
11              THE COURT:  Which is what?
12              MR. MILLER:  The date of birth.
13              THE COURT:  Okay.
14              MR. MILLER:  Place of baptism.  That is what I'm
15    looking for, is this right here.
16              THE COURT:  Okay.  Why don't you ask him about it,
17    and then we'll make copies.
18              MR. MILLER:  Sure.
19              MS. ROGERS:  I'm going to have her make -- I'll have
20    our paralegal make copies on the front and back, and we will
21    show them to you to redact.
22              THE COURT:  But he wants to go ahead and ask --
23              MS. ROGERS:  I have some more questions.  Could I do
24    that while she's doing that, just on the process?
25              THE COURT:  I thought you had passed the witness?

1          MS. ROGERS:  I don't think so.

2          THE COURT:  Okay.  You just offered that.

3          MS. ROGERS:  I just offered it.

4          THE COURT:  All right.

5          (End of Bench Conference)

6     BY MS. ROGERS:

7     Q.   Father, is it okay for my staff to make a copy?

8          THE COURT:  What we are going to do, if it's all

9     right, is we make some copies.  We are going to not copy the

10    names but just the dates.  Is that all right with you?

11         THE WITNESS:  That's fine.  Yes.

12    BY MS. ROGERS:

13    Q.   Father, there -- the church, I assume, has a long

14    tradition of being in the business of registering baptisms?

15    A.   Yes.

16    Q.   And do you -- will you explain to the members of the jury

17    what procedure would follow if someone wanted to register their

18    baptism with your church or in your parish?

19    A.   When parents want to baptize a child, they are requested

20    to bring in the birth certificate and proof of what we call

21    classes for baptism for the sacrament.  Once the sacrament

22    takes place, then it is recorded in the books according to the

23    date and information that was provided.

24    Q.   Has there ever been an occasion where somebody wanted to

25    be registered didn't have a birth certificate or could not meet

1    the normal requirements?

2    A.    Yes, it has happened.

3    Q.    And can you tell, from looking at the entry on

4    Mr. Aguirre, was that -- can you tell if there was a birth

5    certificate presented in his case?

6    A.    I cannot tell if there was a baptismal birth certificate

7    presented -- excuse me, a birth certificate.

8    Q.    And when there is no birth certificate, what is the

9    position of the church about establishing that he should be

10   registered in your records?

11   A.    We request witnesses from the family.  We are trying to

12   prove the sacrament, so we request if anyone was present at the

13   time of the sacrament.

14   Q.    And then someone in a position of authority -- I assume,

15   what, the church makes a determination if someone has met that

16   requirement?

17   A.    The pastor at that moment -- when they approach the

18   church, the pastor who is there is the one who makes the

19   determination, yes.

20   Q.    And the entry on the case that we're asking you about was

21   not made contemporaneous with this birth certificate, was it?

22   A.    Exactly.  No.  It was recorded at a later date.

23   Q.    And you were not the priest that oversaw the recording?

24   A.    I wasn't in the parish at that time, no.

25   Q.    You are simply here today as a custodian of the record

1  because you have now succeeded that priest and are in charge of

2  the documents?

3  A.   Exactly, yes.

4        MS. ROGERS:  May I have a moment?

5        THE COURT:  Yes.

6        MS. ROGERS:  I'll pass the witness, Your Honor,

7  subject to introducing the document.

8        MR. MILLER:  Your Honor?

9        THE COURT:  You need the documents back.

10        MR. MILLER:  I need the documents, yes.

11        THE COURT:  One of the -- why don't we get someone to

12  go back and say we need the documents back.

13        MS. ROGERS:  She is making a copy of them, so --

14        MR. MILLER:  Your Honor, I can proceed.

15        THE COURT:  Okay.  Go ahead.

16                    CROSS-EXAMINATION

17  BY MR. MILLER:

18  Q.   Father, you said you're out of Van Horn?

19  A.   Yes.

20  Q.   Is that the El Paso archdiocese?

21  A.   It is the diocese of El Paso, yes, sir.

22  Q.   Pardon me.  Diocese of El Paso.

23  A.   Okay.

24  Q.   Are you familiar with Indian Hot Springs?

25  A.   I am not.

1   Q.   Have you ever heard of it?

2   A.   Yes.  I just heard the name mentioned, yes, but not that I

3   visited or know where it is exactly, no.

4   Q.   Okay.  And you said -- when was this presentation for a

5   baptismal certificate presented, do you recall?  Or --

6   A.   When was it recorded in the book?

7   Q.   Yes.

8   A.   No, I do not.  I wasn't present.

9   Q.   Okay.  So --

10  A.   The previous pastor was.

11  Q.   Okay.  When was the previous pastor at the church?

12  A.   He was there from 2002 -- excuse me -- 2001 to 2003.

13  Q.   Okay.  So sometime during that timeframe, to your

14  knowledge, is when someone sought a baptismal certificate for a

15  person named Jose Lopez Aguirre; is that correct?

16  A.   Correct.

17  Q.   Did you bring the documentation to show that someone

18  attested that they were present at this baptismal?

19  A.   Excuse me?

20  Q.   Did you bring any documents to show any witnesses at this

21  baptismal?

22  A.   When that is the case, once the record is entered into the

23  book, all other documentation is destroyed or shredded.  Only

24  the book will be the proof.  So, no, I don't have any

25  documentation.

1              MR. MILLER:  Your Honor, may I see that?

2              THE COURT:  Which do you want, the book or the copy?

3              MR. MILLER:  The book.

4              MS. ROGERS:  And, Your Honor, may I mark --

5              THE COURT:  I'm going to let you reopen.

6         Go ahead.  And the book we are looking at is

7    Defendant's Exhibit -- we will go ahead.  What is the Defendant

8    exhibit going to be?

9              MS. ROGERS:  It will be 7.

10             THE COURT:  Any objection to the admission of

11   Defendant's Exhibit 7, Mr. Miller?

12             MR. MILLER:  Yes, at this time.

13             THE COURT:  Any objections to Defendant's --

14             MR. MILLER:  Yes.

15             THE COURT:  What is your objection?

16             MR. MILLER:  My objection is it's an incomplete

17   record.  I would ask to see whether or not he has baptismal

18   records prior to this date from this church.

19             THE COURT:  Prior to which date?

20             MR. MILLER:  Prior to -- this book starts

21   January 15th of 1983.  I would like for the baptism register

22   from -- covering the period September 27, 1964.

23             THE COURT:  Do you have records, Father, from '64 up

24   to '83?

25             THE WITNESS:  We do, yes.  Not with me, of course,

1    but they're in the church.

2              THE COURT:  And did you look in those records to see

3    if either Jose Aguirre-Estrada or Jose Lopez Aguirre's name was

4    in those records?

5              THE WITNESS:  Yes.

6              THE COURT:  And was his name in there?

7              THE WITNESS:  The name was not present.

8              MR. MILLER:  I object to this as not being complete,

9    Your Honor.

10             THE COURT:  All right.  Overruled.  The baptismal

11   book marked as Defendant's Exhibit 7 is admitted under Federal

12   Rules of Evidence 803(11), records of religious organizations.

13             The Government's objection goes to the weight, not to

14   the admissibility.  And your objection is overruled.

15             (Defendant's Exhibit No. 7 received)

16             THE COURT:  There is copies that Ms. Rogers has, I

17   think.

18             MS. ROGERS:  Your Honor, to comply with the Father's

19   wishes, can we redact the other part?

20             THE COURT:  Before it goes to the jury, we will

21   redact all those portions, names.

22             MS. ROGERS:  I marked it as Defendant's Exhibit 7.

23   BY MR. MILLER:

24   Q.   Father?

25   A.   Yes.

1  Q.   Can you turn to the page that you are referencing as to

2  baptism?

3  A.   Page 25?

4  Q.   Yes.

5  A.   Yes.

6  Q.   Now, the page before that, there was a baptism that was

7  performed, was that correct?

8  A.   Performed, yes.

9  Q.   And what date was that baptism performed?

10  A.   It was performed December the 16th, 2001.  Is that the one

11  you're referring to?

12  Q.   Yes.

13  A.   Yes.

14  Q.   And then the one following Mr. Jose Lopez Aguirre?

15  A.   That's March 31, 2002.

16  Q.   So sometime between that date is when the birth

17  certificate was sought from your church?

18  A.   Baptismal certificate, yes.

19  Q.   And normal procedure is when a child is baptized in the

20  church that it will be filled in this baptismal register

21  signifying a specific child was baptized on a certain date?

22  A.   Yes.

23  Q.   Can you explain why on September 27th of 1964, which it

24  now claims in this 1983 to present register, that the child was

25  baptized, but you said you reviewed the 1964 register and there

1    was no -- there was nothing in that register showing that Jose

2    Lopez Aguirre was baptized in your church?

3    A.   To the second question, yes, I reviewed the book from

4    1964, and it wasn't recorded at that time.

5    Q.   Okay.

6    A.   The first question, the explanation of why he recorded it

7    later, again, the area where I'm at, Van Horn, is where we call

8    the mission area.  So there are different areas where

9    sacraments took place, not necessarily in the church.  They

10   could have taken place at a home.  They could have taken place

11   at a gathering place where the church -- we celebrated for mass

12   or other sacraments.

13          So many times we have encountered certain sacraments

14   were not recorded.

15   Q.   1964, you don't know that for a fact, though?

16   A.   No.  That's an assumption based on the need of priests at

17   that time.  There was only one priest for all that area, so

18   some sacraments were celebrated and maybe again not recorded at

19   that time.

20   Q.   If you look at the register again, the date of birth,

21   place of birth, and date of baptism for every other child that

22   was baptized has a date of birth, has a place of birth, and a

23   date of baptism; is that correct?

24   A.   Correct.

25   Q.   There's nothing stated in here where this child was born,

1  is there?

2  A.   Not in the record, no.

3          MR. MILLER:  Pass the witness.

4          THE COURT:  Ms. Rogers?

5                    REDIRECT EXAMINATION

6  BY MS. ROGERS:

7  Q.   Father Miguel Angel, the document that we are introducing

8  from the book you brought, the people seeking to be registered

9  would not have access and would not make the entries in this

10  book; am I correct?

11  A.   Correct.

12  Q.   Either one of the sisters or the priests would be involved

13  in entering the data that they approve or satisfied meets their

14  requirements?

15  A.   Correct.

16  Q.   And can you tell -- I don't know if you would know the

17  handwriting, but can you tell by looking at the entry, do you

18  know who wrote it?

19  A.   I do not know the handwriting, no.

20          MS. ROGERS:  That's all I have.

21          THE COURT:  I'm a little unclear, and I just want to

22  ask some questions to clear up.

23          The entry for Jose Lopez Aguirre, what's your belief

24  as when did that -- when that entry was actually made in the

25  book, the timeframe?

1          THE WITNESS:  It was between 2001, 2002.

2          THE COURT:  Okay.  So sometime between 2001, 2002

3   your predecessor, Father -- what was his name?

4          THE WITNESS:  Clumbis.

5          THE COURT:  Clumbis.  Do you think he's the one that

6   made the entry?  Was the Father in --

7          THE WITNESS:  No, it was entered by Father

8   Villanueva.

9          THE COURT:  How do you know it was between 2001 and

10  2002?  Can you look at the book?  Does it say that or does

11  it --

12         THE WITNESS:  No, because it's in between the

13  records, in between 2001, 2002.  So it's usually recorded in

14  sequence as the sacrament is requested in this case or

15  performed.

16         THE COURT:  All right.  So between 2001, 2002,

17  information was presented to the parish or to the priest, and

18  the information concerning Jose Lopez Aguirre then was placed

19  in your book?

20         THE WITNESS:  Correct.

21         THE COURT:  Mr. Miller, any questions?

22         MR. MILLER:  No, Your Honor.

23         THE COURT:  Ms. Rogers, any questions off those

24  questions?

25         MS. ROGERS:  Your Honor, one.

1                    REDIRECT EXAMINATION

2    BY MS. ROGERS:

3    Q.   Father, is it uncommon that a child would be baptized on

4    the same day as it's born?

5    A.   No.  It depends on the situation.  We call -- what we call

6    an emergency baptism, when there's a serious illness or threat

7    of death of a child, and so the baptism can be performed by

8    anyone willing to celebrate the sacrament, assuming that they

9    are wanting the same faith for that child.  And then later on

10   recorded, again, by the priest at the church.

11            MS. ROGERS:  Thank you very much.  I appreciate it.

12            THE COURT:  Mr. Miller, anything else?

13            MR. MILLER:  No, Your Honor.

14            THE COURT:  Thank you very much, Father, for being

15   here.  And you can take the original back --

16            Is that correct, Ms. Rogers?

17            MS. ROGERS:  Please.

18            THE COURT:  -- back to the church.

19            Mr. Miller, is that agreeable with the Government?

20            MR. MILLER:  Yes, Your Honor.

21            THE COURT:  And can this witness be excused?

22            MR. MILLER:  Yes.

23            THE COURT:  We appreciate you being here, all the

24   way -- is Pecos part of the El Paso diocese?

25            THE WITNESS:  It still is, yes.

1              THE COURT:  Good.

2              We appreciate you being here today.  And if anybody

3  needs a priest, there's a roomful of lawyers, I can tell you

4  for sure.

5              We thank you.  You are excused.  We ask you not to

6  discuss your testimony or this case with anyone, all right?

7              THE WITNESS:  Yes.  Thank you.

8              THE COURT:  Thank you.

9              (Witness excused)

10             THE COURT:  Call your next witness, Ms. Rogers.

11             MS. ROGERS:  Your Honor, our next witness is Mr. Redi

12  Franco.

13             THE COURT:  Mr. Redi Franco, please.

14             (Pause)

15             MR. MILLER:  If I might I approach, I will leave them

16  with him.

17             (Pause)

18             THE COURT:  State your name for me, please, sir.

19             THE WITNESS:  My name is Redi Franco.

20             THE COURT:  You were sworn as a witness outside the

21  presence of the jury just a few minutes ago, correct?

22             THE WITNESS:  That's correct.

23             THE COURT:  All right.  You may proceed, Ms. Rogers.

24

25

1          REDI FRANCO, DEFENDANT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3     BY MS. ROGERS:

4     Q.   Mr. Franco, where do you live?

5     A.   I live in El Paso, Texas.

6     Q.   And tell the jury what you do now and what you've done

7     before you started your present job.

8     A.   I am now a licensed private investigator, and I work for a

9     consortium of insurance companies and clients that request

10    services for verification of either collateral or documents.

11    Q.   And what did you do in your early professional career?

12    A.   In my early profession, after military service, I was a

13    schoolteacher, math teacher for three years.  Been an agent for

14    three years, FBI agent for 12 years, and a senior special agent

15    with the Justice Department Office of Inspector General for 12

16    years.

17    Q.   At the request of the defense in this case, did you drive

18    down to Indian Hot Springs and take some photographs for us?

19    A.   Yes.  I was hired to see if I could locate Hot Springs in

20    Hudspeth County.

21    Q.   And you, in your other duties as law enforcement, you know

22    the Big Bend area very well, do you not?

23    A.   Yes.  I am very familiar with the West Texas area,

24    especially the Big Bend, Jeff Davis, Brewster, Presidio, and

25    Hudspeth and Culberson County.

1   Q.   Now, before I start asking you questions, will you look at

2   the first set of photographs and go one by one and tell us if

3   you can identify those?

4            Will you name them?  I marked them so we can talk

5   about them to the record on the back.

6            Will you just tell me if you can identify those as

7   photographs that you took?

8   A.   Yes.  These are six photographs that I myself took on

9   Sunday, March 12th.

10  Q.   All right.  And will you name them -- I think I have

11  marked them as Defendant's Exhibits either 5 or 6.  I can't

12  remember.  But what do I have on the back?

13  A.   Do you want me to start with Number 1 or --

14  Q.   I'm just trying to make the record reflect what we're

15  talking about.

16  A.   Yes, they are marked from 1 through 6.

17  Q.   All right.  But do I have a 5-A or -- 6-A through F, I

18  think?  Maybe it's my handwriting.

19            THE COURT:  The exhibits are marked as 6-E -- excuse

20  me.  6-A, 6-B, 6-C, 6-D, 6-E, 6-F, 6-G.

21            Have you shown these to Mr. Miller?

22            MS. ROGERS:  Yes, I have.

23            THE COURT:  Do you have any objection?

24            MR. MILLER:  No objection.

25            THE COURT:  Do you offer all these?

1          MS. ROGERS:  I do, Your Honor.

2          THE COURT:  Government's [sic] Exhibits 6-A, B, C, D,

3  E, F, G are all admitted.

4               (Defendant's Exhibit Nos. 6-A through 6-G

5               received)

6  BY MS. ROGERS:

7  Q.   And so they are small, and the jury can't see them all.

8  Can you generally give us an overview of what you were

9  photographing?

10          THE COURT:  Do you want to put them on the ELMO?

11          MS. ROGERS:  I don't know how to work the

12  Government's ELMO.  We would be here a while.  They can see

13  them later.  Would it be okay?

14          THE COURT:  Okay.

15          MS. ROGERS:  If it's okay with the jury.

16  BY MS. ROGERS:

17  Q.   Are they pictures of the Indian Hot Springs?

18  A.   Yes, they are.

19          The first photograph, I will raise it up, and it's

20  the entrance to Indian Hot Springs.

21          The second photograph is the encampment of the Hot

22  Springs.

23          The third photograph I'm going to show you here is

24  also the Indian Hot Springs that reflects the area of Mexico.

25          The third one reflects a foot bridge that leads or

1  goes into Mexico.

2  Q.   And the Mexican community across from Indian Hot Springs

3  is?

4  A.   Ojos Calientes.

5         This is also the foot bridge.

6         This other photograph, Number 5, is a house.  And to

7  the right of that house is a building.  That building consists

8  of four to six rooms, and they are clearly visible.

9  Q.   Okay.  And that is -- that is what you saw this last

10  weekend.  But for those members of the jury that might not know

11  it, Indian Hot Springs used to be a little resort, did it not?

12  A.   Yes, it used to be.

13  Q.   It's been closed for some years?

14  A.   That's correct.

15  Q.   And it's privately owned now?

16  A.   Yes.

17  Q.   Will you go to the next series of documents that I marked?

18         Are those maps that you provided to me to show

19  exactly the location of Indian Hot Springs?

20  A.   Exhibit 5-A, it's a map.  It's a map from Mexico for the

21  State of Chihuahua, northern state of Chihuahua.  And in there

22  is the -- annotated in yellow is Ojos Calientes.

23  Q.   So that map in 7-A [sic] is only of the Mexican side of

24  the map.  Texas is all blank, correct?

25  A.   Yes.

1   Q.   It shows little villages?

2   A.   Yes.

3   Q.   Go to the next one, please.

4   A.   The next map is of the Rio Grande.

5   Q.   And I have marked that as 7-B [sic], correct?

6   A.   Marked in yellow.  And it stops where it says Indian Hot

7   Springs.

8   Q.   The number of that is 7-B.  5.  I'm so sorry.

9           I'm sorry.  Go ahead to the next one.

10  A.   The next map is from -- reflects the road from Fort

11  Hancock, Texas, to Esperanza.

12          The only way to reach Indian Hot Springs is by

13  road -- Texas Road 192.

14          MS. ROGERS:  May I approach, Your Honor?

15          THE COURT:  You may.

16  BY MS. ROGERS:

17  Q.   And that document that we were just talking about was

18  Defendant's Exhibit 5-C, and the previous one was 5-B.

19          And now go to 5-D.  Is that another map you provided

20  for me?

21  A.    5-D is a map that I provided, and this is from the Texas

22  Almanac.  And this map has the county of Hudspeth and the

23  county seat of Sierra Blanca and lists Indian Hot Springs and

24  the road.

25          MS. ROGERS:  And at this time, Your Honor, I

1   previously published those to the Government, and I move to

2   admit 5-A, B, C, and D.

3               THE COURT:  Okay.  You were talking about 7-A, 7-B,

4   7-C to begin with.

5               MS. ROGERS:  I am so sorry.

6               THE COURT:  On the maps, just to make the record

7   clear, the map that you discussed as 7-A is really 5-A, and it

8   shows -- a multicolor map showing the Mexican side of the Rio

9   Grande from Juarez down to Tres Alamos.

10              7-B [sic] is a Xerox map that shows in yellow the --

11  part of the Rio Grande and the United States Mexican river down

12  to Indian Hot Springs.

13              5-C -- I'm sorry.  5-A, 5-B.

14              5-C shows Highway 192, shows part of the Rio Grande

15  and part of Hudspeth County and Sierra Blanca.

16              And 5-D comes from the Texas Almanac, I believe the

17  witness said.  It again shows Hudspeth County and the

18  Texas-Mexican border.

19              Mr. Miller, any objections to Government's

20  Exhibits -- to Defendant's Exhibits 5-A, 5-B, 5-C, and 5-D?

21              MR. MILLER:  Your Honor, I have no objections to the

22  maps provided we're allowed to mark them if need be on

23  cross-examination.

24              MS. ROGERS:  Absolutely.  They are very nice Xerox

25  copies, and you can mark away.

1          THE COURT:  Exhibits 5-A, 5-B, 5-C, and 5-D are

2     admitted.

3               (Defendant's Exhibit Nos. 5-A through 5-D

4               received)

5          MS. ROGERS:  May I approach, Your Honor?

6          THE COURT:  You may.

7     BY MS. ROGERS:

8     Q.   Okay.  Mr. Franco, when we are talking about the Big Bend

9     area, is there only one Hot Springs?

10    A.   No, there is not.

11    Q.   Tell the jury what are commonly known as communities named

12    Hot Springs.

13    A.   In the Big Bend area, there is the Hot Springs south of

14    Lajitas in Brewster County, and they are referred to as the

15    Lajitas Hot Springs.

16          There's also another Hot Springs northwest of

17    Presidio.  That is known as the Ruidosa Hot Springs.

18    Q.   Also known as Chinati Hot Springs?

19    A.   Chinati also.

20    Q.   And on each of those Hot Springs, are you personally

21    familiar with the areas?

22    A.   Yes, I am.

23    Q.   Are they all three rural and close to the Mexican border?

24    A.   The one at Lajitas and the one at Chinati and Indian Hot

25    Springs are adjacent to the Mexican border.

1   Q.   And the one at Sierra Blanca, is it always referred to as

2   Indian Hot Springs, or do some people, if you know, refer to it

3   as Hot Springs?

4   A.   They all refer to Hot Springs, and mostly it's Sierra

5   Blanca.

6   Q.   And the -- across from Indian Hot Springs, Hot Springs at

7   Sierra Blanca, Hudspeth County, you have already indicated the

8   Mexican village is Ojos Calientes, correct?

9   A.   That's correct.

10  Q.   And when you translate that, it doesn't translate

11  perfectly into English; is that correct?

12  A.   That's correct.

13  Q.   It's Hot Springs, but you don't call it spring hot?

14  A.   There is no Spanish terminology for the three words.  I

15  know the Indian Hot Springs.  In Spanish, in the map, it's

16  referred as Ojos Calientes, even though ojos is eyes; it's not

17  spring.

18  Q.   If you were to -- I don't know if -- in your investigation

19  if you were to Google Hot Springs, Texas, do you know what you

20  would get?

21  A.   No.

22  Q.   Is it possible you would get any one of these Hot Springs?

23  A.   Any one of these.

24       MS. ROGERS:  I think that's all I have at this time,

25  Your Honor, for this witness.

1          THE COURT:  All right.  Mr. Miller, would you like to
2    cross-examine?
3          MR. MILLER:  Yes, Your Honor.
4                    CROSS-EXAMINATION
5    BY MR. MILLER:
6    Q.   Mr. Franco, you said Indian Hot Springs is in Hudspeth
7    County?
8    A.   I'm sorry?
9    Q.   Indian Hot Springs is in Hudspeth County?
10   A.   Yes.
11   Q.   There is no way in God's green earth it could be in
12   Brewster County?
13   A.   No.
14   Q.   Okay.  To your knowledge, back in 1964, would it be in
15   Brewster County?
16   A.   Unless there are some labeling areas.  But so far, no.
17   Q.   You grew up in Presidio County; is that correct?
18   A.   Yes.
19   Q.   And Presidio County is in between Brewster County and
20   Hudspeth County; isn't that correct?
21   A.   Yes.
22   Q.   When you were growing up, did Brewster County ever
23   encompass Presidio County and Hudspeth County?
24   A.   No.
25   Q.   The photos that you talked about, that you introduced,

1   those were all taken within the past week?

2   A.   It was Sunday, a week ago Sunday.

3   Q.   Okay.  Do you have any photos from 1964 what the area

4   looked like?

5   A.   No.

6   Q.   And Indian Hot Springs is about a half hour -- pardon

7   me -- as a crow flies, about how many miles south of Sierra

8   Blanca?

9   A.   I would say south of Sierra Blanca it's about 44 miles.

10  Q.   Okay.

11          MR. MILLER:  Can I approach the witness, Your Honor?

12          THE COURT:  You may.

13  BY MR. MILLER:

14  Q.   Mr. Franco, Defendant's Exhibit 5-B is a map, is that

15  correct, as well as 5-C and 5-D?

16  A.   Yes.

17  Q.   Which was it that you mentioned that the only way to get

18  to Indian Hot Springs was down Route 192?

19  A.   All three maps.

20  Q.   All three maps?

21  A.   Yes.

22  Q.   As of today, the only way to get to Indian Hot Springs is

23  on Route 192; is that correct?

24  A.   There are -- there are other ways.  There's another way

25  you can get there, but it's not public accessible.

```
 1   Q.   Okay.  But it's a way to get there?
 2   A.   There is a way to get there.
 3   Q.   And which way is that?
 4   A.   That's from Sierra Blanca south towards the river.
 5   Q.   And what road is that?
 6   A.   I have no -- I think they refer to it as Quitman Road.
 7   Q.   So you say it's not a public road.  When did it stop
 8   becoming a public road?
 9   A.   I do not know.
10   Q.   Is there another road, 1111, that goes down to Indian Hot
11   Springs?
12   A.   There is -- there is, but halfways it turns into a dirt
13   road, and there's also locked gates and posted signs.
14   Q.   Okay.  when is the first time you've been to Indian Hot
15   Springs?
16   A.   I think in 1988.
17   Q.   In 1988, was there locked gates on that road?
18   A.   I didn't go that route.
19   Q.   Okay.  Did you go the route of 192?
20   A.   Yes.
21   Q.   Okay.  But there's actually two other routes that you can
22   get access to Indian Hot Springs from Sierra Blanca?
23   A.   Yes.
24   Q.   And they were more direct than the route you talked about,
25   Route 192?
```

1   A.   If you make it, yes.

2   Q.   The other two Hot Springs that you mentioned, Chinati and

3   the one at Lajitas?

4   A.   Yes.

5   Q.   Are they anywhere near Indian Hot Springs?

6   A.   No.  When you say are they near, are you talking like

7   within 100 miles?

8   Q.   Yeah, let's say --

9   A.   Yes, they're near, then.

10   Q.   Which one is nearest?

11   A.   Ruidosa, the Chinati Hot Springs.

12   Q.   But across from Ruidosa, Chinati Hot Springs, there is not

13   a town called Ojos Calientes, is there?

14   A.   No.

15   Q.   And the other springs, Lajitas Hot Springs you mentioned?

16   A.   Yes.

17   Q.   That is located near Lajitas, Texas; is that correct?

18   A.   Yes.

19   Q.   That's in -- that's south Brewster County?

20   A.   Yes, west Brewster County.

21   Q.   That's several hundred miles from Indian Hot Springs?

22   A.   Yes.

23   Q.   And there's not a town called Ojos Calientes?

24   A.   There is no town at all.

25   Q.   Thank you, Mr. Franco.

```
 1              MR. MILLER:  Pass the witness.
 2              THE COURT:  Ms. Rogers?
 3              MS. ROGERS:  Nothing further, Your Honor.
 4              May this witness be excused?
 5              THE COURT:  Yes.
 6              Mr. Miller, may this witness be excused?
 7              MR. MILLER:  Yes.
 8              THE COURT:  All right.  We appreciate you being here.
 9     You are excused.  We would ask you not to discuss this case or
10     your testimony until the jury begins its deliberations, all
11     right?
12              THE WITNESS:  Thank you.
13              THE COURT:  Thank you very much.
14              (Witness excused)
15              THE COURT:  Where is our water?
16              SECURITY OFFICER:  I don't know, Judge.  Let me call
17     them up again.
18              THE COURT:  All right.  I understand there may be
19     some water -- can you get some down over there?
20              MR. MILLER:  I got some water here, Your Honor.
21              THE COURT:  We want bottles.
22              MR. MILLER:  Oh, I'm sorry.
23              THE COURT:  For the jury, not for me.
24              MS. ROGERS:  Your Honor, may I be excused?
25              THE COURT:  Sure.
```

1          (Pause)

2          THE COURT:  Are those exhibits?

3          MS. HARRIS:  Yes.

4          THE COURT:  Why don't we leave them here.

5          (Pause)

6          MS. ROGERS:  Your Honor, I bet you are waiting on me.

7   Sorry.

8          THE COURT:  No.

9          MS. ROGERS:  The next witness is Salvador Estrada

10  Chavez.

11         THE COURT:  All right.

12         (Pause)

13         THE COURT:  All right.  Ms. Rogers, you may proceed.

14         Would you state your name for me please, sir?

15         THE WITNESS:  Salvador Estrada Chavez.

16         THE COURT:  And, Mr. Chavez, were you sworn as a

17  witness just a few minutes ago?

18         THE WITNESS:  Yes, ma'am.

19         THE INTERPRETER:  The witness is referring to the

20  interpreter, Your Honor.

21         THE COURT:  Okay.  I know I wear a dress, but --

22         It's very important, Ms. Rogers is going to ask you a

23  question in English.  Let Ms. Nazaroff translate it into

24  Spanish.  And if you would tell her the answer in Spanish --

25  and if you have a long answer, that's fine.  But you might

1  break it up into smaller pieces so that Ms. Nazaroff can

2  interpret for us in English.

3          THE WITNESS:  Okay.

4          THE COURT:  Go ahead, Ms. Rogers.

5      SALVADOR ESTRADA CHAVEZ, DEFENDANT'S WITNESS, SWORN

6                  DIRECT EXAMINATION

7  BY MS. ROGERS:

8  Q.   Mr. Estrada, where do you live?

9  A.   In Ojinaga, Chihuahua.

10  Q.   Are you a citizen of Mexico?

11  A.   That's right.  Yes.

12  Q.   Do you know my client?

13  A.   Oh, yes.

14  Q.   Tell the jury how you know him.

15  A.   I met him when he was three years old.

16  Q.   And are you married -- were you married, or are you now

17  married to his mother?

18  A.   Well, I'm still married, but we are separated.

19  Q.   And you've been separated for some time?

20  A.   Yes, it's been a while.  Since '88 or '89, more or less.

21  Q.   Mr. Estrada, are you the natural father of my client?

22  A.   No, no.

23  Q.   Do you refer to yourself as his stepfather?

24  A.   Yes.

25  Q.   Do you know who his natural biological father is?

1   A.   No, I don't know him.

2   Q.   Do you know his name?

3   A.   No, I don't know that either.

4   Q.   Did there -- did you raise my client, Jose?

5   A.   That's right.  Yes.

6   Q.   Did you raise all the rest of Socorro Aguirre's children

7   in addition to Jose?

8   A.   Yes.

9   Q.   And do you have children of your own with Ms. Socorro

10  Aguirre?

11  A.   Yes.

12  Q.   Did Jose commonly use your name when he was a child

13  growing up?  How did he refer to himself?

14  A.   I don't remember.

15  Q.   All right.  Do you know how he referred to himself or how

16  you referred to him?

17  A.   Him?

18  Q.   Yes.  Well, if you know.

19  A.   I don't remember.

20       MS. ROGERS:  May I approach the witness, Your Honor?

21       THE COURT:  You may.

22  BY MS. ROGERS:

23  Q.   I'm showing you a piece of paper that has been introduced

24  into evidence as Government Exhibit Number 4.

25  A.   Yes.

1   Q.   Do you see your signature anywhere on that?

2   A.   No.

3   Q.   That's not your signature where it says "Salvador

4   Estrada"?

5   A.   No.

6   Q.   You have never seen this document in your whole life?

7   A.   No.  I had not seen this all my life.

8   Q.   I thought yesterday that we had a conversation that as the

9   head of the household that you helped your stepson obtain a

10  Mexican birth certificate.

11  A.   True.

12  Q.   And that's not the certificate?

13  A.   I don't recognize it.

14  Q.   Okay.  Will you tell the members of the jury what kind of

15  birth certificate you got for him if it's not that one?

16  A.   There's one that I think I signed.

17  Q.   Okay.  And when you signed a Mexican birth certificate,

18  even if it's not that one, did you put that he was your son

19  when, in fact, he's not?

20  A.   I don't remember.  Possibly.

21  Q.   All right.  And why would you obtain a Mexican birth

22  certificate for him if he was not a Mexican citizen?

23  A.   Because I didn't know.  Well, can I speak?

24  Q.   Can you answer my question?

25  A.   Yes.  I need to think about it.  His mother had told me

1  before I married her that he had been born in the United

2  States.  But since we're, like, 5-, 600 kilometers from the

3  border, we were in Tamara.  And when he needed a birth

4  certificate and he was under my power, I accepted signing a

5  document and getting him a birth certificate.

6  Q.   All right.  And you did that believing that he was born in

7  the United States, but you helped get a document that said he

8  was Mexican born; is that correct?

9  A.   Since it happened many years ago, I don't remember

10  exactly.  But I do remember his mother telling me that, and

11  maybe I forgot about it.  And also because he was my stepson, I

12  had to give him my last name.  He was my stepson.

13  Q.   Mr. Estrada, would you have a copy of the birth

14  certificate that you helped him obtain?

15  A.   No.

16  Q.   Okay.

17          MS. ROGERS:  I'll pass the witness.

18          THE COURT:  Mr. Miller?

19                      CROSS-EXAMINATION

20  BY MR. MILLER:

21  Q.   Mr. Estrada, you mentioned that you did sign a birth

22  certificate for what you are saying is your stepson; is that

23  correct?

24  A.   Correct.  Yes.

25  Q.   Did you ever live in Midland or Odessa, Texas?

1    A.   Yes, in Odessa.  Yes, yes.

2    Q.   And did you live with your wife at the time, Socorro

3    Aguirre Estrada?

4    A.   Yes.

5    Q.   And you resided at 4550 Spartan Drive in Odessa; is that

6    correct?

7    A.   Oh, you mean the domicile, the house address?

8    Q.   Yes.

9    A.   Yes.

10   Q.   And Jose lived there as well; is that correct?

11   A.   I don't remember.  I don't think so.

12   Q.   Okay.  And this was back in 1989; is that correct?

13   A.   Yes.  Correct.  He did not live with us.

14   Q.   But you lived at that address -- residence in Odessa; is

15   that correct?

16   A.   Yes, yes.

17   Q.   And about that time period you were living in Odessa, you

18   were aware that Jose had been deported back to Mexico on at

19   least two occasions by that time -- one time, pardon me?

20           THE INTERPRETER:  I beg your pardon?

21   BY MR. MILLER:

22   Q.   He's been deported to Mexico one time?

23   A.   Yes.

24           MS. ROGERS:  Your Honor, excuse me -- that's all

25   right.

1   A.   Yes.

2   Q.   Did you or your wife at that time ever claim to

3   immigration officials that he was a United States citizen?

4   A.   Could you repeat that, please?

5   Q.   In 1989, prior to Jose being deported, did you or your

6   wife go to immigration officials and claim he was a United

7   States citizen?

8   A.   No.

9   Q.   Did you ever tell Jose that he was a United States

10  citizen?

11  A.   I don't remember.

12  Q.   When did you move back to Mexico?

13  A.   From this time?

14  Q.   You are living in Ojinaga right now?

15  A.   Yes, I'm living in Ojinaga.

16  Q.   How long have you been living in Ojinaga?

17  A.   About 18 years, more or less.

18  Q.   Okay.  So you left Midland-Odessa around -- I'm trying to

19  figure out -- that would take us back to 1987.

20       When did you leave Odessa?

21  A.   Around '88 or '89.

22  Q.   Okay.  And is that when you moved to Ojinaga?

23  A.   Yes, to Ojinaga.  That's right.

24       MR. MILLER:  Pass the witness.

25       THE COURT:  Ms. Rogers?

1          MS. ROGERS:  Nothing further for this witness, Your
2     Honor.
3          THE COURT:  May Mr. Estrada be excused?
4          MS. ROGERS:  Please.
5          THE COURT:  Mr. Miller?
6          MR. MILLER:  Yes, Your Honor.
7          THE COURT:  Mr. Estrada, we appreciate you being
8     here.  You are excused.  You can go back to Ojinaga or wherever
9     you have business.
10          I would ask you not to discuss this case or your
11     testimony with anyone except the attorneys until the jury
12     returns -- begin its deliberations.
13          THE WITNESS:  Thank you very much.
14          (Witness excused)
15          THE COURT:  Call your next witness.
16          MR. MILLER:  Your Honor, the defense next calls
17     Socorro Aguirre de Estrada.
18          (Pause)
19          THE COURT:  Would you tell me your name, please,
20     ma'am?
21          THE WITNESS:  Socorro Aguirre de Estrada.
22          THE COURT:  Ms. Aguirre, you were previously sworn as
23     a witness outside the presence of the jury; is that correct?
24          THE WITNESS:  Yes, yes.
25          THE COURT:  Ms. Rogers is going to ask some questions

1    in English.  Ms. Nazaroff is going to interpret into Spanish.

2    And then if you will answer the question in Spanish,

3    Ms. Nazaroff will give us all the answer in English.

4              THE WITNESS:  Okay.

5              THE COURT:  Is that okay with you?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.  You may proceed.

8         SOCORRO AGUIRRE DE ESTRADA, DEFENDANT'S WITNESS, SWORN

9                   DIRECT EXAMINATION

10   BY MS. ROGERS:

11   Q.   Ms. Aguirre, will you tell the jury where you live?

12   A.   Right now I'm living in Dallas.

13   Q.   Do you live with your young daughter -- your youngest

14   daughter Socorro in Dallas?

15   A.   Yes.

16   Q.   Are you the mother of my client, Jose?

17   A.   Yes.

18   Q.   Will you look at the members of the jury and tell them

19   where he was born and the circumstances surrounding his birth

20   certificate?

21   A.   He was born in Hot Springs, Ojos Calientes.

22   Q.   Was he born in Hot Springs, Texas, Ojos Calientes, or do

23   you refer to both the communities as the same?

24   A.   It's the same place.

25   Q.   What side of the river was he born on, the Mexican side or

1    the United States side?

2    A.    This side.

3    Q.    And do we commonly refer to the place he was born as

4    Indian Hot Springs in English?

5    A.    Yes.

6    Q.    And would you tell the members of the jury the

7    circumstances?  Tell them what happened and what you can

8    remember about his actual birth.

9    A.    I suddenly got ill, and they bring you to Sierra Blanca

10   normally when you get sick.  And since I was pretty bad off,

11   there was a man there who said that he knew a midwife.  And he

12   said, "I will bring her to you right now."

13          There were a lot of tourists in that area because

14   that's -- Ojos Calientes is where you go take baths, for

15   healing.  And so he brought her to me, and she is the one that

16   helped me give birth.

17   Q.    Ms. Aguirre, was Jose born in a hospital, or was he just

18   born in a little room?

19   A.    No, in a room.

20   Q.    And had you been living and working at the Indian Hot

21   Springs at the time of his birth, or did you cross back and

22   forth daily?

23   A.    I would go not very often.  I would stay for a long time,

24   and I would stay where I was working.

25   Q.    And were you working at the Indian Hot Springs?

1   A.   Yes.

2   Q.   Would you tell the members of the jury what you were

3   doing?

4   A.   Sweeping, mopping, cleaning the rooms.  There were a lot

5   of people coming.

6   Q.   And how many children did you have before Jose was born?

7   A.   It was Amelio, Mario, Consuela, and that was it.

8   Q.   And then Jose?

9   A.   Yes.

10   Q.   Was Amelio born in the United States?

11   A.   Yes.

12   Q.   Was Mario born in the United States?

13   A.   No.

14   Q.   Was Consuela born in the United States?

15   A.   No, not her either.

16   Q.   After Jose, how many more children have you had?

17   A.   Lupito, who was a little boy I had, died when he was five

18   years old.  Socorro, Salvador, Emelda and Manuel.

19   Q.   And of all of those children, are they all Mexican

20   citizens except for Socorro?

21   A.   Amelio was born here and Socorro.

22   Q.   Okay.  So out of all of your children, most were born in

23   Mexico with the exception of Amelio, Jose, and Socorro; is that

24   correct?

25   A.   Yes.

1  Q.   Is your son -- is that your son Salvador that is with you

2  here today?

3  A.   Yes.

4  Q.   And does he now live permanently and legally in the United

5  States?

6  A.   Yes.

7  Q.   After Jose was born -- well, first of all, who witnessed

8  the birth of Jose other than yourself?

9  A.   Yolanda, the one who relieved me, and the one that brought

10 her.  His name is Rafael.

11 Q.   And do you know if Rafael is still alive today?

12 A.   We don't know.  Yolanda says he's not seen around town

13 anymore.

14 Q.   Did you register your son Jose's birth?

15 A.   No.

16 Q.   Can you explain to the members --

17 A.   Not until he was older.

18 Q.   I'm sorry?

19 A.   Not until he was older.

20 Q.   All right.  And when you registered him -- well, first of

21 all, did he go by your husband Salvador Estrada's name, or did

22 he carry his natural father's name?

23 A.   Who, Jose?

24 Q.   Yes.

25 A.   Yes, he used his name until he realized his true father

1  was someone else.

2  Q.  Okay.  But when you say he used his name, who are you

3  referring to?

4  A.  My husband's, Salvador's.

5  Q.  And were you aware at any time before today that some

6  Mexican birth certificates had been obtained in your son's

7  name, Jose -- in your son Jose's name?

8  A.  Well, the one that my sister made up, I didn't know.

9        MS. ROGERS:  May I approach, Your Honor?

10  A.  I didn't know about.

11  Q.  Ms. Aguirre, I will show you what has been introduced into

12  evidence as Government's Exhibit 3.

13        Can you read that without glasses?

14  A.  No, I can't.

15  Q.  Do you have your glasses with you?

16  A.  They're in the truck.

17  Q.  Are you aware that there was a birth certificate that your

18  sister got for him?

19  A.  Just recently she told me.

20  Q.  And was that your sister Elodia?

21  A.  Elodia, yes.

22  Q.  And if Government's Exhibit 3 shows a state of Chihuahua

23  birth certificate showing Elodia Aguirre's name, do you think

24  that's the one you're aware of?

25  A.  Well, yes.

1   Q.   All right.  I'm going to show you also what has been

2   introduced as Government Exhibit 4.  Can you see your signature

3   on the document?

4   A.   What year was this done?

5   Q.   This looks like in 1987, birth certificate.

6   A.   No, I did not sign it.  Sometimes they can copy it almost

7   like your own.

8   Q.   Do you -- do you recall having signed for or seen a

9   Mexican birth certificate saying that your son Jose was born in

10   Cerocahui, Chihuahua?

11   A.   When my husband accepted him and wanted to give him his

12   last name.

13   Q.   Okay.  But you didn't go through -- your husband Salvador

14   never went through any formal adoption of your son Jose or your

15   other children, did he?

16   A.   No.  No, he just signed for him.

17   Q.   Is it possible that you could have signed a document

18   stating that your son was born in Mexico when you knew that he

19   wasn't?

20   A.   No, because that shouldn't have been like that.  I didn't

21   know, because -- I didn't know how I was going to get his

22   papers, and I never -- I never did get them for him.  And I

23   told him to -- you know, fix it any way he could or find out

24   how to do it himself so he could prove that he was a citizen.

25   Q.   Did there come a time where you believed that you could

1  pursue his citizenship because you found proof?

2  A.   Well, the fact that he was baptized here.

3  Q.   All right.  But --

4  A.   That's what I thought -- he was born, and that's the only

5  proof he had.

6  Q.   And did you actively try to find the midwife and

7  ultimately find the midwife that helped you birth him?

8  A.   Yes, yes.

9  Q.   And when you found the midwife, did you try to straighten

10 out his documents to show his U.S. birth?

11 A.   Yes, of course.

12 Q.   Who helped you with the paperwork in these matters?

13 A.   I can't remember.  It was some notary, I guess.

14 Q.   All right.

15 A.   Notary public where I took those people.

16 Q.   Do you have any education?  Have you gone to school,

17 Ms. Aguirre?

18 A.   Almost none.

19 Q.   Can you read English?

20 A.   No.

21 Q.   Do you rely on other people --

22 A.   I almost can't do it in Spanish.

23 Q.   Do you rely on other people to help you on written

24 documents?

25 A.   Yes, and my daughters.  It goes through my daughter's

1  hands so she can tell me.

2  Q.   All right.  Do you have more than one daughter?

3  A.   There's three, but the one that's with me is the one

4  that's here.

5  Q.   All right.  And is it Socorro that you live with that has

6  helped you try to document your son Jose's birth?

7  A.   Well, she -- well, yes, she reads to me everything that we

8  can find so that things are done properly.

9  Q.   Do you know the difference between Hot Springs in Brewster

10  County and the Indian Hot Springs in Hudspeth County?

11  A.   Yeah, they are far from each other.

12  Q.   Have you been to both of those Hot Springs?

13  A.   Yes.

14  Q.   Have you ever claimed on any of your other children born

15  in Mexico that they are, in fact, U.S. born?

16          MR. MILLER:  Objection, Your Honor, as to relevance.

17          THE COURT:  Overruled.

18  A.   No.  If it ever happened, it would have been a mistake.

19  But, no, I haven't.

20  Q.   Ms. Aguirre, are you telling the truth before God today?

21  A.   Yes.

22          MS. ROGERS:  I will pass the witness.

23          THE COURT:  Mr. Miller?

24

25

1                      CROSS-EXAMINATION

2    BY MR. MILLER:

3    Q.   Ms. Aguirre, could you tell us in order the oldest child

4    you have to the youngest child?

5    A.   Amelio, Consuela, Mario.

6    Q.   Amelio, Consuela.  Who is after Consuela?

7             THE INTERPRETER:  Mario.

8    BY MR. MILLER:

9    Q.   Okay.  After Mario?

10   A.   It was either Salvador or Emelda.

11   Q.   Okay.  And after Salvador or Emelda?

12   A.   I get them all mixed up.  Salvador, Emelda.  No, because

13   Jose was born before them.  I had so many, I get them all mixed

14   up.

15   Q.   How many kids did you have total whether they are alive or

16   passed away at this time?

17   A.   Amelio, Mario -- Amelio --

18             THE COURT:  The question is, how many children does

19   she have, has she had in total, whether or not they are still

20   living or dead.

21   A.   Amelio, Mario, Consuela, Salvador, Lupito, Manuel, and

22   Socorro.  Who is missing?

23   Q.   Jose?

24   A.   Jose.

25   Q.   Where was Amelio born?

1   A.   It's in Hot -- it's called Hot Springs.

2   Q.   Okay.  The same place you are alleging that Jose was born?

3   A.   No.  Another part.

4   Q.   Okay.  You told Ms. Rogers that Amelio, Jose, and Socorro

5   were the only three that were born in the United States; is

6   that correct?

7   A.   How many?

8   Q.   Amelio, Socorro, and Jose were the only three that were

9   born in the United States?

10  A.   Amelio.  Those three.

11  Q.   Okay.

12  A.   They are the only ones.

13  Q.   Consuela, Mario, Salvador, Emelda, Lupito, and Manuel were

14  all born in Mexico?

15  A.   In Mexico, yes.  I just -- it's really -- I get really

16  mixed up because I had so many, my god.

17  Q.   Ms. Aguirre, your son Manuel, he passed away; is that

18  correct?

19  A.   No.  He's living.

20  Q.   Manuel is living?

21  A.   Lupito.

22  Q.   How old is Lupito?

23  A.   And Amelio.  They have died.

24  Q.   You said Lupito passed away when?

25  A.   He was five years old.

1   Q.   When was he born?

2   A.   I really can't remember, but I think it was five years

3   before Jose?  No.  Jose was born first.  I told them I'm

4   going -- I told my other children once I'm going to have

5   another baby, it's going to be Papito.  Yes, five years.  Five

6   years later.

7   Q.   Okay.  When did Amelio pass away?

8   A.   It's about -- almost six years old.

9   Q.   You mentioned you gave birth to Jose in Hot Springs,

10  Texas, in Hudspeth County, correct?

11  A.   Yes.

12  Q.   And that was south of Sierra Blanca, Texas?

13  A.   It's down by the river.

14  Q.   Is it by Sierra Blanca, Texas?

15  A.   Yes, it belongs to Sierra Blanca.

16  Q.   Okay.  How far of a drive was it to get to Sierra Blanca

17  from Indian Hot Springs?

18  A.   I imagine about an hour, hour and a half.

19  Q.   Okay.  And you just happened to be in Ojos Calientes, and

20  there was a gentleman there, and he took you from Ojos

21  Calientes across the river, ready to give birth, and he brought

22  you to Indian Hot Springs?

23  A.   No.  I was already there.  I was around there, and he was

24  there collecting firewood or something.  I don't know.  And I

25  asked if they would bring me over to Sierra Blanca.  "What can

1    I do?"
2            And he said, "Well, I know a lady, and she's in the
3    baths right now."
4            There are a lot of tourists that used to come there.
5    Q.   Ma'am --
6    A.   And then --
7    Q.   Do you remember testifying on an earlier occasion back in
8    1999 under oath?
9    A.   When I went for -- Louisiana?
10   Q.   Yes.
11   A.   To Louisiana, yes.
12   Q.   That was about six and a half years ago; is that correct?
13   A.   I think so.
14   Q.   Okay.  Do you remember the question being asked:  "So when
15   you crossed the border into Texas, did you find someone to help
16   you deliver the baby?"
17           And you responded:  "Yes."
18   A.   Yes.
19   Q.   So is your testimony today different than your testimony
20   six and a half years ago?
21           MS. ROGERS:  Excuse me.  I think the question is
22   unfounded.  The way I'm understanding her answer is she did
23   find somebody to help her deliver the baby.  And I don't see
24   how that's different.  So I object to the improper
25   cross-examination.

 1          MR. MILLER:  Your Honor?

 2          THE COURT:  Yeah, I'm not sure I understand the

 3   nuance of the question.

 4          MR. MILLER:  She mentioned, if I'm correct -- she

 5   stated she was already there in Hot Springs when someone went

 6   to find her a midwife, when, in fact, six and a half years ago

 7   she testified to something differently.

 8          THE COURT:  Did you find -- were you in Texas when

 9   you found someone to help you deliver the baby?

10          THE WITNESS:  Yes.

11          THE COURT:  And do you want to show her testimony

12   from before?

13          MR. MILLER:  Yes, Your Honor.

14          (Pause)

15          MR. MILLER:  Your Honor, do you want a copy?

16          THE COURT:  Sure.

17          MR. MILLER:  Your Honor, I'm going to mark this as

18   Government's Exhibit 13 for identification.

19          THE COURT:  For identification.

20          MR. MILLER:  May I approach the witness?

21          THE COURT:  You may.

22   BY MR. MILLER:

23   Q.   Ms. Aguirre, six and half years ago, you were sworn --

24   sworn to tell the truth, the whole truth, and nothing but the

25   truth; is that correct?

1    A.    Yes.  Uh-huh.

2    Q.    And your testimony today is that you were already in Texas

3    before someone went to go get a midwife?

4    A.    Yes.

5    Q.    Did you not testify six and a half years ago that you were

6    in Mexico, then crossed the border in order to get someone to

7    help you deliver the baby?

8    A.    No, no, no.  I was staying -- I was staying there.

9    Q.    Okay.  Ms. Aguirre, I'm showing you what's been marked as

10   Government Exhibit 13.  On page 108, line 12 to 13, it says,

11   "Whereupon, Socorro Aguirre, having been first duly sworn,

12   testified and examined as follows."

13         And if you will go -- and you stated that you do

14   recall being sworn and testifying back in October of 1999 in

15   Louisiana; is that correct?

16   A.    Yes.

17   Q.    I want to draw your attention to page 112, line 21 to line

18   23.  The question was asked of you:  "Okay.  So when you

19   crossed the border into Texas, did you find someone to help you

20   deliver the baby?"

21         And you responded:  "Yes."

22   A.    Yes.

23   Q.    Was that your testimony back in October of 1999?

24   A.    When I was living here?  That I was living here or what?

25   Q.    Prior to giving birth, did you not state six and a half

1  years ago that you were over in Mexico and then someone brought

2  you across the border to find someone to help you deliver the

3  baby?

4  A.  No, I was staying there.  I was working there.  And I had

5  a room there.

6  Q.  So you are saying the statement you made under oath six

7  and a half years ago was not the truth?

8  A.  Well, yes, it was the truth.  Well, what does it say?

9  Q.  Ms. Aguirre, six and a half years ago, did you not testify

10  under oath that you were in Mexico; someone brought you across

11  into Texas in order to find someone to help you with the baby?

12  A.  I used to work there.

13          MS. ROGERS:  Your Honor, excuse me.  And I just

14  object.  I think there is some confusion because of the way the

15  question was put to her.

16          THE COURT:  Let's move on.

17          MR. MILLER:  I will.

18          MS. ROGERS:  It is a compound question.

19          THE COURT:  Let's move along.

20          MR. MILLER:  May I approach, Your Honor?

21          THE COURT:  You may.

22          MR. MILLER:  Your Honor, may I stay here so I can

23  direct?

24          THE COURT:  Yes.

25  BY MR. MILLER:

1    Q.   Ms. Aguirre, I'm showing you Government Exhibit 4.  It's a

2    document that was issued or registered on August 5th of 1987.

3    And it states that Jose Aguirre-Estrada was born on the 27th of

4    September, 1964, in Cerocahui, Chihuahua, in Urique, Chihuahua,

5    which is in Mexico.  He was born at 5:00 in the morning.  It

6    has the name Socorro Aguirre.

7              Your name is Socorro Aguirre; is that not correct?

8    A.   Yes.

9    Q.   And then down here at the bottom, it has apparently two

10   signatures.  Are you stating this signature, this is Socorro

11   Aguirre de -- and then I can't decipher the rest.  You are

12   stating that is not your signature?

13   A.   No.

14   Q.   Well, who do you think would have signed the document like

15   this with your signature?

16   A.   Maybe my sister.

17   Q.   Okay.  Ms. Aguirre, what is your A number?

18   A.   I don't know.  I need to look at it.

19   Q.   Do you have it with you?

20   A.   It's in the truck.  All I have is my ID.

21   Q.   State-issued ID?

22   A.   ID.

23   Q.   Is that a state-issued ID?

24   A.   State of Texas-issued ID.

25   Q.   Ms. Aguirre, do you recall applying for immigration

1   benefits in or about 1991?

2   A.   I don't remember the date.  Probably correct.

3   Q.   Actually, it's 1992.  January of '92.

4   A.   I think so.

5          MR. MILLER:  Your Honor, may I approach the witness?

6          THE COURT:  You may.

7   BY MR. MILLER:

8   Q.   Ms. Aguirre, I'm showing you what's been marked as

9   Government Exhibit 14 for identification.  It's inside a brown

10  folder with the number A-43242327.

11         Does that sound familiar as your A number?

12  A.   I don't remember it.

13  Q.   I'm showing you the document.  This is a form I --

14         MR. MILLER:  One moment, Your Honor.

15         (Pause)

16  BY MR. MILLER:

17  Q.   I'm showing you on the first document it's Form 155A.

18  It's titled Immigration Visa and Alien Registration.

19         Is that your picture on this document?

20  A.   Yes.

21  Q.   Is that your signature around the photo?

22  A.   I don't know.  Don't remember.  Maybe, yes.

23  Q.   Okay.

24  A.   I write really ugly.

25         MS. ROGERS:  I'm sorry, I didn't hear that, what she

1   said.

2              THE INTERPRETER:  I write really ugly.

3   BY MR. MILLER:

4   Q.   Now, I'm also showing you within this form it's an

5   application for immigration -- immigrant visa and alien

6   registration.  And this is a three-page document.

7              Is that your signature on the third page?

8   A.   Yes.

9   Q.   And you signed it Socorro Aguirre Estrada; is that

10  correct?

11  A.   Yes.

12  Q.   Would you say those signatures are similar?

13  A.   I don't remember that one.  I don't remember that.

14  Q.   Okay.  But would you agree those --

15  A.   Yes, they look alike.

16  Q.   And on this document dated January 6 of '92, would you say

17  those signatures are similar?

18  A.   Yes, they are similar.

19  Q.   And this is your signature on this file on Government

20  Exhibit 14?  And I'm referring --

21  A.   Yes, it has to be.

22  Q.   And I'm referring to Optional Form 157.  It's titled

23  Medical Examination.  And that's your picture on this page as

24  well, correct?

25  A.   Yes.

```
 1              MS. ROGERS:  Your Honor, excuse me.
 2              Mr. Miller, are you referring to her whole A-File as
 3    Government's Exhibit 14?
 4              MR. MILLER:  Yes.
 5              MS. ROGERS:  Is that what you are calling the whole
 6    A-File?
 7              MR. MILLER:  Yes.
 8    BY MR. MILLER:
 9    Q.   Ms. Aguirre, when you applied for your application for
10    immigration visa, I count that you testified today that you
11    have nine children or had nine children:  Amelio, Consuela,
12    Mario, Salvador, Emelda, Manuel, Socorro, and Jose; is that
13    correct?
14              THE INTERPRETER:  One moment, Mr. Miller, please.
15              (Pause)
16    A.   Lupito is not there, right?
17    Q.   Pardon me?
18    A.   Lupito is not there?
19    Q.   And Lupito.
20    A.   Yes, but since he was so little when he passed away, I
21    forget about him.
22    Q.   Okay.  And when you applied for this immigration visa, who
23    did you -- who did you have helping you, or did you do it
24    yourself?
25    A.   Someone must have helped me, I guess, because I've been
```

1   ill most of my life.
2          MR. MILLER:  Your Honor, may I approach the witness?
3          THE COURT:  You may.
4   BY MR. MILLER:
5   Q.   I'm showing you immigration visa form application for
6   immigrant visa and alien registration form.  It's on the first
7   page, back side.
8          It asks you -- as you testified earlier, this was
9   sworn to in January of 1992.  You only state seven -- seven
10  children's names, and there is no mention of Lupito.
11  A.   Yes, because he had died when he was little, and I didn't
12  think -- I had forgotten.
13  Q.   Okay.  And I'm going to show you -- and that was in
14  reference to paragraph 13.  Paragraph 25, don't you state
15  Manuel Aguirre?  It says he died in 1984.
16  A.   No.  Manuel is not deceased.
17  Q.   Well, according to a form that you submitted, that you
18  swore to, you said that he was deceased.
19  A.   How could that be?  I'm ill.  I'm very ill, and I had
20  heart surgery and all.
21  Q.   Now, you stated in here -- you only state one person,
22  Amelio, and where he was born, but leave blank everybody else.
23          Ma'am, I'm showing you this form.  You have Amelio.
24  You have his birthday.  And then you have where he was born,
25  Hot Springs.  But everybody else you don't even mention where

1    they were born.

2    A.    Maybe I didn't remember.  I don't know.

3    Q.    Okay.

4    A.    But they're Mexicans.

5    Q.    Okay.  And that includes Jose?

6    A.    No.

7    Q.    Okay.  Well, you didn't state that Jose was born in the

8    United States, did you?

9              MS. ROGERS:  I'm sorry, I'm just -- I'm having a hard

10   time.

11             THE COURT:  Why don't you come around here,

12   Ms. Rogers, if you would like to come around and --

13             THE WITNESS:  The midwife and everybody else.

14             THE COURT:  If the jury would like to come up, too.

15             Mr. Miller, we are lost, or I'm lost.  And I'm close

16   here.  I think you are making some points.  I just don't know

17   exactly what they are.

18             MR. MILLER:  Your Honor, I can't get a straight

19   answer.  That's the problem.

20             THE COURT:  Well, no sidebar.

21             MS. ROGERS:  Objection to that.

22             MR. MILLER:  Sorry.  I withdraw.

23             THE COURT:  The jury is instructed to disregard the

24   sidebar.

25             Why don't you show it?

1           On the form that he was showing you -- and that date
2    is what?  1992?
3           MR. MILLER:  That is correct, Your Honor.
4           THE COURT:  Did you put down where Jose was born on
5    the form?
6           THE WITNESS:  I don't remember.
7           THE COURT:  If the form doesn't have his location or
8    where he was born on there, why didn't you put it on there?
9           THE WITNESS:  I wasn't thinking about registering
10   him, because I had no idea how to do it.  And that's why I told
11   him to take care of his own papers, to take care of it himself.
12          THE COURT:  Mr. Miller, next question.
13   BY MR. MILLER:
14   Q.   Ms. Aguirre, when is the first time you told your son that
15   he was a United States citizen?
16   A.   He was small, and children forget things, so I figure he
17   probably doesn't even remember.  And then once when he was
18   older and he was in jail, he found out.  I told him that he was
19   from here.
20   Q.   That was about six years ago, is that correct, in 1999?
21   A.   Yes.  He was incarcerated, but I don't remember how many
22   years ago it was.
23   Q.   Okay.
24   A.   And I told him just take care of your own paperwork; I
25   don't know how to do it.

1   Q.   And three times prior to telling him about six, seven

2   years ago, whenever he was incarcerated, you stated, you never

3   brought this to his attention, "You are a United States

4   citizen"?

5   A.   That's when I started telling him.  And I told him, you

6   know, "Just take care of this however you can.  I'll find the

7   people for you."

8   Q.   It wasn't after he was deported three times; is that

9   correct?

10  A.   What was that?

11  Q.   You didn't remind him until he was -- until after three

12  times being deported back to Mexico?

13  A.   Well, the truth is I don't remember every time I have

14  surgery.  The anesthetics affect me.

15  Q.   Ms. Aguirre, in 2002, did you apply with the State of

16  Texas for a delayed birth certificate for Jose Lopez Aguirre?

17  A.   Here?

18  Q.   In the State of Texas, did you file paperwork in Austin,

19  Texas, with the Bureau of Vital Statistics?

20  A.   Yes.

21  Q.   And your claim was denied; is that correct?

22  A.   No.

23  Q.   Are you sure it wasn't denied by the State?

24          MS. ROGERS:  Your Honor, excuse me.  I'm going to

25  object unless you have some independent basis that it was

1   denied.  If he wants to introduce the statement, that was

2   granted.

3           May I approach?

4           THE COURT:  Let me see the attorneys.

5           (Bench Conference on the record)

6           MS. ROGERS:  We are on two separate subjects, Your

7   Honor.

8           THE COURT:  Do we need to approach or not?

9           MS. ROGERS:  I'm sorry.  I thought he was talking

10  about --

11          (End of Bench Conference)

12          THE COURT:  Let's take a break.  Let's take about a

13  10-, 15-minute break.

14          I ask the jury not to discuss the case among

15  yourselves, or if you do discuss the case among yourselves I

16  hope you understand the case better than I understand the case

17  right now.

18          Anyway, we will take a break for 15 minutes.  Don't

19  discuss the case among yourselves.  And we will be in recess

20  for 15 minutes.

21          All rise, please, for the jury.

22          (Jury out)

23          THE COURT:  Okay.  We are outside the presence of the

24  jury.

25          What -- let me see the counsel.  Everybody take a

```
 1   recess.
 2             (Recess)
 3             THE COURT:  All right.  Let's all rise and bring the
 4   jury in, please.
 5             (Jury in)
 6             THE COURT:  All right.  Let's be seated.
 7             It is five minutes until 4:00.  We are back in the
 8   courtroom with the jury.
 9             Mr. Miller is here.  Ms. Rogers is here.  Mr. Aguirre
10   is here.  And the jury is with us.
11             Ladies and gentlemen, disregard my comment I made
12   before the break about discuss the case among yourselves.  For
13   both Ms. Rogers and Mr. Miller, it's difficult.
14             As Mr. Miller made in his opening statement, there
15   are lots of documents involved and pieces of paper.  We also
16   have translation issues sometimes that occur, so I know it's
17   frustrating for everybody a little bit to kind of get to these
18   issues that these fine lawyers are trying to do.
19             So, Mr. -- we have -- Ms. Aguirre is on the stand.
20             Continue cross-examination, Mr. Miller.  What is your
21   next question?
22   BY MR. MILLER:
23   Q.   Ms. Aguirre, I want to clarify something.  Would your
24   dad's -- was your dad's name Manuel?
25   A.   Yes, Manuel.
```

1  Q.   And he passed away in 1984; is that correct?

2  A.   Yes.

3  Q.   It was not your son that passed away?

4  A.   No.

5  Q.   Okay.  In 2002, did you apply for a birth certificate with

6  the State of Texas and have your signature notarized by a

7  lawyer, Laurie Whitaker, L-A-U-R-I-E, D. Whitaker out of

8  Hudspeth County, Texas?

9  A.   Yes.

10  Q.   And do you recall about two months later, on April 1st,

11  receiving a letter from the Texas Department of Health, Bureau

12  of Vital Statistics, saying your request -- your submission for

13  a delayed birth certificate was denied?

14  A.   I don't remember.

15  Q.   Do you recall submitting documents in Alpine, Texas, to

16  get a birth certificate from the County of Brewster?

17  A.   Yes.

18  Q.   And did you ever try to get a birth certificate out of

19  Hudspeth County?

20  A.   In Alpine.

21  Q.   Did you ever go to Sierra Blanca and try to obtain a

22  delayed birth certificate for a Jose Lopez Aguirre?

23  A.   Yes.

24  Q.   You did go to Sierra Blanca and went to court there?

25  A.   I don't remember.  I went -- I think so.

1  Q.   Based on your claim, you are stating Jose was born in

2  Indian Hot Springs, which is in Hudspeth County; is that

3  correct?

4  A.   Yes, because I was following directions in a letter I got

5  from Austin that I belong to Alpine, and that's why I went

6  there.

7  Q.   Okay.

8  A.   There's a letter there.

9  Q.   When you applied in Brewster County, you never informed

10  the county that your son had been deported on four occasions?

11  A.   No, I didn't remember.

12  Q.   And you never told Brewster County that your son has at

13  least one Mexican birth certificate?

14  A.   I don't think I told them.  I don't know.

15  Q.   As a matter of fact, you only provided part of the

16  information; is that correct?

17  A.   Yes.

18  Q.   As a matter of fact, there was never a hearing on the

19  matter, was there?

20  A.   No.

21            MR. MILLER:  Pass the witness.

22            THE COURT:  Ms. Rogers?

23                      REDIRECT EXAMINATION

24  BY MS. ROGERS:

25  Q.   Ms. Aguirre, when your son Jose was born, were you married

```
 1   to his father?
 2   A.   We were just living together.
 3   Q.   And would you tell the members of the jury who the natural
 4   father of Jose is?
 5   A.   Yes, Jose Lopez Miranda.
 6   Q.   Did he ever contribute to Jose's upbringing, or did you
 7   raise him by yourself?
 8   A.   He left me when he was little.  Just left.
 9   Q.   And then you married Mr. Salvador Estrada shortly
10   thereafter and had other children with him?
11   A.   Yes.  Right.  Yes.
12   Q.   Do you recall that Ramona Rodriguez was the person that
13   helped you prepare your immigrant visa application?
14   A.   Yes.
15            MS. ROGERS:  Just for purposes of clarification for
16   the jury's benefit, Your Honor, I'm going to move to mark --
17   introduce what we marked earlier as Government's Exhibit 14,
18   and it's her A-File.
19            MR. MILLER:  No objection, Your Honor.
20            THE COURT:  All right.  Government's Exhibit 14 is
21   admitted.
22            (Government's Exhibit No. 14 received)
23            MS. ROGERS:  This is a copy.
24            THE COURT:  Let me ask this.  During the recess you
25   were going to look at the one that Mr. Miller had and your
```

1  copy.  Were they identical?

2         MS. ROGERS:  We didn't look at it all, but I will

3  check it before it goes to the jury, but I think it is the

4  same.

5         THE COURT:  Okay.

6         MS. ROGERS:  I should certify that it was, but I

7  didn't look at it all.

8         Your Honor, may I have a moment?

9         (Pause)

10        MS. ROGERS:  That's all I have of this witness.

11        THE COURT:  Mr. Miller, anything else?

12        MR. MILLER:  We have no further questions.

13        THE COURT:  We appreciate you testifying,

14  Ms. Aguirre.  We would ask you not to discuss your testimony

15  with any of the other witnesses until the jury begins its

16  deliberations, all right?

17        THE WITNESS:  All right.  Thank you.

18        MS. ROGERS:  Your Honor, excuse me.  One minute.  I'm

19  sorry.  May I -- may I have just a moment?  My client is asking

20  me.

21        (Pause)

22        MS. ROGERS:  May I ask -- may I follow up?

23              REDIRECT EXAMINATION CONTINUED

24  BY MS. ROGERS:

25  Q.   Before you leave, Ms. Aguirre, did there come a time in

1    Jose's life that his natural father came looking for him,

2    trying to take him back?

3            MR. MILLER:  Objection, Your Honor, as to relevance.

4            THE COURT:  Sustained.

5            MS. ROGERS:  I have nothing further.

6            THE COURT:  All right.  That's all.  Thank you very

7    much.

8            THE WITNESS:  Thank you very much.

9            (Witness excused)

10           THE COURT:  Who is your next witness, Ms. Rogers?

11           MS. ROGERS:  Your Honor, the defense would call

12    Socorro Fierro-Estrada next.

13           THE COURT:  Does she need an interpreter?  Yes or no?

14           MS. ROGERS:  We need to ask her.  She speaks some

15    English, but she may be more comfortable in Spanish.

16           (Pause)

17           MS. ROGERS:  A change of plans, Your Honor.  A

18    witness is about to depart on me if I don't put her on.  May I

19    call instead the midwife in this case, Yolanda Tapia?  She said

20    she is tired and leaving, so I would like to accommodate her.

21           THE COURT:  Why don't we ask Ms. Tapia -- I talked to

22    the Courtroom Security Officer.  I think we are going to let

23    her use the chair.

24           MS. ROGERS:  Put her down below?

25           THE COURT:  We might put her down.

1           They have a chair for her.  They are bringing her in

2     in a chair.

3           Marshal, you might give a hand as well.

4           (Pause)

5           THE COURT:  Would you state your name for me, please,

6     ma'am?

7           THE WITNESS:  Yolanda Tapia-Pliego.

8           THE COURT:  Ms. Tapia, were you sworn as a witness?

9           THE REPORTER:  I'm sorry.  What was your name?

10           THE WITNESS:  Yolanda Tapia-Pliego.

11           THE COURT:  And, ma'am, were you sworn -- ma'am, wait

12     till a question is asked.

13           THE WITNESS:  Yes.

14           THE COURT:  Were you sworn as a witness earlier in

15     the afternoon?

16           THE WITNESS:  It's been a while.

17           THE COURT:  But it was this afternoon?

18           THE WITNESS:  Yes.

19           THE COURT:  All right.  You may proceed, Ms. Rogers.

20           THE WITNESS:  They showed me a paper like that, and I

21     swore before God and all men.

22         YOLANDA TAPIA-PLIEGO, DEFENDANT'S WITNESS, SWORN

23                         DIRECT EXAMINATION

24     BY MS. ROGERS:

25     Q.   Ms. Tapia, where do you live?

1  A.  I live in Porvenir, Apartment Number 21.

2  Q.  How old a woman are you?

3  A.  I was born October 27, 1932.

4  Q.  So I should be able to do that right off, but you're over

5  70?

6  A.  I'm a Scorpio.

7  Q.  Ms. Pliego, tell the jury what you've done for a living.

8        THE INTERPRETER:  Your Honor, may the interpreter sit

9  down?

10        THE COURT:  Yes, you may.  Sure.

11        THE INTERPRETER:  Thank you.

12  A.  I began helping in deliveries in November 13, 1962.  I

13  would charge 5, 10, 15 pesos.

14  Q.  So are you a midwife?

15  A.  Yes, empirical.

16        MS. ROGERS:  May I approach the witness, Your Honor?

17  A.  And now I am registered.  I am registered in the civil

18  registry in Juarez.

19        MS. ROGERS:  May I approach, Your Honor?

20        THE COURT:  Yes, ma'am, you may.

21  BY MS. ROGERS:

22  Q.  I'm going to show you three documents, but I'm going to

23  call them Defendant's Exhibit 1.  Did you bring these to show

24  the jury?

25  A.  No.  I showed it to her.  This is at the health center.

1   That's me.

2   Q.    Is that in Ciudad Juarez, Chihuahua?

3   A.    Yes.  That's me.

4   Q.    And what's this?

5   A.    That was given to me at General Hospital in Juarez.

6   Q.    And then --

7   A.    And also that in Juarez.

8   Q.    Okay.  And this is to show that you are a certified

9   midwife; is that correct?

10  A.    Yes.  And -- now, I take their footprints, the right foot,

11  the left foot.

12  Q.    All right.  Excuse me.

13  A.    And I'm registered in the civil registry in Juarez.

14            MS. ROGERS:  And I know she wants to take these nice

15  documents home.  May I substitute you copies for these?

16            MR. MILLER:  Yes.

17            MS. ROGERS:  I'm going to move to admit her

18  recognition, which are three documents entitled Defendant's

19  Exhibit 8.

20            THE COURT:  As Exhibit 8?

21            MS. ROGERS:  8.

22            THE COURT:  Any objection, Mr. Miller, to Defendant's

23  Exhibit 8?

24            MR. MILLER:  No, Your Honor.

25            THE COURT:  Defendant's Exhibit 8 is admitted.

1            (Defendant's Exhibit No. 8 received)

2   BY MS. ROGERS:

3   Q.   Ms. Pliego -- Ms. Tapia-Pliego, do you know my client,

4   Jose Aguirre?

5   A.   He was born in these hands.  And when I was tying his

6   umbilical cord, he wet my face.  I don't know him now.  I saw

7   him when he was little, and I saw that he was a boy.  But no

8   one paid for it.  Nobody answered for him.  The lady was a lot

9   younger then.  Look at this finger, because I keep checking and

10  checking and checking.

11  Q.   Where did this birth occur?

12  A.   Look at this finger here, even with gloves.

13  Q.   Where did the birth -- where did the birth happen?  Where?

14  A.   He was born in the United States.  I was on vacation,

15  looking for thermal waters, and I had lost my bathing suit and

16  everything, because a gentleman asked me -- there was some lady

17  that was complaining, and I had already taken care of his wife,

18  and I thought, well, maybe somebody is killing her or

19  something.  It was like in a hotel.  It was ugly, very ugly.

20  It was an ugly table.  There was nothing there.

21            THE COURT:  Okay.

22  A.   Just a blanket.

23            THE COURT:  Ma'am, ma'am, ma'am.

24  A.   This little boy peed on my face.

25            THE COURT:  Ma'am, ma'am.

1          THE WITNESS:  I was younger.

2          THE COURT:  Okay.  Just answer the question and don't

3   go into all the detail.  Ms. Rogers is a very good lawyer, and

4   she will ask you if she needs more information.

5          So the question was, where was Mr. Aguirre -- where

6   did you deliver Mr. Aguirre?

7          THE WITNESS:  Where I was saying, in Louisiana.

8   BY MS. ROGERS:

9   Q.   Where you were saying, in Louisiana?  Where was he born?

10  A.   Where I was -- where I was telling you, where they have

11  those thermal waters.

12  Q.   And you just happened --

13  A.   In some little ugly little rooms.

14  Q.   Ma'am, you just happened to be there and helped

15  Ms. Aguirre, because she went into labor unexpectedly; is that

16  correct?

17  A.   I used to help a lot of women without money.

18  Q.   Ms. Tapia, how can you be sure that it was this man that

19  you delivered?

20  A.   Because I saw he was male.  He was born there with me.  I

21  didn't do any paperwork because nobody was coming forward for

22  this poor woman.

23  Q.   And did you deliver other babies in the United States?

24  A.   No.

25  Q.   This is the only child that you've ever birthed in the

1   United States?

2   A.   The only one.

3          MS. ROGERS:  I'll pass the witness.

4          THE WITNESS:  A lot in Porvenir.

5          THE COURT:  Mr. Miller?

6          MR. MILLER:  Thank you, Your Honor.

7                    CROSS-EXAMINATION

8   BY MR. MILLER:

9   Q.   Ms. Pliego, where were you living in 1964?

10   A.   In Porvenir in '64.  Porvenir.

11   Q.   Porvenir, near Fort Hancock, Texas?

12   A.   No.  San Ignacio, Guadalupe, and all those little towns.

13   Porvenir, Guadalupe.  There's many -- San Ignacio, like that.

14   Q.   How far is that from El Paso?

15   A.   I like to go to El Paso because I like Hershey's

16   chocolates very much.

17   Q.   Ma'am, my question is, how far is the Porvenir that you

18   lived in in 1964 from El Paso?

19   A.   I don't know.  I get my visa.  I get my passport,

20   everything.  I do it right, and then I go.

21          MR. MILLER:  I'll go on, Your Honor.

22   BY MR. MILLER:

23   Q.   How many times have you been to the Hot Springs that

24   you're talking about today?

25   A.   Just one time.  It was just the luck.  I had lost my

1    bathing suit, really pretty much everything.

2    Q.    How did you come to be at Indian Hot Springs?

3    A.    I was younger then.

4    Q.    How did you come to Indian Hot Springs?

5    A.    I was already taking care of a gentleman's wife, and he

6    said there is another woman that's complaining.  And I said

7    maybe they've killed her.  But he was presenting -- the baby

8    was presenting, and what else could I do?  I couldn't leave her

9    like that.

10   Q.    So you drove from Porvenir down to Indian Hot Springs

11   initially to take care of somebody?

12   A.    No, no, no.  I was on vacation.

13   Q.    Oh, okay.

14   A.    It was just a miracle, God-sent miracle.

15   Q.    Now, after -- how long did this birthing process take?

16   A.    It's very fast, because it was already presenting itself.

17   Q.    Okay.  How fast?  Five minutes?  Ten minutes?  Half hour?

18   A.    Less.  It was quickly, quickly.  I always have a lot of

19   handkerchiefs and things in my purse.  I didn't have my

20   instruments or anything.

21   Q.    Okay.

22   A.    I washed my hands, and I left her there like a little

23   goat, like a little animal there.

24   Q.    So as soon as -- as soon as this woman gave birth, what

25   did you -- and you cleaned her up, you took off?

1   A.   Everything.  I took out the placenta and everything.  Then
2   I put my hand in, and I took out all the blood clots so she
3   wouldn't continue to bleed or anything like that, because I
4   like to do things well.  I don't like to leave things half
5   done.
6   Q.   Now, after this woman gave birth, how soon after did you
7   leave?
8   A.   I left right away.  I rushed out of there.  I went quick,
9   quick.  Because what would happen if the child died or
10  something?  I'm leaving.
11  Q.   Okay.  But weren't you there vacationing?
12  A.   Yes.
13  Q.   And you left Hot Springs?
14  A.   I was younger then.
15  Q.   Okay.  So you left Hot Springs right after the baby was
16  born?
17  A.   Yes, I left.  I left.  But that little boy peed on me.
18  Q.   Now, after you helped -- you said you were younger then.
19  How old were you?
20  A.   Right now -- well, I was born 27 October 1932.
21  Q.   How long were you in Hot Springs before you helped this
22  woman give birth?
23  A.   Just an hour or two hours at most.
24  Q.   Now, did you recall -- you testified in an earlier hearing
25  back in 1999; is that correct?

1   A.   No.  I just came here because the man told me to take care
2   of it because maybe the woman would die or something.
3   Q.   Ms. Pliego, in 1999, did you go to Louisiana and testify?
4   A.   No.  Never.  For nobody.
5   Q.   You never went to Baton Rouge, Louisiana, and were sworn
6   like you were today and testified?
7   A.   No.
8            THE COURT:  Let me ask, Ms. Tapia -- Ms. Tapia, did
9   you go to a court in Louisiana?
10           THE WITNESS:  No.  Never.
11           THE COURT:  Have you ever been to Louisiana?
12           THE WITNESS:  I haven't been back.  I don't know
13  that -- I don't know it.  I was told not to come because it's
14  too many hours to get here.  But I was able before to walk and
15  run and play ball and everything.
16           THE COURT:  Ms. Tapia, have you ever been to
17  Louisiana?
18           THE WITNESS:  Just that one time with the little --
19  when the little boy was born.
20  BY MR. MILLER:
21  Q.   So you are saying -- Ms. Pliego, are you saying this
22  little boy was born in Louisiana?
23  A.   Yes, I know, because the man that took me there, the young
24  man that took me there said that it was Louisiana.
25  Q.   Okay.  How long --

1   A.   They gave me as a gift a T-shirt with a big fish on it.

2   Q.   How long ago was this?

3   A.   A lot of years ago.  Then I laid down on a couch, and

4   cockroaches were like this.

5   Q.   Now, when you say -- Ms. Pliego --

6   A.   And that is why I left, because I was afraid.

7   Q.   Ms. Pliego, you say many years ago.  Was it more than six

8   years ago?

9   A.   Yes.  It's been a -- it's been so long, I thought maybe --

10   I didn't remember.  I thought maybe the young man had already

11   died.

12   Q.   After this child was born, you never saw this baby again

13   for years?

14   A.   Never again.

15   Q.   How do you know that baby that was born that you helped

16   deliver is anybody in this courtroom?

17   A.   Because his mother came to find me, and she said her son

18   was in jail.  And the first time I came I saw him.  But now I

19   don't know him.  I don't know anything about him.  He was

20   little.

21   Q.   He was a newborn?

22   A.   Yes.

23   Q.   So you don't know if -- Ms. Pliego, you don't know if the

24   child back in -- around 1964 was this gentleman sitting over

25   here that you gave birth to or helped assist give birth to?

1          MS. ROGERS:  Your Honor, excuse me.  I am going to

2    object.  It is not a good-faith question to ask it that way,

3    and so I object.

4          THE COURT:  Overruled.

5    A.   I don't know him.  Who is he?

6    Q.   Okay.  How do you know that's not the person you assisted

7    giving birth to?

8    A.   I would like to see him.  I would like to see him.

9    Q.   Would you recognize someone you gave birth to -- I mean

10   was a midwife to -- strike that.

11          After 40-some years, not seeing a baby that you

12   helped deliver, you wouldn't know what they looked like today,

13   would you?

14   A.   No, I don't know him.  I couldn't recognize him.  I

15   couldn't tell you if he was dark or not.  I went to help her

16   give birth, and she was going to go like this with a knife, and

17   I told her no, don't do that, give birth this way.

18   Q.   This woman that you stated you assisted as a midwife, did

19   this -- was this woman brought over from Mexico from Ojos

20   Calientes?

21   A.   I think so.  I think this man brought her up.

22   Q.   So he brought her across the river to --

23   A.   Yes.  He told me she was there, for me to look at her, and

24   then he hid.  He hid.  He left.

25   Q.   And he brought her from Mexico; is that correct?

```
 1   A.    Him, no, no.
 2   Q.    Did he bring -- did he tell you that he brought this woman
 3   over from the cart over from Mexico?
 4            THE INTERPRETER:  From a car or cart?
 5            MR. MILLER:  Cart.
 6   A.    No, nothing.  Nothing.  It was an ugly old man.  He looks
 7   like a fish, real ugly.
 8   Q.    As a midwife, it was your obligation to report births?
 9            THE INTERPRETER:  I'm sorry?
10   BY MR. MILLER:
11   Q.    As a midwife, was it your duty to -- duty to report
12   births?
13   A.    No, I was afraid.  I was very young.  I was afraid to say
14   anything about it, because I have a fear of God.
15   Q.    Ms. Pliego, you stated you became a midwife in 1962; is
16   that correct?
17   A.    Yes.  I already attended a lot of women.
18   Q.    Okay.  So you attended women before you became registered?
19   A.    Yes.  In El Faro, four women.  And she said not to help
20   her anymore because I wouldn't be -- I wasn't bringing her
21   girls.
22   Q.    So --
23   A.    Ignacio and Faro.
24   Q.    Ms. Pliego --
25   A.    She would say to me, why did you bring me a man?
```

1  Q.  Ms. Pliego, you stated prior to being certified, you did

2  participate as a midwife prior to being certified; is that

3  correct?

4      MS. ROGERS:  Your Honor, that's been asked and

5  answered.

6      THE COURT:  Overruled.  Overruled.

7  A.  I had -- I had helped with two premature girls.  And I

8  learned that -- I was very careful with them.

9      MR. MILLER:  Pass the witness.

10      REDIRECT EXAMINATION

11  BY MS. ROGERS:

12  Q.  Ms. Tapia, you weren't licensed in the United States to

13  deliver babies.  Is that why you were scared?

14      MR. MILLER:  Objection, leading.

15  A.  Yes.

16      THE COURT:  Sustained.

17      MS. ROGERS:  I'll rephrase it.

18      THE COURT:  Disregard the answer.

19      MS. ROGERS:  May I rephrase it?

20      THE COURT:  You may.

21  BY MS. ROGERS:

22  Q.  Were you licensed to deliver babies in the United States?

23  A.  No.  Not until now that I have the certificate from the

24  civil registry in Juarez.  I have it in my purse over there.

25  Q.  And do -- excuse me, ma'am.

1           THE COURT:  Ma'am?

2    BY MS. ROGERS:

3    Q.   Senora, the question Mr. Miller, the prosecutor, was

4    asking you is, are you sure -- how are you sure that you

5    delivered Jose Aguirre in Indian Hot Springs back in 1964?

6    A.   Yes, because he was born -- he was born in these little

7    hands.  And it's very sad.  It's not just -- just to make him

8    fly.

9    Q.   And you know that it was the baby of Socorro Aguirre?

10   A.   Yes, I know, because I never again helped anybody else,

11   just that one there.

12   Q.   And you know it's her baby named Jose?

13           MR. MILLER:  Objection.

14           THE COURT:  Objection -- the objection is?

15           MR. MILLER:  I'll withdraw it.

16           THE COURT:  Okay.

17           MS. ROGERS:  I'll pass the witness.

18                      RECROSS-EXAMINATION

19   BY MR. MILLER:

20   Q.   Ms. Pliego, do you remember testifying on an earlier

21   occasion?

22   A.   Never, never, to no one.  I have a fear of God.  I don't

23   like it.  I was married to a professor.

24           THE COURT:  Ma'am, ma'am, ma'am, ma'am.  Wait till

25   Mr. Miller asks you a question.

1    BY MR. MILLER:

2    Q.   Ms. Pliego, do you ever recall telling anybody that you

3    did not know the child and you don't know who he is?

4    A.   No.

5          MS. ROGERS:  Your Honor, before that answer comes

6    out --

7    A.   I don't know him.

8          MS. ROGERS:  Objection.  That's way outside the

9    extent of my redirect.  And, again, I think it is improper

10   cross-examination.

11         THE COURT:  I'm going to overrule the objection just

12   because of the nature of this particular witness, that we had

13   some problems understanding one another.

14         Mr. Miller, go ahead.

15         Ma'am, ma'am, ma'am.

16   BY MR. MILLER:

17   Q.   Ms. Pliego --

18         THE COURT:  Ask your question.

19   BY MR. MILLER:

20   Q.   Ms. Pliego, after you gave birth to this child, when

21   was -- did you see this child grow up and be part of his life?

22   A.   No.

23   Q.   So --

24   A.   I don't know if it's white, blond.

25   Q.   So you don't know who this child is?

```
 1   A.   I don't know.  I don't know who he would be.
 2            MR. MILLER:  Pass the witness.
 3            THE COURT:  Ms. Rogers?
 4            MS. ROGERS:  Nothing further.
 5            THE COURT:  Thank you very much.  Ms. Tapia, we
 6   appreciate you being here.
 7            THE WITNESS:  Is that him (indicating the Security
 8   Officer)?
 9            SECURITY OFFICER:  No, no.
10            THE WITNESS:  Muchas gracias.
11            THE COURT:  Muchas gracias.
12            THE WITNESS:  God bless you.
13            MS. ROGERS:  Bye-bye, senora.
14            THE COURT:  Your Honor, may I send these originals
15   out to her?
16            THE INTERPRETER:  She is saying, "Let him fly," Your
17   Honor, "let him fly."
18            (Witness excused)
19            MS. ROGERS:  Your Honor?
20            THE COURT:  Ms. Rogers?
21            Let me say this.  You don't see this on Law & Order.
22            Yes, Ms. Rogers?  I'm just standing for --
23            MS. ROGERS:  I have a witness.  We would call Socorro
24   Fierro-Estrada.  Maybe she hasn't threatened to leave on me.
25            THE COURT:  Who is your next witness?
```

1              MS. ROGERS:  Socorro Fierro-Estrada.

2              THE INTERPRETER:  That is the standby, Your Honor,

3    for me.

4              THE COURT:  While we're waiting, y'all come up here.

5              (Pause)

6              THE COURT:  Ms. Rogers, do we need an interpreter?

7              MS. ROGERS:  This is the one that speaks English but

8    might prefer Spanish.

9              THE COURT:  Ma'am, right up here.  And come right

10   around.

11             You can be seated.

12             Would you tell me your name, please?

13             THE WITNESS:  Socorro Fierro-Estrada.

14             THE COURT:  And you were previously sworn.  I brought

15   a group in here together, and you swore to tell the truth; is

16   that correct?

17             THE WITNESS:  Yes, sir.  That's correct.

18             THE COURT:  Do you need an interpreter at all?

19             THE WITNESS:  Yes, probably.  My English is not that

20   good.

21             THE COURT:  If you think you need an interpreter, I

22   am going to let Ms. Rogers ask the question in English, let

23   Ms. Nazaroff interpret into Spanish, answer in Spanish, and

24   then Ms. Nazaroff will interpret back to English, okay?

25             THE WITNESS:  Okay.

1         THE COURT:  Sometimes -- I know you have very good
2    English -- you may have very good English skills, so don't just
3    jump in and answer in the middle of a question.
4         THE WITNESS:  Yeah, yeah.
5         THE COURT:  You may proceed.
6       SOCORRO FIERRO-ESTRADA, DEFENDANT'S WITNESS, SWORN
7                     DIRECT EXAMINATION
8    BY MS. ROGERS:
9    Q.   Ms. Fierro, is Fierro your married name?
10   A.   Yes.
11   Q.   Ms. Fierro, are you the half-sister of my client, Jose
12   Aguirre?
13   A.   Yes.  Correct.
14   Q.   And that's because you have the same mother but different
15   father; is that correct?
16   A.   Yes.  Correct.
17   Q.   Can you tell the members of the jury about how old you
18   were when you left home?
19   A.   About three, four years.
20   Q.   Have you known him all your life under your stepfather's
21   name as Aguirre-Estrada?
22   A.   Yes, of course.
23   Q.   Have you ever met his real biological father or known
24   anything about him?
25   A.   No, I have never met him.

```
1   Q.   Are you a United States citizen by birth?

2   A.   Yes.  I was born in the United States.

3   Q.   And where were you born?

4   A.   In Presidio, Texas.

5   Q.   Have you assisted your mother in trying to get documents

6   proving that your brother was born in the United States?

7   A.   Yes.  Because she can't drive, I would take her where she

8   asked me to.

9   Q.   And did you -- did you assist her in filling out documents

10  or trying to explore what the law required?

11  A.   I just helped her once fill one out.

12            MS. ROGERS:  May I approach, Your Honor?

13            THE COURT:  You may.

14  BY MS. ROGERS:

15  Q.   I'm going to mark -- I have marked this as Defendant's

16  Exhibit 9.

17            THE CLERK:  Yes.

18  BY MS. ROGERS:

19  Q.   Do you recognize this document?

20  A.   Yes.  That's the one I helped her fill out.

21  Q.   And it's an affidavit to birth facts?

22  A.   Yes.

23  Q.   And you were filling it out so -- for your mother's

24  signature?

25  A.   Yes.  I think it was in the court in Sierra Blanca.  There
```

1   was a notary public there.

2   Q.   And is it your handwriting up there that is printed in

3   your mother's name?

4   A.   Yes.  Correct.

5              MS. ROGERS:  I move to admit Defendant's Exhibit 9.

6              MR. MILLER:  No objection, Your Honor.

7              THE COURT:  Defendant's Exhibit 9 is admitted.

8                  (Defendant's Exhibit No. 9 received)

9   BY MS. ROGERS:

10  Q.   Now, I will leave this with you.

11             Now, up on the top on Defendant's Exhibit 9 it says

12  Hot Springs, Texas, Hudspeth County.  Do you see that?

13  A.   Yes, I do.  I see it.

14  Q.   At least on the copy, Hudspeth is marked out; isn't that

15  correct?

16  A.   Yes.

17  Q.   Can you tell the members of the jury what transpired to

18  make you leave Hudspeth County where you had your mother's

19  signature notarized and end up in Brewster County?

20             THE COURT:  Just a second.

21             MR. MILLER:  I'm going to object.  I believe this is

22  going to elicit hearsay statements of what the mother told her.

23             THE COURT:  If the answer is going to require a

24  hearsay answer, I am going to sustain the objection and ask you

25  to rephrase the question.

1          MS. ROGERS:  I understood she was with her and the

2    one that got the instructions.

3          I will rephrase the question about what she did.

4    BY MS. ROGERS:

5    Q.   Were you in Hudspeth County at the time your mother had

6    that signature notarized or the document was notarized by your

7    mother?

8    A.   Yes, we were there.

9    Q.   And where was the notary public?  Was she at the

10   courthouse or some other place?

11   A.   I think it was in the jail, county jail.

12   Q.   And did you take that document and send it to the State of

13   Texas in Austin?

14   A.   First my mother went to the courthouse in Hudspeth, and

15   they told her that's not where she had to be.

16   Q.   Were you present with the mother?

17          MR. MILLER:  Objection, Your Honor, hearsay.

18          THE COURT:  Sustained.

19          The jury is instructed to disregard the witness's

20   answer.

21          MS. ROGERS:  Your Honor, we're not offering this for

22   the truth of the matter asserted about what her mother was

23   told.  We are trying to walk her through what she did

24   personally.

25          THE COURT:  Well, you are offering it for the truth

1   of the matter asserted, aren't you?  Isn't that the very

2   question, goes to about why this document is in the position it

3   is today?

4           MS. ROGERS:  I think the truth -- Your Honor, may we

5   approach?

6           THE COURT:  Sure.

7           (Bench Conference on the record)

8           MS. ROGERS:  The truth of the matter asserted is

9   Indian Hot Springs is in Hudspeth county, and there is a reason

10  she can explain why she was directed to Brewster County, that

11  she was doing the instructions.

12          THE COURT:  She just needs to tell what she did.

13          MS. ROGERS:  I'm trying to do that.

14          THE COURT:  She just needs to say what she did.  And

15  the question was, did you take it and send it to Austin, and

16  then she got off on this other conversation anyway, so --

17          MS. ROGERS:  Thank you, Your Honor.

18          (End of Bench Conference)

19          THE COURT:  Ma'am, you just need to say what it is

20  you did, what you did or what you saw.

21          THE WITNESS:  What we did?

22          THE COURT:  What you did.

23  BY MS. ROGERS:

24  Q.   All right.  Were you acting as your mother's interpreter

25  and helping her fill out forms?

1  A.   Yes, you could say so.

2  Q.   All right.  And when you wrote down that form that I just

3  introduced as Defendant's Exhibit 9, you wrote down Indian Hot

4  Springs, Hudspeth County, correct?

5  A.   That was the information my mother was giving me, because

6  she can't write very well.

7  Q.   But you are talking about what you did.  Just limit it to

8  what you did.

9  A.   Yes, I wrote it.

10  Q.   Your mother has been a witness, and we got to question

11  her, so I need to know what you did.

12  A.   Yes.

13  Q.   Did you send that form to Austin to get a delayed birth

14  certificate for your mother?

15  A.   Before I mailed it to Austin, we were in Hudspeth County.

16  We were told to go to Brewster.

17  Q.   Did you then go to Brewster County and fill out a similar

18  form that said -- that said Hot Springs, Brewster County?

19  A.   I think it was the same one.

20  Q.   Okay.  The same form where somebody just marked out

21  Hudspeth and put Brewster, do you think?

22  A.   I think -- yes, I think it was in the court there in

23  Alpine.

24  Q.   All right.  And the name that you filled out for your

25  mother for your brother Jose was Lopez Aguirre, not

1   Aguirre-Estrada; is that correct?

2   A.   Correct.

3   Q.   All right.  Was there anything about that form that asked

4   you had he been deported before?

5   A.   No, I didn't see anything like that being asked.

6   Q.   Did you assist your mother in getting supporting

7   affidavits either from the church or from the midwife that

8   corroborated his birth in Hot Springs?

9   A.   Yes, I did that, too, because she can't drive.  I'm the

10  one that takes her around.

11          MS. ROGERS:  I'll pass the witness.

12          THE COURT:  Mr. Miller?

13                    CROSS-EXAMINATION

14  BY MR. MILLER:

15  Q.   Ms. Fierro, you said you -- when were you born?

16          THE INTERPRETER:  When?  Where?

17          MR. MILLER:  When?

18  A.   When?  January the 30th, '75.

19  Q.   Okay.  And you said you were born in Presidio; is that

20  correct?

21  A.   Yes, sir.

22  Q.   And did you live in -- how long did you live in Presidio

23  after you were born?

24  A.   I don't remember that.

25  Q.   Okay.  Where did you go to school?

1   A.    In Mexico.

2   Q.    Where in Mexico?

3   A.    In Ojinaga, Chihuahua.

4   Q.    Okay.  Did you ever move to the United States?

5   A.    Yes, around the year '84.  I think we spent some time in

6   Arkansas, just a few months.  Two months, maybe.

7   Q.    Okay.  How long did you stay in the United States if you

8   moved here in 1984?

9   A.    About two months.

10  Q.    And then you moved where?

11  A.    But when I was 13 years old, we came to live here.

12  Q.    Okay.  And where did you live when you came at 13?

13  A.    In Odessa, Texas.

14  Q.    Okay.  And what grade were you in when you arrived in

15  Odessa, Texas?

16  A.    In Mexico, I had been in sixth grade, in elementary

17  school, and when I came over here they put me in the seventh.

18  Q.    Okay.  So from -- so basically the majority of your life

19  now you've lived in the United States?

20  A.    I would say yes, the majority.  I'm 31 years old now.

21  Q.    Okay.  Now, you stated earlier that Mr. Jose Aguirre here

22  is your half-brother; is that correct?

23  A.    Yes, correct.

24  Q.    You don't know that for a fact.  Someone told you; isn't

25  that correct?

1  A.   Yes, my mother told me.

2  Q.   And your mother told you this back in about when?  In the

3  past six years?

4  A.   Actually, when I was told about my half-brothers, I was

5  about 12 years old.  That's when I understood everything real

6  well.

7  Q.   Were you told where they were born?

8  A.   Well, when I got older, I was able to figure out where my

9  other brothers were born, when I was about 16.

10 Q.   Okay.  But when your brother Jose here was born, were you

11 ever told where he was born by your mother?

12 A.   I heard her when she was telling my older sister.  I was

13 about three or four years old.  I remember very well when Jose

14 left the house.  And I remember my mother talking to my older

15 sister and telling her, "Poor guy, poor boy, he is going to

16 suffer.  He is going to suffer, because even though he is an

17 American citizen he doesn't have his papers."

18          MR. MILLER:  I object to that.

19          THE COURT:  Sustained.

20          MS. ROGERS:  Excuse me.  For the record, I heard the

21 ruling, but it was a question he posed to her.  She answered

22 him.

23          THE COURT:  When you brother here was born, were you

24 told where he was born by your mother?

25          MS. ROGERS:  And she answered that she had.

         1          THE COURT:  So she said she had.  Let's go to the
         2    next question.  The answer would be yes.
         3    BY MR. MILLER:
         4    Q.   Ms. Fierro, do you recall speaking back in 1989 with a
         5    Michael Stevenson?
         6    A.   I don't remember.
         7    Q.   Do you remember speaking with someone from the courts
         8    after your brother's conviction?
         9          MS. ROGERS:  Your Honor, just also for the -- excuse
        10    me.
        11          THE COURT:  Just a second.
        12          MS. ROGERS:  I'm sorry, I've already been overruled
        13    on it, but may I renew my objection to that discussion?
        14          THE COURT:  You may.  And your objection is overruled
        15    on the same grounds I overruled it outside the presence of the
        16    jury.
        17    A.   Maybe with his attorney.
        18    Q.   No.  Ms. Fierro, do you remember Michael Stevenson asking
        19    you questions about trying to corroborate information that your
        20    brother provided him regarding where he was born?
        21    A.   I don't remember that.
        22    Q.   Well, would you recall -- if Mr. Stevenson did state you
        23    did speak with him, would you doubt that?
        24    A.   I don't remember that time.  Maybe if he tells me
        25    personally, I would.

1  Q.   Okay.  He would have spoken to you by phone.

2  A.   Where was I?

3  Q.   Where were you living in 1999?

4  A.   In Odessa, Texas.

5  Q.   He would have called you in Odessa, Texas.

6  A.   I don't remember that.

7  Q.   Okay.  Do you ever remember telling anybody your brother

8  was born in Mexico?

9  A.   That I said that to somebody?

10  Q.   Yes.

11  A.   No, never.

12  Q.   You never told anybody in 1999, after your brother's

13  conviction, that your brother was born in Mexico?

14        MS. ROGERS:  That's been asked and answered twice,

15  Your Honor.

16        THE COURT:  Overruled.

17  A.   No, no one.  Nobody.  I never said that, because he was

18  born in the United States.

19        You're talking about 1999, right?

20  Q.   That is correct.

21  A.   No, I haven't said anything since then.

22  Q.   How about early 2000?

23  A.   What about 2000?

24  Q.   Did you ever tell anybody that your brother was born in

25  Mexico?

1   A.   No, not even.

2   Q.   You speak English; is that correct?

3   A.   Yes, but not very correctly.

4   Q.   Do you understand English?

5   A.   Yes, of course.

6   Q.   Okay.  Do you read English?

7   A.   Almost everything.  Not everything.

8   Q.   As a matter of fact, if your mother needs any assistance

9   on anything in English, you would assist her in reading that;

10  is that correct?

11  A.   Yes.  Of all her children, I'm the only one that actually

12  takes care of her.  She's very ill.  I'm the only one.

13          MR. MILLER:  Your Honor, may I approach the witness?

14          THE COURT:  You may.

15          MR. MILLER:  And I don't know what my last exhibit

16  number was, Your Honor.

17          MS. ROGERS:  You introduced Government Exhibit 14 as

18  the A-File.

19          THE CLERK:  15 is what I show.  You have not entered

20  it yet.

21          MR. MILLER:  I haven't offered that one?

22          THE CLERK:  No.

23          MR. MILLER:  Your Honor, may I approach the witness?

24  BY MR. MILLER:

25  Q.   Ms. Fierro, Defendant's Exhibit 9 was the document you

1   said you filled out; is that correct?

2   A.   Yes, I helped her fill it out in front of a notary.

3   Q.   And it stated that this person was born in Hudspeth

4   County, and your mom has sworn to that; is that correct?

5   A.   Yes, that's true.

6   Q.   And Hudspeth isn't blackened out, isn't scratched out.

7   There is just a line through it.

8   A.   I don't know why they did that line.

9   Q.   You don't know who did that line, do you?

10  A.   They crossed it out when they said that it wasn't Hudspeth

11  County, that they had to go make sure which county it was.

12  Q.   Okay.  Well, isn't it true that was the actual document

13  that you actually submitted to the Texas Department of Health

14  in Austin, Texas?

15  A.   I'm not sure.  I don't remember that very well.

16  Q.   Okay.  Now, that document is dated February 20 -- that

17  document is signed on the 12th of February, 2002; is that

18  correct?

19  A.   Yes.  Correct.

20  Q.   Okay.  Now, I'm showing you what's been marked as

21  Government Exhibit Number 16 for identification.  This is a

22  letter regarding a birth certificate.  And doesn't that state

23  that?

24          MS. ROGERS:  Is that the -- excuse me.

25          THE COURT:  Mr. Miller, has that document been --

1          MR. MILLER:  No, it's not been introduced.

2    BY MR. MILLER:

3    Q.   Do you recall reading this document to your mother?

4          MS. ROGERS:  I object.  Excuse me, Your Honor.  I

5    object if she's testifying to something that hasn't been

6    introduced into evidence.

7          THE COURT:  Are we going to introduce the document?

8          MR. MILLER:  I will.  I'm asking her to review it to

9    see if she recognizes her.

10         THE COURT:  Okay.  Let's have her identify it.

11         Do you recognize that document?

12         THE WITNESS:  Yes, I remember this.

13   BY MR. MILLER:

14   Q.   Okay.  So this is a document regarding -- regarding that

15   the application that was submitted to the State indicated that

16   you were not able to --

17         THE COURT:  Before we go in the document, let's offer

18   the document.

19         MR. MILLER:  I move Government Exhibit Number 16 into

20   evidence, Your Honor.

21         THE COURT:  Ms. Rogers?

22         MS. ROGERS:  I object if the document is not to her.

23   She identified and said she had seen it, but I didn't get what

24   it is about.  And so I don't think the proper predicate has

25   been laid, and I object to that as I think it is hearsay.  It

1    is hearsay from the Texas department, I guess.  I'm sorry.  I

2    don't think it's an appropriate thing to cross-examine her on.

3             THE COURT:  Sustained.

4    BY MR. MILLER:

5    Q.   Ms. Fierro, do you recall informing your mother that the

6    birth certificate that was submitted to the State was denied?

7    A.   That it was denied?  Well, there was a little piece --

8    there was a small piece of paper at the courthouse in Brewster,

9    because they told her that they can't give it to her from

10   Austin, but they could -- would be able to get it -- that she

11   would be able to get it in Brewster County.

12   Q.   Do you recall --

13            MR. MILLER:  No, strike that.

14            Pass the witness.

15            THE COURT:  Ms. Rogers?

16            MS. ROGERS:  Nothing further, Your Honor.

17            THE COURT:  All right.  We appreciate you testifying.

18   We ask you not to discuss your testimony with any person until

19   the jury begins its deliberations.

20            May this witness be excused, Mr. Miller?

21            MR. MILLER:  Yes, Your Honor.

22            THE COURT:  Ms. Rogers?

23            MS. ROGERS:  Yes, Your Honor.

24            THE COURT:  You are excused.  You can't come back in

25   the courtroom, okay?

 1                    THE WITNESS:  Thank you.

 2                    THE COURT:  Yes, ma'am.

 3                    MS. ROGERS:  At this time, Your Honor, the defense

 4     rests.

 5                    (Defense rests)

 6                    THE COURT:  All right.  Mr. Miller, is the Government

 7     going to offer any rebuttal?

 8                    MR. MILLER:  I believe we are now, Your Honor.

 9                    THE COURT:  Let me ask you to come here for just a

10     minute.

11                    (Bench Conference on the record)

12                    THE COURT:  How many do you think you are going to

13     offer?

14                    MR. MILLER:  I'm going to offer Michael Stevenson

15     basically to her credibility where he spoke with her and she

16     said he was born in Mexico.

17                    THE COURT:  Is that it?

18                    MR. MILLER:  Steve Houston, I think I might -- I sent

19     for him, because I didn't think I was going to need him, but I

20     didn't know.

21                    THE COURT:  Call him in the morning, then?

22                    MR. MILLER:  Yeah.

23                    THE COURT:  How long is he going to take?

24                    MR. MILLER:  Unless Charlotte talks me out of it.  I

25     just need Michael Stevenson.

 1          THE COURT:  Okay.  Let's go ahead and do him right

 2    now.

 3          MR. MILLER:  Sure.

 4          THE COURT:  He wants to get back to Louisiana, I'm

 5    sure, anyway.

 6          MR. MILLER:  Yes.

 7          THE COURT:  So, Jay, this is going to be your last

 8    one.

 9          (End of Bench Conference)

10          THE COURT:  We have one witness that should not take

11    very long.

12          The Government has the right to recall a witness on

13    rebuttal.  That way we can finish all the testimony this

14    evening, and we will just come back in the morning, get the

15    Court's charge to you, and let the lawyers make their

16    arguments.  It will make tomorrow go much quicker.

17          I don't think this will take us longer than about 10

18    or 15 minutes.  And let's hear this one witness, and we will

19    send you on your way.

20          (Pause)

21          THE COURT:  Off the record.

22          (Discussion off the record)

23          THE COURT:  Mr. Stevenson, come on back up here,

24    please, sir.

25          And would you state your name for us again?

1           THE WITNESS:  Michael Stevenson.

2           THE COURT:  And, Mr. Stevenson, speak up so Art can

3    hear you back there.

4           And you were previously sworn as a witness; is that

5    correct?

6           THE WITNESS:  That's correct.

7           THE COURT:  Do you understand you are still under

8    oath?

9           THE WITNESS:  Yes.

10          THE COURT:  All right.  Go ahead, Mr. Miller.

11   MICHAEL L. STEVENSON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

12                      REDIRECT EXAMINATION

13   BY MR. MILLER:

14   Q.   Mr. Stevenson, back in 1999, as an officer of the court,

15   were you asked to verify certain information the Defendant

16   provided you?

17   A.   Yes.

18   Q.   And did he ask you to speak with anybody in his family to

19   corroborate his information?

20   A.   Yes.

21   Q.   And who did he tell you to speak with?

22   A.   His sister, Socorro.

23   Q.   Okay.  And did you speak with Socorro?

24   A.   Yes.

25   Q.   Did she tell you where the Defendant was born?

1  A.   Yes.

2  Q.   And where did she tell you?

3  A.   Escondida, Chihuahua, Mexico.

4  Q.   Thank you.

5         MR. MILLER:  Pass the witness.

6         THE COURT:  Ms. Rogers?

7         MS. ROGERS:  Your Honor, may I have a limiting

8  instruction as to his testimony on that, that it was not

9  offered for the truth of the matter asserted but impeachment

10  against our witness?

11         THE COURT:  It is offered as --

12         MR. MILLER:  As impeachment, Your Honor.

13         THE COURT:  As impeachment.  That's correct.

14         MS. ROGERS:  And will you so instruct the jury?

15         THE COURT:  Yeah.

16         Ladies and gentlemen, when you have a witness that is

17  impeached, Mr. Stevenson's statement is not offered for the

18  truth that Mr. Aguirre was born in Mexico.  It's offered for

19  the fact that she made a different statement at a different

20  time, and you can consider that.  And you will get an

21  instruction on this.

22         You can consider that in determining how much of the

23  sister's testimony to believe or not believe because she made a

24  different statement at a different time.

25         MS. ROGERS:  Thank you.

1          THE COURT:  You bet.

2                RECROSS-EXAMINATION

3    BY MS. ROGERS:

4    Q.   Mr. Stevenson, you are aware that Mr. Aguirre has more

5    than one sister?

6    A.   Yes.

7    Q.   And did you take any contemporaneous notes of the

8    conversation that you had?

9    A.   Yes.

10   Q.   Did you bring those with you today?

11   A.   Yes.

12          MS. ROGERS:  May we have a chance to review those?

13          THE COURT:  Yes.

14          (Pause)

15   BY MS. ROGERS:

16   Q.   Did you obtain her name and phone number from him?

17   A.   Yes.

18   Q.   And maybe -- so this jury doesn't jump over the bench and

19   kill me, I am looking through it, and I see a phone number up

20   here of Jose Miranda Lopez.

21   A.   Uh-huh.

22   Q.   And that's the name that my client gave you as his true

23   and correct name; is that correct?

24   A.   Yes.  That's his father's name, yes.

25   Q.   Okay.  And where is the note about her?

1  A.   Basically, all the information -- this is all the
2  information that he gave me.
3  Q.   Okay.
4  A.   And I just verified through her what he told me.
5  Q.   So there is no note of her conversation to you.  You were
6  just calling her to verify what he told you?
7  A.   Right.
8  Q.   And you learned in some part of this interview, did you
9  not, that the mother always claimed he --
10        MR. MILLER:  Objection, Your Honor.  It's beyond the
11  scope of the cross -- I mean of the direct.  This was the
12  limited purposes of impeachment.
13        THE COURT:  Sustained.
14        MS. ROGERS:  May I have one moment, Your Honor?
15        (Pause)
16        MS. ROGERS:  That's all I have, Your Honor.
17        THE COURT:  All right.  Mr. Miller, anything else?
18        MR. MILLER:  The Government rests.
19        (Government closes)
20        THE COURT:  All right.  Mr. Stevenson, you can step
21  down.
22        Is this witness excused?
23        MR. MILLER:  Yes, he is, Your Honor.
24        THE COURT:  Ms. Rogers, is it all right if he is
25  excused?

1          MS. ROGERS:  That is all right with me.

2          (Witness excused)

3          THE COURT:  And, Ms. Rogers, does the defense wish to

4     offer any other testimony?

5          MS. ROGERS:  No, Your Honor.  We close.

6          (Defense closes)

7          THE COURT:  All right.  Ladies and gentlemen, we have

8     heard all of the testimony in this case.

9          Who is driving -- do we have anybody from Presidio?

10    In Presidio with us?

11         Okay.  Let's start at 10:00.  That way I will be sure

12    to have the lawyers here and everything done for you and be

13    ready to go.  We will get here early and get everything done

14    and have y'all come in at 10:00.

15         I will read the Court's charge to you, let the

16    lawyers make their opening [sic] arguments, and begin

17    deliberations.

18         We will have lunch for you tomorrow.  We will have

19    lunch at the courthouse here for you.

20         I would ask you not to discuss the case with anyone

21    tonight.

22         Take your pads when you go into the jury room, turn

23    them upside down.  Maybe put your name -- Art will lock the

24    jury room so you can't get in -- that you can get in, but no

25    one else can get in.

1          I would ask you if there is any TV or radio about

2    this, don't pay any attention to it.  Don't do any

3    investigation.  We want to decide this case solely on the

4    evidence that we hear -- that we hear here in the courtroom and

5    the law that I will give you tomorrow.

6          So if y'all will be back here ready to go at 10:00,

7    we will get the Court's instructions and the final arguments,

8    and you can begin your deliberations.

9          Let's all stand for the jury, please.

10         (Jury out)

11         THE COURT:  All right.  Do you want to make a Rule 29

12   motion right now?

13         MS. ROGERS:  Oh, thank you, Your Honor.  I do.

14         THE COURT:  All right.

15         MS. ROGERS:  I forget that all the time.

16         I want to renew my motion for acquittal pursuant to

17   Federal Rules of Criminal Procedure Rule 29 because the

18   evidence is insufficient to the jury to sustain on any count.

19         THE COURT:  What would you respond?

20         MR. MILLER:  We respectfully would request this Court

21   to deny that motion.  There is ample evidence there to present

22   for a jury to determine the guilt or innocence phase -- the

23   guilt or not guilt phase of the trial.

24         THE COURT:  The Court finds in resolving all issues

25   in favor of the Government -- or reviewing the evidence in the

1  light most favorable to the Government and resolving all issues

2  of credibility in favor of the Government, the Court finds that

3  a reasonable juror could find the Defendant guilty on the

4  elements of the offense contained in the indictment beyond a

5  reasonable doubt, and respectfully overrules the Defendant's

6  motion for acquittal.

7            Let me see the lawyers in chambers.  And then what I

8  would like to do is have the lawyers at 8:30 in the morning.

9  Let's go work on the charge a little bit now and have you back

10  at 8:30 in the morning to work on the charge.

11            MR. MILLER:  Your Honor, can the Government witnesses

12  all be excused?

13            MS. ROGERS:  No objection.

14            THE COURT:  And the same thing for defense witnesses

15  are all excused.

16            And we will see the lawyers back in chambers.

17            MS. ROGERS:  Thank you.

18            THE COURT:  Thank you very much.

19            (Recessed for the day at 5:14)

20

21

22

23

24

25

1     I, TODD ANDERSON, United States Court Reporter for the

2  United States District Court in and for the Northern District

3  of Texas, Dallas Division, hereby certify that the above and

4  foregoing contains a true and correct transcription of the

5  proceedings in the above entitled and numbered cause.

6     WITNESS MY HAND on this 12th day of January, 2023.

7

8

9

                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25